Alex J. Shepard, SBN 295058
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive Suite 109
Las Vegas, NV 89117
Telephone: (702) 420-2001
Email: ecf@randazza.com

*Attorneys for Creditor,*
*Veronica Brill*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF CALIFORNIA**

In re:

Michael Postle,

     Debtor.

Case No. 21-22632-C-7

**OPPOSITION TO DEBTOR'S MOTION TO DISMISS INVOLUNTARY BANKRUPTCY FILING**

**OPPOSITION TO DEBTOR'S MOTION TO DISMISS INVOLUNTARY BANKRUPTCY FILING**

     Debtor Michael Postle's motion should be denied. It is wrong on the facts and law and does not even say anything about the Creditors in this matter. It is nothing more than a bizarre screed written by someone with a personal grudge against Attorney Randazza. Attorney Randazza almost does not mind, as his mission here is to serve his client. If Mr. Postle wishes to make it all about Attorney Randazza, so that he misses the point as to the law and the relevant facts, it seems almost illogical to bring this to his attention. Nevertheless, here we are.

**1.0    The Actual Introduction**

     Postle's introduction contains more lies than truths, and is largely irrelevant to the case. The only real introduction that is relevant here is that Postle is a card cheat. He sued Creditors for calling him a card cheat in *Postle v. Brill*, No. 34-2020-00286265 (Sacramento Cty. Sup. Ct.) (the "State Court Case"). He got Anti-SLAPP motions filed against him. He lost. The court imposed an attorneys' fees award of $26,982 to Creditor Todd Witteles. A few weeks later, the Court

RANDAZZA | LEGAL GROUP

RANDAZZA | LEGAL GROUP

1  imposed a fee award of $27,745 against Postle on Creditor Veronica Brill's behalf. Postle refuses

2  to pay either fee award. No other facts are needed.

## 2.0    This is Not a "Bad Faith Filing"

4         Postle argues, with neither evidence nor legal support, that the Bankruptcy should be

5  dismissed because Postle claims that the filing was in "bad faith." His argument is that it was filed

6  because Mr. Randazza, Ms. Brill's counsel in the State Court Case from which Postle's debt arises,

7  does not like Postle. It is true that Mr. Randazza does not like Postle. Postle cheats at cards, has

8  battered his ex-wife, and seems fixated on Mr. Randazza rather than his own actions. Nevertheless,

9  unless directly working on this case, Mr. Randazza can barely recall Postle's name. Mr. Randazza

10  resides rent free in Postle's head, not vice versa. In fact, Mr. Randazza has stepped away from

11  this portion of the case and has given lead responsibility for it to the undersigned in large part to

12  remove the sideshow of Postle's personal issues.

13         One almost humorous fact here is that it is Mr. Witteles who filed the petition and his

14  counsel, Mr. Bensamochan, is taking the lead on this matter. Mr. Randazza admits to being a

15  dilettante at bankruptcy law. Nevertheless, he signed on to the petition for Ms. Brill, and has taken

16  his lead from Attorney Bensamochan – who has more bankruptcy law knowledge in his sleep than

17  Mr. Randazza will ever have on his sharpest day.

18         But, let us presume that Mr. Randazza was the prime mover of this filing, and he did so

19  entirely out of malice toward Mr. Postle. So what? The *emotional state of counsel* for a petitioner

20  toward a respondent has no bearing on whether the petition is proper. Postle does not make a single

21  allegation as to Ms. Brill's motive in filing this petition, and does not mention the other Creditor,

22  Todd Witteles, in any context at all. This throughline of Postle's entire Motion is completely

23  irrelevant. The only question is whether there is a proper, uncontested debt. There is.

## 3.0    Postle is Wrong on Numerosity and Improperly Challenges it Here

25         Postle, citing Bankruptcy Rule 1003(b), claims that this Petition must be dismissed because

26  he has more than 12 creditors. Rule 1003(b) provides that:

27

> If the answer to an involuntary petition filed by fewer than three creditors avers the existence of 12 or more creditors, the debtor shall file with the answer a list of all creditors with their addresses, a brief statement of the nature of their claims, and the amounts thereof.  If it appears that there are 12 or more creditors as provided in §303(b) of the Code, the court shall afford a reasonable opportunity for other creditors to join in the petition before a hearing is held thereon.

This rule does not help Postle.  Postle filed a motion to dismiss, not an answer.  Even if he had filed an answer, Postle has not provided the creditors' addresses nor a brief statement of the nature of their claims, meaning he has not provided a creditors' list under this rule.  The rule also only requires that the Court allow the other creditors to join the petition for involuntary bankruptcy before conducting a hearing.  It is not grounds for dismissal.

It appears that Postle meant to cite 11 U.S.C. § 303(b)(2), which provides that fewer than three creditors may file an involuntary petition if there are fewer than 12 holders of claims against the debtor.  But a motion to dismiss relying on extrinsic evidence is not the proper vehicle for asserting this challenge.  Fed. R. Bankr. P. 1011 allows a debtor to contest an involuntary petition by filing a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *Hayden v. QDOS, inc. (In re QDOS, Inc.)*, 607 B.R. 338, 345 (B.A.P. 9th Cir. 2019).  In deciding such a motion, the factual allegations of the petition are accepted a true and "[i]f the petitioning creditors plausibly allege that they have met the standards, the motion must fail, and the involuntary debtor must answer."  *Id*.  Asserting the existence of more than 12 creditors must be done by an answer; "a debtor cannot merely state that [it] has more than twelve creditors in [its] motion to dismiss."  *In re Clignett*, 567 B.R. 583, 587 (Bankr. C.D. Cal. 2017).  "[I]f resolution of a contested involuntary proceeding requires a trial, there is no procedural path that allows the alleged involuntary debtor to leap over the requirement that it answer and . . . file the creditor list mandated by Rule 1003(b). The mere fact that the involuntary debtor initiated its opposition through a Civil Rule 12(b)(6) motion delays, but does not invariably negate, the requirement of answer and creditor list." *QDOS*, 607 B.R. at 345.

The involuntary petition does not allege that Postle has more than 12 creditors.  The Court thus may not conclude that dismissal due to numerosity on a motion to dismiss is appropriate.  The court in *QDOS* found that, in similar circumstances, it was reversible error for the trial court to

rely on extrinsic evidence that the debtor had more than 12 creditors and proceed to trial without requiring the debtor to file an answer and the Rule 1003(b) list of creditors, noting that the issue of numerosity required a trial. *Id*. at 346. Postle's motion to dismiss should be denied.

But even if the Court were to consider Postle's extrinsic evidence as to the alleged number of his creditors, he is being dishonest with the Court. Prior to filing the petition for involuntary bankruptcy, counsel for both Ms. Brill and Mr. Witteles reviewed Postle's credit report, and determined that he had fewer than 12 creditors. (*See* Postle credit report, attached as **Exhibit 1**.)[1]

Postle lists his creditors in Exhibit 4 to his Motion. However, he has cooked the books to ensure that he could come up with more than 12 creditors, as a perfunctory review of his credit report shows some glaring inconsistencies. For example, he lists American Express, Discover, Capital One, Macys, Fortiva, and Genesis as creditors. However, his credit report reveals that all six of these creditors have charged off his debt, and thus he owes them nothing. (*See* **Exhibit 1**.) This reduces his number of creditors to 11. Analysis over.

Nevertheless, let us continue: Postle lists "Southwest," Wells Fargo, Amazon, First Bankcard, and "Debtsy" as creditors. However, a review of his credit report does not show any of these creditors listed. (*See* **Exhibit 1**.) It defies logic that Wells Fargo would fail to report a debt on his credit report. Further, there is no explanation as to what "Southwest" is or how he could owe Amazon money – unless he is trying to claim that those companies' credit cards are creditors – but again, how he got an Amazon credit card without it being on his credit report is inexplicable. This seems to reduce his number of creditors to 6. Postle's argument as to numerosity is thus factually and legally erroneous, and his motion to dismiss should be denied.

**4.0    Ms. Brill's Debt Qualifies**

Postle lists the elements for a debt to qualify for involuntary bankruptcy – that the amount 1) is not contingent on liability, 2) is not subject to a bona fide dispute as to liability or amount,

---

[1]    Creditor Todd Witteles will also be filing an opposition to Postle's motion to dismiss. Witteles's counsel, Eric Bensamochan, will be authenticating this document in said opposition. The report is partially redacted to prevent disclosure of sensitive information.

and 3) is at least $15,325.  Ms. Brill's debt was not contingent; it had been reduced to a judgment as of the date of the petition.  There was no bona fide dispute as to liability or amount.  Postle claims that he *could have* appealed, but he did not.  He did not even file a notice of appeal and acknowledges that his time to appeal has expired.  He is also wrong about his ability to appeal. As the order granting Ms. Brill's fee motion makes clear, he did not oppose the fee motion. (*See* order granting Veronica Brill's fee motion, attached as **Exhibit 2**.)  "As a general rule, failure to raise a point in the trial court constitutes [a] waiver and appellant is estopped to raise that objection on appeal."  *Redevelopment Agency v. City of Berkeley*, 80 Cal. App. 3d 158, 167 (1978); *see K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.*, 171 Cal. App. 4th 939 (2009) (finding that objection to dismissal of claims was waived on appeal because it was not asserted at trial court).  He also did not contest the tentative ruling granting the motion or try to appear for a hearing on the motion.  He consented to the Court's ruling, thus precluding any appeal.  His debt to Ms. Brill was certain and incontestable the day the Court's order was entered.  Finally, the amount he owes Ms. Brill is greater than $15,325.  This debt qualifies.

**5.0     The Remainder of Postle's Motion is False and Immaterial**

Postle uses his "introduction" to introduce irrelevant, untrue, and scurrilous accusations, all based on extrinsic evidence which may not be considered on a Rule 12(b)(6) motion.  Despite them being irrelevant, it is at least necessary to respond to the accusations in a perfunctory manner, so that they are not on the record unchallenged.  Postle was an illustrious card cheat.  He claims that since Ms. Brill was unable to provide **forensic evidence** of cheating, that means he did not cheat.  Meanwhile, he somehow managed to have a 94% success rate in poker games – but only poker games at Stones Casino, and only poker games in which there was a delayed video feed.  It is statistically impossible that he did not cheat, but he evaded liability for doing so.[2]

---

[2]     These facts are laid out in Brill's Anti-SLAPP Motion she filed in response to Postle's defamation suit. Brill will not belabor these points, as they have little, if any, relevance to whether Postle's instant Motion should be denied, but if the Court wishes to review such information it may be do so by referring to Brill's Anti-SLAPP Motion, attached as **Exhibit 3**.

RANDAZZA | LEGAL GROUP

Postle then attempted to intimidate everyone who reported on his cheating by filing a frivolous defamation claim against everyone who reported on his unlikely success, again limited to one casino, in one forum. Postle then claimed, in the midst of that lawsuit, that he discharged his attorney because his attorney lacked knowledge in defamation law. (*See* motion to continue hearing on Anti-SLAPP motions in *Postle v. Brill* (Feb. 24, 2021), attached as **Exhibit 4**, at 3.) However, this was clearly false. (*See* Brill opposition to motion to continue hearing on Anti-SLAPP motions (Mar. 5, 2021), attached as **Exhibit 5**, at 4.)  Postle claims that he was unable to afford a new attorney, but he had filed a lawsuit for $300,000,000.  If his case was worth 1/100th of that, a legion of lawyes would have flocked to his side for a chance at a contingent fee as large as 1/3 of *that* recovery.  He is not being honest.

Postle makes reference to a conversation Mr. Randazza had with an employee of the HONR Network, Alexandrea Merrell. Prior to this lawsuit, Mr. Randazza had no recollection of ever hearing of the HONR Network.  However, Mr. Randazza does represent someone that the HONR Network's founder, Lenny Pozner, is suing.  Mr. Pozner apparently believes that by involving himself in this case, it might diminish Mr. Randazza's resolve to defend his other clients' First Amendment rights.  This is not the first time that Mr. Randazza has had to tolerate collateral attacks on his character in an effort to dissuade him from representing unpopular clients in First Amendment cases.  For example, the "Huffington Post" blog post that Mr. Postle is so joyfuyl should serve as evidence to this court?  This was the result of a vendetta by a former "journalist" by the name of Luke O'Brien.  O'Brien had a dispute with one Mr. Andrew Anglin.  When Mr. Randazza took on Anglin as a client (in a matter not involving Mr. O'Brien), O'Brien called Randazza under the guise of writing an article about the Anglin case.  However, the "interview" turned into O'Brien trying to cajole Mr. Randazza into ceasing to represent Anglin.  When Mr. Randazza refused to abandon his client, O'Brien became obsessed with Mr. Randazza – a sad obsession he maintains to this day.

Mr. Pozner is cut from the same cloth as Mr. O'Brien – and apparently believes that collateral attacks on counsel in one case can benefit him in another case.  Therefore, the HONR

1    Network, clearly at Pozner's unethical direction, reached out to Postle, and Ms. Merrell began

2    committing the unlicensed practice of law. (*See* Brill motion for attorneys' fees in *Postle v. Brill*

3    (Apr. 13, 2021), attached as **Exhibit 6**, at 12 & *Exhibit 15*; *see also* Opposition to Postle's

4    supplemental brief regarding attorneys' fees in *Postle v. Brill* (June 14, 2021), attached as **Exhibit

5    7**, at 4-6.)  Thereafter, Postle and Merrell committed perjury by submitting sworn declarations as

6    to comments that Randazza made on the call. (*See* Postle's supplemental brief regarding attorneys'

7    fees in *Postle v. Brill* (June 9, 2021), attached as **Exhibit 8**, at 7-10 & *Exhibit 14*.)[3]

8        Again, none of this is actually relevant to the merits of Postle's motion, but if he is going

9    to abuse the litigation privilege to defame someone, then it is appropriate to address such

10   defamation.  Postle's claims are otherwise largely duplicative of his similarly irrelevant arguments

11   in his rogue "supplemental brief" filed in the *Postle v. Brill* case, and are adequately addressed in

12   the opposition to that brief.  (*See* **Exhibit 7**.)

13   **6.0    CONCLUSION**

14       For the foregoing reasons, the Court should deny Postle's Motion in its entirety. It is legally

15   meritless and amounts to little more than an opportunity for Postle to air his grievances against

16   Mr. Randazza.  He may air them away, but the fact remains that he owes the two creditors money,

17   he refuses to pay it, and he has fewer than 12 creditors.

18   Dated: September 28, 2021.                    Respectfully Submitted,

19                                                 /s/ Alex J. Shepard

20                                                 Alex J. Shepard, SBN 295058
                                                   Randazza Legal Group, PLLC

21                                                 2764 Lake Sahara Drive Suite 109
                                                   Las Vegas, NV 89117

22                                                 Telephone: 702-420-2001
                                                   ecf@randazza.com

23                                                 *Attorneys for Creditor,*
24                                                 *Veronica Brill*

25

26   _____
     [3]    These filings in the State Court Case are voluminous, and so only the legal briefing and
27   cited exhibits are attached as exhibits to this Opposition, so as to avoid clogging the file in this
     case.

Case No. 21-22632-C-7

## **CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that on September 28, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I further certify that a true and correct copy of the foregoing document being served via transmission of electronic mail and U.S. Mail.

Michael Postle, Debtor
<dreamseatpoker@gmail.com>

3724 Deer Walk Way
Antelope, CA 95843

2219 Catherwood Way
Sacramento, CA 95835

Respectfully Submitted,


/s/ *Alex J. Shepard*
Alex J. Shepard

Opposition To Debtor's Motion to Dismiss Involuntary Bankruptcy Filing
Case No. 21-22632-C-7

# EXHIBIT 1

Michael Postle Credit Report

```
PAGE 1   DATE  6-29-2021  TIME 13:45:22  V401  TCA4

 MICHAEL POSTLE                    SS: 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      E: SENTEC
COMMUNICATION
*███████████                        111-11-█████ *     RPTD: 12-19 I
 RANCHO CORDOVA CA 957428007      DOB: 12/26/76
 RPTD: 2-12 TO 1-21 U 1X                                E: NOT PROVIDED
 LAST SUB: 1476770                                      RPTD: 11-19 I


 ████████████████                                       E: SENTEC
CORPORATION
 ANTELOPE CA 958435404                                  RPTD: 10-19 I
 RPTD: 12-17 TO 5-20 U 17X
 LAST SUB: 3182310                                      E: CONVERGED
COMMUNICATIO
                                                        RPTD: 6-18 I
*7500 CIRCUIT DR
 CITRUS HEIGHTS CA 956104419
 RPTD: 1-17 TO 12-19 U 1X
 LAST SUB: 3182310

*2219 CATHERWOOD WAY
 SACRAMENTO CA 958352120
 RPTD: 12-14 TO 7-18 U 1X
 LAST SUB: 3182310

*460 CARAVAGGIO CIR
 SACRAMENTO CA 958352641
 RPTD: 1-12 U
 LAST SUB: 3904027

*4952 DANUBE AVE
 LAS VEGAS NV 891413837
 RPTD: 3-08 TO 11-10 U
 LAST SUB: 2194010

*1860 GREEN VILLAGE DR
 HERNANDO MS 386327250
 RPTD: 10-06 TO 12-06 U
 LAST SUB: 1270246
```

```
*8786 N CREEK BLVD APT 2-4
 SOUTHAVEN MS 386717209
 RPTD: 3-05 TO 6-06 U
 LAST SUB: 2610018

*4740 HIGH WAY 51 S APT 21102
 SOUTHAVEN MS 38671
 RPTD: 2-02 TO 8-04 U
 LAST SUB: 1270246

*1652 THOMAS ST
 HORN LAKE MS 386373329
 RPTD: 6-00 TO 10-02 U
 LAST SUB: 1395287

*700 SCARLET OAK ST APT 202
 SOUTHAVEN MS 386716329
 RPTD: 4-99 U
 LAST SUB: 0201640

*MIKE POSTLE
```

```
-------------------------------- DEMOGRAPHICS
--------------------------------
 PH:  ██████████    UC        PH: ████████████    UC          PH:
              UC
 GEO: █████████████████████
```

```
-------------------------------- SCORE SUMMARY
--------------------------------
 RETAIL RECOVERY SCORE                =    ███     SCORE FACTORS: NONE
```

```
------------------------------------- TRADES
------------------------------------
 SUBSCRIBER                 OPEN    AMT-TYP1   AMT-TYP2 ACCTCOND
PYMT STATUS
 SUB#   KOB TYP TRM ECOA BALDATE     BALANCE   PYMT LEVEL MOS REV
PYMT HISTORY
 ACCOUNT #                 LAST PD   MONTH PAY   PAST DUE  MAXIMUM
BY MONTH

*AFFIRM INC                 10-19    $521-0      $583-C CHARGOFF
COLLACCT
 0999347 FP UNS  12   1  6-03-21     $583       4-21      ( 7)
LLLGGGG
 DOJH2EOV                                       $583
 ** FIRST PAYMENT NEVER RECEIVED **

*AFFIRM INC                 10-19    $1,625-0   $1,821-C CHARGOFF
COLLACCT
```

```
 0999347 FP UNS  24  1  6-03-21   $1,821        4-21      ( 7)
LLLGGGG
 AG118W8C                                    $1,821
 ** FIRST PAYMENT NEVER RECEIVED **


*AFFIRM INC              10-19    $305-0     $342-C CHARGOFF
COLLACCT
 0999347 FP UNS  12  1  6-03-21    $342         4-21      ( 7)
LLLGGGG
 64JKCNS1                                    $342
 ** FIRST PAYMENT NEVER RECEIVED **


*MACYS/DSNB              11-18   $1,500-L   $2,019-C CHARGOFF
DELINQ 180
 1362830 DZ CHG REV  1  6-29-21   $2,019        5-20      (33)
LLLLLLLLLLLLL
 6035340106589894        12-18               $2,019
L654321CC000
 ** ACCOUNT CLOSED AT CREDIT GRANTOR'S REQUEST **


*DISCOVER FIN SVCS LLC    2-17   $4,100-L   $5,018-C CHARGOFF
DELINQ 180
 3276502 BC CRC REV  1  6-22-21   $5,018        7-20      (52)
LLLLLLLLLLLL6
 601100697248            10-19               $5,018
54321CCCCCC


*JPMCB CARD              8-19   $4,400-L   $5,257-C CHARGOFF
DELINQ 180
 3182310 BC FSC REV  1  7-03-20   $5,257        7-20      (11)
L654321CCCC
 414740025645            10-19               $5,257
 ** ACCOUNT CLOSED AT CREDIT GRANTOR'S REQUEST **


*JPMCB CARD              8-17   $8,000-L   $9,431-C CHARGOFF
DELINQ 180
 3182310 BC FSC REV  1  6-26-20   $9,431        6-20      (34)
L654321CCCCCC
 426684162602            10-19               $9,431
CCCCCCCCCCCC
 ** ACCOUNT CLOSED AT CREDIT GRANTOR'S REQUEST **


*JPMCB CARD             10-17   $11,000-L  $12,878-C CHARGOFF
DELINQ 180
 3182310 BC FSC REV  1  5-17-20  $12,878        5-20      (30)
L654321CCCCCC
 424631523682             9-19              $12,878
CCCCCCCCCCCC
 ** ACCOUNT CLOSED AT CREDIT GRANTOR'S REQUEST **
```

```
*WF CRD SVC               3-16    $6,000-L    $7,592-C CHARGOFF
DELINQ 150
 3270007 BC CRC REV  1  6-25-21   $7,592        5-20       (64)
LLLLLLLLLLLLL
 4465420599              10-19                  $7,592
L54321CCCCCC
 ** ACCOUNT CLOSED AT CREDIT GRANTOR'S REQUEST **

*CAPITAL ONE BANK USA N   8-17    $2,000-L    $2,393-C CHARGOFF
DELINQ 150
 1270246 BC CRC REV  1  6-17-21   $2,393        5-20       (46)
LLLLLLLLLLLLL
 400344764126            1-19                   $2,393
L54321CC0000
 ** ACCOUNT CLOSED AT CREDIT GRANTOR'S REQUEST **

*CAP1/WMT                12-17    $1,800-L    $2,176-C CHARGOFF
DELINQ 150
 2517060 DV CHG REV  1  6-17-21   $2,176        6-20       (21)
LLLLLLLLLLLLL
 6032203783654220        9-19                   $2,176
54321CC0
 ** ACCOUNT CLOSED AT CREDIT GRANTOR'S REQUEST **

*AMEX                    10-19    $1,000-L    $1,413-C CHARGOFF
DELINQ 150
 1229200 BC CRC REV  1  6-06-21   $1,413        6-20       (20)
LLLLLLLLLLLLL
 3499927471371293                               $1,216
54321CC
 ** ACCOUNT CLOSED AT CREDIT GRANTOR'S REQUEST **

*ONEMAIN                 10-19    $6,510-0    $6,510-C CHARGOFF
DELINQ 150
 2502057 FP UNS  54  1  5-31-21   $6,510        5-20       (20)
LLLLLLLLLLLLL
 10193219060108901                              $6,510
54321CC

*SYNCB/CARE CREDIT       10-17    $8,000-L    $8,242-C CHARGOFF
DELINQ 150
 1476770 BB CHG REV  1  5-24-21   $8,242        7-20       (44)
LLLLLLLLLLLL54
 6019182335368884        12-19                  $8,242
321CCC000000

*MIDLAND CREDIT MANAGEM   7-20    $6,236-0
COLLACCT
 2910772 YC D/B   1  1  6-17-21   $6,236        7-20      ( 8)
GGGGGGGG
```

```
 306203615                                    $6,236
 ORIGINAL CREDITOR: SYNCHRONY BANK

*CAVALRY PORTFOLIO SERV      6-20   $17,965-0
COLLACCT
 8996284 YC COL   1   1  6-01-21   $17,965      6-20      (12)
GGGGGGGGGGGG
 21736483                                     $17,965
 ORIGINAL CREDITOR: CITIBANK

*TBOM/ATLS/FORTIVA           10-19   $5,000-L   $3,021-C   CLOSED
CHARGOFF
 1924932 BC CRC REV  1  7-31-20      $0        1-20      (10)
BL65-321CC
 7656502004266521
 ** PURCHASED BY ANOTHER LENDER **

*TBOM - GENESIS RETAIL       10-19   $4,000-L   $4,285-C   CLOSED
CHARGOFF
 1950590 FF CRC REV  1  7-01-20                 7-20      (17)
BL54321CC0000
 7633005002751450
0000
 ** PURCHASED BY ANOTHER LENDER **

*SYNCB/WALMART               12-17   $1,800-L   $389-H    CLOSED
CURR ACCT
 1327500 DV CHG REV  1 10-10-19      $0        10-19      (22)
BCCCCCCCCCCCC
 603220378365         9-19       $25
CCCCCCC00
 SOLD TO: CAPITAL ONE
 ** PURCHASED BY ANOTHER LENDER **

*NISSAN-INFINITI LT          6-18   $21,797-0              PAID
CURR ACCT
 3690580 FA AUL  39   1  4-17-20                 4-20      (22) BCC-
CCCCCCCCC
 29010144319         12-19
CCCCC-CC
 ** PAID THROUGH INSURANCE **

 ALLY FINANCIAL               2-18   $23,310-0              PAID
CURR ACCT
 1918788 FA AUT  72   2 12-23-19                12-19      (22)
BCCCCCCCCCCCC
 611925737443        12-19
CCCCCCCCC

 JPMCB AUTO                  12-14   $26,522-0              PAID
```

```
CURR ACCT
 1101969 BB AUT  48   2  6-04-18                    6-18      (42)
BCCCCCCCCCCCC
 11435322062501              5-18
CCCCCCCCCCCC

*CREDIT ONE BANK NA          7-15      $950-L     $423-H     PAID
CURR ACCT
 3278143 BC CRC REV  1  7-20-17                    7-17      (25)
BC00CCCCCCCCC
 4447962286604313            6-17
CCCCCCCCCCCC
 ** ACCOUNT CLOSED AT CONSUMER'S REQUEST **

 FORD MOTOR CREDIT COMP    12-19  $26,562-O                 OPEN
CURR ACCT
 1631440 FA AUT  51   2  6-17-21  $18,593        6-21      (18)
CCCC--CCCCCCC
 58551550                   6-21      $576-A
CCCCC

 --------------------------------- INQUIRIES
---------------------------------
 NEW ERA ASSET MANAGEME  7-16-20  2798830 YC
 CITIBANK NA              3-05-20  1228970 BC
 TRAVIS CU/CUDC          12-06-19  9700111 FC       UNK AUT
 CAPITAL ONE AUTO FIN    12-05-19  1254780 FA            AUT
 FORD CRED               12-05-19  1654140 FA
 NCCINC/FUTURE FORD ROS  12-04-19  1462450 AN            AUT
 ROADLOANS.COM           11-29-19  1937812 FA
 CREDIT ONE BANK NA      11-05-19  3278143 BC
 SYNCB                   11-04-19  1223465 FF
 TD RETAIL CARD SERVICE  10-19-19  2727050 BC
 SYNCB                   10-18-19  1223465 FF
 ONEMAIN FINANCIAL SERV  10-09-19  2907594 FP
 AMEX                    10-07-19  1234990 BC
 JPMCB CARD               8-19-19  1832320 BC

 END -- EXPERIAN


                         DIRECT CHECK



SUBCODE SUBSCRIBER        TELEPHONE   ADDRESS            CITY
ST ZIP
```

```
0999347 AFFIRM INC        650.269.8523 650 CALIFORNIA ST FL SAN
FRANCIS CA 94108
1918788 ALLY FINANCIAL    800.200.4622 200 RENAISSANCE CTR  DETROIT
MI 48243
1229200 AMEX              800.874.2717 PO BOX 297871         FORT
LAUDER FL 33329
1234990 AMEX              800.874.2717 PO BOX 981537         EL PASO
TX 79998
0201640 BESTBANK/ACQD BY  303.450.8000 2646 E 120TH AVE      THORNTON
CO 80233
1254780 CAPITAL ONE AUTO  800.946.0332 PO BOX 259407         PLANO
TX 75025
1270246 CAPITAL ONE BANK  800.955.7070 PO BOX 31293          SALT LAKE
C UT 84131
2517060 CAP1/WMT          800.955.7070 PO BOX 31293          SALT LAKE
C UT 84131
8996284 CAVALRY PORTFOLIO 800.501.0909 PO BOX 27288          TEMPE
AZ 85285
1228970 CITIBANK NA       904.954.7500 14000 CITICARDS WAY
JACKSONVILL FL 32258
3278143 CREDIT ONE BANK N 702.269.1000 PO BOX 98875          LAS VEGAS
NV 89193
3276502 DISCOVER FIN SVCS 800.347.2683 PO BOX 15316          WILMINGTON
DE 19850
2194010 FIRST ELECTRONIC  801.572.4004 2150 S 1300 E STE 40 SALT LAKE
C UT 84106
1654140 FORD CRED         800.370.9749 9930 FEDERAL DR        COLORADO
SP CO 80921
1631440 FORD MOTOR CREDIT BYMAILONLY   PO BOX BOX 542000      OMAHA
NE 68154
2610018 GMAC              800.200.4622 PO BOX 380901
BLOOMINGTON MN 55438
1101969 JPMCB AUTO        800.336.6675 700 KANSAS LN          MONROE
LA 71203
1832320 JPMCB CARD        800.432.3117 PO BOX 15298           WILMINGTON
DE 19850
3182310 JPMCB CARD        800.945.2000 PO BOX 15369           WILMINGTON
DE 19850
1362830 MACYS/DSNB        800.243.6552 PO BOX 8218            MASON
OH 45040
1395287 MACYS/FDSB        800.762.9879 13141 34TH ST N        CLEARWATER
FL 33762
2910772 MIDLAND CREDIT MA 877.822.0381 320 E BIG BEAVER RD   TROY
MI 48083
1462450 NCCINC/FUTURE FOR 916.786.3673 650 AUTOMALL DR        ROSEVILLE
CA 95661
2798830 NEW ERA ASSET MAN 844.853.3670 701 SENECA ST STE 65 BUFFALO
NY 14210
3690580 NISSAN-INFINITI L 800.950.6622 8900 FREEPORT PKWY     IRVING
TX 75063
```

```
2502057 ONEMAIN             844.298.9773 PO BOX 1010         EVANSVILLE
IN 47706
2907594 ONEMAIN FINANCIAL 844.298.9773 PO BOX 1010          EVANSVILLE
IN 47706
1937812 ROADLOANS.COM     866.923.9282 8585 N STEMMONS FWY  DALLAS
TX 75247
3904027 SACRAMENTO COUNTY               20 BICENTENNIAL CIR SACRAMENTO
CA 95826
1223465 SYNCB             BYMAILONLY   PO BOX 965033         ORLANDO
FL 32896
1476770 SYNCB/CARE CREDIT 937.534.6950 950 FORRER BLVD      KETTERING
OH 45420
1327500 SYNCB/WALMART     855.893.5848 PO BOX 965024         ORLANDO
FL 32896
1950590 TBOM – GENESIS RE              PO BOX 4499           BEAVERTON
OR 97076
1924932 TBOM/ATLS/FORTIVA BYMAILONLY   PO BOX 105555         ATLANTA
GA 30348
2727050 TD RETAIL CARD SE BY    MAIL   1000 MACARTHUR BLVD  MAHWAH
NJ 07430
9700111 TRAVIS CU/CUDC    800.877.8328 PO BOX 2069           VACAVILLE
CA 95696
3270007 WF CRD SVC        800.642.4720 PO BOX 14517          DES MOINES
IA 50306

END —— EXPERIAN DIRECT CHECK
```

# EXHIBIT 2

Order Granting Veronica Brill's Fee Motion in State Court Case

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY:     STATE BAR NO.: 269535 <br> NAME: Marc J. Randazza <br> FIRM NAME: Randazza Legal Group, PLLC <br> STREET ADDRESS: 2764 Lake Sahara Drive Suite 109 <br> CITY: Las Vegas    STATE: NV    ZIP CODE: 89117 <br> TELEPHONE NO.: 702-420-2001    FAX NO.: <br> E-MAIL ADDRESS: ecf@randazza.com <br> ATTORNEY FOR (name): Veronica Brill | FOR COURT USE ONLY <br><br> FILED <br> ENDORSED <br><br> 2021 JUL -2 AM 9: 43 |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF Sacramento <br> STREET ADDRESS: 720 9th Street <br> MAILING ADDRESS: <br> CITY AND ZIP CODE: Sacramento, CA 95814 <br> BRANCH NAME: Department 53 | |
| PLAINTIFF/PETITIONER: Michael Postle, an individual | CASE NUMBER: <br> 34-2020-00286265 |
| DEFENDANT/RESPONDENT: Veronica Brill, et al <br><br> OTHER: | JUDICIAL OFFICER: <br> Shama H. Mesiwala |
| PROPOSED ORDER (COVER SHEET) | DEPT: <br> 53 |

**NOTE:** This cover sheet is to be used to electronically file and submit to the court a proposed order. The proposed order sent electronically to the court must be in PDF format and must be attached to this cover sheet. In addition, a version of the proposed order in an editable word-processing format must be sent to the court at the same time as this cover sheet and the attached proposed order in PDF format are filed.

1. Name of the party submitting the proposed order:

    Attorney Marc Randazza for Defendant Veronica Brill

2. Title of the proposed order:

    Order Granting Attorney's Fees

3. The proceeding to which the proposed order relates is:

    a. Description of proceeding: Motion for Attorney's Fees

    b. Date and time: June 16, 2021, 1:30pm

    c. Place: Remote hearing

4. The proposed order was served on the other parties in the case.

Alex Shepard, Esq.
_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

Page 1 of 2

**EFS-020**

| CASE NAME: | CASE NUMBER: |
|---|---|
| Postle v. Brill, et al | 34-2020-00286265 |

## PROOF OF ELECTRONIC SERVICE
### *PROPOSED ORDER*

1. I am at least 18 years old and **not a party to this action.**

    a. My residence or business address is *(specify):*
    RANDAZZA LEGAL GROUP, PLLC, 2764 Lake Sahara Drive Suite 109, Las Vegas, NV 89117

    b. My electronic service address is *(specify):* 2764 Lake Sahara Drive Suite 109, Las Vegas, NV 89117

2. I electronically served the *Proposed Order (Cover Sheet)* with a proposed order in PDF format attached, and a proposed order in an editable word-processing format as follows:

    a. On *(name of person served) (If the person served is an attorney, the party or parties represented should also be stated.):*
    Michael Postle, pro per

    b. To *(electronic service address of person served):* dreamseatpoker@gmail.com

    c. On *(date):* June 23, 2021

    ☒ Electronic service of the *Proposed Order (Cover Sheet)* with the attached proposed order in PDF format and service of the proposed order in an editable word-processing format on additional persons are described in an attachment.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

Alex Shepard, Esq.
_____
(TYPE OR PRINT NAME OF DECLARANT)

▶ _____
(SIGNATURE OF DECLARANT)

1
2
3
4
5
6
7
8
9

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SACRAMENTO

| | |
|---|---|
| **Michael Postle**, an individual;<br><br>       Plaintiff,<br><br>      vs.<br><br>**Veronica Brill**, an individual; **ESPN, Inc.,** a Delaware Corporation; **Joey Ingram**, an individual; **Haralabos Voulgaris**, an individual; **Daniel Negreanu**, an individual; **Upswing Poker, Inc.,** a Nevada Corporation; **iBus Media Limited d/b/a "PokerNews"**, and Isle of Man, United Kingdom Private Limited Liability Company Parent; **Jonathan Little Holdings LLC, d/b/a "Poker Coaching"**, a Nevada Limited Liability Company; **Solve For Why Academy LLC**, a Nevada Limited Liability Company; **Todd Witteles**, an individual; **Run It Once, Inc.,** a Nevada Corporation; and **DOES 1** through **1,000**, inclusive;<br><br>       Defendants. | Case No. 34-2020-00286265<br><br>**ORDER**<br><br>Judge: Shama H. Mesiwala<br>Dept: 53<br>Date last calendared for hearing:<br>June 16, 2021<br><br>Action Filed:  10/01/2020<br>Trial Date:    Not yet set |

This matter came on for decision upon Defendant Veronica Brill's Motion for Costs and Attorneys' Fees Under Cal. Code Civ. Proc. § 425.16(c)(1) (the "Fee Motion") filed on April 13, 2021, following the hearing held on June 16, 2021. The Court having reviewed the papers and pleadings on file, and for good cause showing, the Court makes the following findings:

Plaintiff voluntarily dismissed his lawsuit on April 1, 2021, before the hearing on the anti-SLAPP filed by Defendant was heard. On April 20, 2021, the Court dropped the anti-SLAPP motion, without prejudice to Defendant filing a motion for attorneys' fees and costs incurred in defending this SLAPP lawsuit, pursuant to Code of Civil Procedure section 425.16(c).

Where the plaintiff voluntarily dismisses an alleged SLAPP lawsuit while a special motion to strike is pending, the trial court has discretion to determine whether the defendant is the prevailing party for purposes of attorney's fees under Code of Civil Procedure section 425.16(c). The voluntary dismissal of a complaint before the hearing on an anti-SLAPP motion creates a presumption that the defendant is the prevailing party on the anti-SLAPP motion. The defendant need not obtain a ruling from the court on the motion to strike in order to prevail for purposes of attorneys' fees. (*Coletrain v. Shewalter* (1998) 66 Cal.App.4th 94, 106-107.)

The anti-SLAPP statute provides: "In any action subject to subdivision (b), a prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs. (Code Civ. Proc. § 425.16(c).) An award of attorney's fees to a prevailing defendant is mandatory. (*Ketchum v. Moses* (2001) 24 Cal.4th 1121, 1131 ("[A]ny SLAPP defendant who brings a successful motion to strike is entitled to mandatory attorney fees."); *Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 685.) Defendant is entitled to recover attorney's fees and costs she reasonably incurred in extricating herself from this action. (*Wilkerson v. Sullivan* (2002) 99 Cal.App.4th 443, 446 (the statute is broadly construed as to effectuate the legislative purpose of reimbursing the prevailing defendant for expenses incurred in extricating herself from a baseless lawsuit).)

Under California law, in determining the amount of reasonable attorney fees to be awarded under a statutory attorney fees provision, the court begins by calculating the "lodestar" amount. (*Bernardi v. County of Monterey* (2008) 167 Cal.App.4th 1379, 1393; *Cruz v. Ayromloo* (2007) 155 Cal.App.4th 1270.) The "lodestar" is "the number of hours reasonably expended multiplied by the reasonable hourly rate." (*Bernardi*, 167 Cal.App.4th at 1393; *Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140,154.) To determine the reasonable hourly rate, the court

1  looks to the "hourly rate prevailing in the community for similar work." (*Bernardi*, 167

2  Cal.App.4th at 1394.) The California Supreme Court has further instructed that attorney fee awards

3  "should be fully compensatory." (*Id.*, citing *Ketchum*, 24 Cal.4th at 1133.) Thus, an attorney fee

4  award should ordinarily include compensation for all of the hours reasonably spent, including

5  those relating solely to the fee. (*Id.* at 1394.) This lodestar fee may then be adjusted to account for

6  "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them,

7  (3) the extent to which the nature of the litigation precluded other employment by the attorneys,

8  and (4) the contingent nature of the award." (Id.)

9          Fee award amounts are matters within the trial court's discretion: the "trial judge is the best

10 judge of the value of professional services rendered in h[er] court, and while h[er] judgment is of

11 course subject to review, it will not be disturbed unless the appellate court is convinced that it is

12 clearly wrong." (*Ketchum*, 24 Cal.4th at 1132; *accord PLCM Group v. Drexler* (2000) 22 Cal.4th

13 1084, 1096.) The Court will reduce the hours it determines were excessive or not supported. (*Levy*

14 *v. Toyota Motor Sales, U.S.A., Inc.* (1992) 4 Cal.App.4th 807, 816 (party seeking attorney fees has

15 the "burden of showing that the fees incurred were 'allowable,' were 'reasonably necessary to the

16 conduct of litigation,' and were 'reasonable in amount'"); *Christian Research Institute v. Ahor*

17 (2008) 165 Cal.App.4th 1315, 1326-1329.)

18         The billing records that support this motion are attached as Exhibit 3 to the motion, and

19 supported by the declaration of Marc J. Randazza, which is attached as Exhibit 2 to the motion.

20 The billing records reflect the following rates and amount of time requested: $800/hour for Mr.

21 Randazza; $450/hour for attorney Alex J. Shepard; $200/hour for law clerk Trey Rothell;

22 $200/hour for law clerk Bryttni Yi; $175/hour for paralegal Cassidy Curran; $175/hour for

23 paralegal Jasmyn Montano; and $175/hour for paralegal Heather Ebert. The records submitted also

24 reflect $961.91 in costs.

25         **THE COURT HEREBY FINDS** that Defendant is the prevailing party in this action and

26 is therefore entitled to attorneys' fees and costs pursuant to section 425.16(c). Plaintiff has not

27 opposed this motion, or otherwise dispelled the presumption that Defendant is the prevailing party.

1    **THE COURT FURTHER FINDS** the costs requested to be reasonable. The Court awards

2    15 hours at $800 per hour for Mr. Randazza; 25 hours at $450 per hour for Mr. Shepard; and 20

3    hours of paralegal time at the rate of $175 per hour.

4    **IT IS HEREBY ORDERED** that Defendant Veronica Brill shall be awarded $26,783.50

5    in attorneys' fees and $961.91 in costs, for a total of $27,745, from Plaintiff Michael Postle. Said

6    amount is reduced to judgment for which let execution issue immediately and is collectible by any

7    lawful means plus interest at the legal rate.

8    IT IS SO ORDERED this ~~day of~~ **JUL - 2 2021** 202

9

10

11

                                      Superior Court Judge

12                                     SHAMA H. MESIWALA

13    Respectfully submitted:

14

15

16

   Marc J. Randazza, SBN 269535

17    Alex J. Shepard, SBN 295058

     RANDAZZA LEGAL GROUP, PLLC

18    2764 Lake Sahara Drive Suite 109

     Las Vegas, NV 89117

19    Telephone: 702-420-2001

     ecf@randazza.com

20

   Attorneys for Defendant

21    Veronica Brill

22

23

24

25

26

27

**PROOF OF SERVICE**

*Postle v. Brill, et al.* | Sacramento County Superior Court | Case No. 34-2020-00286265

At the time of service, I was over the age of 18 and not a party to this action. I am employed in the County of Clark, State of Nevada. My business address is Randazza Legal Group, PLLC, 2764 Lake Sahara Drive, Suite 109, Las Vegas, Nevada 89117.

On June 23, 2021, I served true and correct copies of the foregoing document, entitled:

**PROPOSED ORDER GRANTING MOTION FOR ATTORNEY'S FEES WITH PROPOSED ORDER COVER SHEET**

on the interested parties as follows:

Michael Postle
3724 Deer Walk Way
Antelope, CA 95843
dreamseatpoker@gmail.com
*Plaintiff pro se*

BY UNITED STATES MAIL. I enclosed the documents listed above in a sealed envelope or package addressed to the persons at the addresses above, and deposited the sealed envelope with the United States Postal Service, with postage fully prepaid; and,

BY ELECTRONIC MAIL. I electronically served the documents listed above to the persons at the electronic mail addresses listed above, from my electronic service address, ssl@randazza.com.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 23, 2021 at Las Vegas, Nevada.

/s/ Suzanne S. Levenson
Employee,
Randazza Legal Group, PLLC

# EXHIBIT 3

Veronica Brill's Anti-SLAPP Motion in State Court Case

1  Marc J. Randazza, SBN 269535
   Alex J. Shepard, SBN 295058
2  RANDAZZA LEGAL GROUP, PLLC
   2764 Lake Sahara Drive Suite 109
3  Las Vegas, NV 89117
   Telephone: (702) 420-2001
4  Email: ecf@randazza.com

5  *Attorneys for Defendant,*
   *Veronica Brill*

6



FILED/ENDORSED

JAN 13 2021

By: _____ E. Medina
         Deputy Clerk

7          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8            **FOR THE COUNTY OF SACRAMENTO**

9

10 **Michael Postle,** an individual;            Case No. 34-2020-00286265

11          Plaintiff,

12     vs.                                      **DEFENDANT VERONICA BRILL'S
                                                NOTICE OF MOTION AND ANTI-
                                                SLAPP SPECIAL MOTION TO
13 **Veronica Brill,** an individual; **ESPN, Inc.,** a    STRIKE COMPLAINT UNDER Cal.
   Delaware Corporation; **Joey Ingram,** an individual;   CODE CIV. PROC. § 425.16
14 **Haralabos Voulgaris,** an individual; **Daniel**
   **Negreanu,** an individual; **Upswing Poker, Inc.,** a
15 Nevada Corporation; **iBus Media Limited d/b/a**
   **"PokerNews",** and Isle of Man, United Kingdom    Judge:        Richard K. Sueyoshi
16 Private Limited Liability Company Parent; **Jonathan**  Dept:         53
   **Little Holdings LLC, d/b/a "Poker Coaching",**   Date:         February 11, 2021
17 a Nevada Limited Liability Company; **Solve For**   Time:         1:30 p.m.
   **Why Academy LLC,** a Nevada Limited Liability   Reservation No.  2545114
18 Company; **Todd Witteles,** an individual; **Run It**
   **Once, Inc.,** a Nevada Corporation; and **DOES 1**  Action Filed:   10/01/2020
19 through **1,000,** inclusive;                        Trial Date:     Not yet set

20          Defendants.

21

22

23

24

25

26

27

Defendant Veronica Brill's Notice of Motion and Special Motion to Strike Plaintiff's Complaint
Case No. 34-2020-00286265

1   **TO:   ALL PARTIES AND THEIR ATTORNEYS OF RECORD PLEASE TAKE**
2         **NOTICE THAT:**

3         On February 11, 2021 at 1:30 p.m. in the courtroom of the Honorable Judge Richard K.
4   Sueyoshi, Defendant Veronica Brill will and hereby does move to strike Plaintiff Michael Postle's
5   Complaint under California Code of Civil Procedure § 425.16, and seeks the pending action's
6   dismissal, as well as costs and reasonable attorneys' fees.

7         Brill seeks dismissal of the Complaint under this statute because (1) the conduct alleged in the
8   Complaint was done in furtherance of Brill's right of petition or free speech, (2) Brill's speech was
9   connected to an issue of public interest, and (3) Plaintiff does not have a likelihood of prevailing on
10  his claims. Brill made statements on the social media website Twitter notifying people of her expert
11  opinion that Plaintiff was cheating in a professional poker game being broadcast to thousands of
12  viewers. In this context, Plaintiff was a public figure. The statements that form the basis of Plaintiff's
13  complaint were either true, substantially true, statements of opinion or rhetorical hyperbole, or were
14  made without actual malice.

15        This Motion is based on this Notice; the accompanying Memorandum of Points and
16  Authorities; the declarations and exhibits thereto; and such other authorities and argument as may be
17  submitted in any reply at or before the hearing.

18        Dated: January 6, 2021.                    Respectfully Submitted,

19
20
21                                                   Marc J. Randazza
                                                     Alex J. Shepard
22                                                   RANDAZZA LEGAL GROUP, PLLC

23                                                   *Attorneys for Defendant*
                                                     *Veronica Brill*
24
25
26
27

RANDAZZA | LEGAL GROUP

1       **MEMORANDUM OF POINTS AND AUTHORITIES**

2   **1.0     INTRODUCTION**

3          Plaintiff is a professional poker player who many believe cheated during poker games run by

4   a particular company.  His play was erratic, irrational, and led to mathematically impossible results.

5   Defendant Brill informed Plaintiff's favored gaming host of her suspicions.  Seeing no action taken,

6   Brill had no choice but to inform the professional poker community to bring some accountability back

7   to the game.  She expressed her opinion publicly and provided the factual bases for her statements.

8   Other players, viewers, and commentators found her observations valid and further investigated.

9          More than a year after Brill made her statements, Plaintiff sought to punish Brill for calling

10  out the apparent cheating.  This is a SLAPP[1] suit meant to silence her and other critics. Plaintiff, a

11  public figure, cannot prove that Brill's statements are actionable and cannot prove that she made any

12  statement with actual malice.  All of his non-defamation claims are duplicative and must be dismissed

13  for the same reasons his defamation claims fail.  Because his causes of action are based on Brill's

14  statements made in connection with an issue of public interest, the Court should dismiss all of his

15  claims with prejudice and award Brill her costs and reasonable attorneys' fees incurred in connection

16  with this motion under Cal. Code Civ. Proc. § 425.16.

17  **2.0     FACTUAL BACKGROUND**

18          **2.1     Plaintiff's Status as a Public Figure**

19          Plaintiff "is a professional poker player who has made a full-time career out of playing poker.

20  Poker has been Plaintiff's primary source of income since April 2003."  (Complaint at ¶ 19.)  Postle

21  claims he is known for his playing style.  (Complaint at ¶ 22.)  He alleges that, within 14 months, he

22  "played approximately four hundred (400) hours, consisting of approximately eight thousand (8,000)

23  hands of poker …."  (Complaint at ¶ 26.)

24          Plaintiff's career began to take off in June 2018 when Stones Gambling Hall ("Stones Hall"),

25  a professional gambling company that arranged and broadcast professional poker games, took a

26

27  [1]     SLAPP is an acronym for "Strategic Lawsuit Against Public Participation."

RANDAZZA | LEGAL GROUP

1   particular interest in him. Stones Hall live streams poker and broadcasts them over the internet.

2   (Complaint at ¶ 20.) Plaintiff played in Stones Live games until September 21, 2019. (*Id.*)

3       Stones Hall's "broadcast team did its best to turn him into a poker celebrity. They created a

4   series of graphics designed to hype his talents," including showing "Postle's face superimposed over

5   that of Jesus." (*See* Brendan I Koerner, "The Cheating Scandal That Ripped the Poker World Apart,"

6   WIRED (Sept. 21, 2020) (last accessed Jan. 5, 2021), attached as **Exhibit 1**.)[2] Leading up to the

7   September 2019 Stones Hall game, Plaintiff "was in the midst of an epic winning streak – a 'heater' –

8   that had turned him into a local folk hero. He'd become such a force on Stones' livestream, in fact,

9   that casino regulars had taken to calling him the Messiah and even God." (*Id.*) Indeed, in an interview

10   of Plaintiff by Justin Kuraitis, the Stones Hall employee "in charge of the live-stream production of

11   Stones Live at Stones Hall" (Complaint at ¶ 33), Kuraitis said to Plaintiff, "I mean, who wouldn't want

12   to know the thought process of a poker player that is running like a freaking god. They nicknamed

13   you in previous streams 'Mike Jesus Postle,' 'G.O.D.', it's like – I think it's the other way, I think you

14   may have sold your soul to the devil." (Declaration of Heather Ebert ["Ebert Decl."], attached as

15   **Exhibit 2**, at ¶ 6; *see also* "Mike Postle Interview with Justin Kuraitis 1-23-2019" (Jan. 4, 2019), also

16   attached as **Exhibit 3**.)[3]

17       Other players noted his unusual win streak as well. Jaman Burton posted a video on YouTube

18   in November 2018 discussing a Stones Live game in which he played against Postle. (*See* screenshot

19   of "Avoid Mike Postle: Crazy 1/3 No-Limit game at Stones Gambling Hall" (Nov. 26, 2018), attached

20   as **Exhibit 4**.)[4] Burton's YouTube account has 35,000 subscribers, and this video garnered over

21   120,000 views. (*Id.*) In June 2019, Jonathan Little of Defendant Poker Coaching published a video

22   on his YouTube account discussing unusual and unnecessarily risky play by Postle during a Stones

23   Live game. (*See* screenshot of "God Mode (or Cheating?) by Mike Postle in a $5/$10 Cash Game"

24

---

25   [2]   Available at: https://www.wired.com/story/stones-poker-cheating-scandal/ (last accessed Jan. 5, 2021).

26   [3]   Available at: https://www.youtube.com/watch?v=uuWuc4hHT-w_(last accessed Jan. 5, 2021).

27   [4]   Available at: https://www.youtube.com/watch?v=9L6DueV9aHc (last accessed Jan. 5, 2021).

RANDAZZA | LEGAL GROUP

1   (June 6, 2019), attached as **Exhibit 5**.)[5]  Little's YouTube account has over 71,000 subscribers and

2   this video garnered about 90,000 views.  (*Id.*)  By September 21, 2019, Plaintiff was a public figure.

3   　　**2.2　　Brill's Suspicions that Plaintiff Was Cheating**

4   　　　　Defendant Veronica Brill regularly hosted Stones Live games.  (Declaration of Veronica Brill

5   ["Brill Decl."], attached as **Exhibit 6** at ¶ 3.  Brill saw Postle's win percentages as a mathematical

6   anomaly.  This is because his play style was not compatible with game theory optimal ("GTO"), the

7   prevailing theory of play among professional poker players.  (*Id.* at ¶¶ 5, 8.)  GTO states that, for each

8   scenario in a poker game, there is a decision that will maximize a player's winnings over time.  (*Id.* at

9   ¶ 5.)  Due to poker's randomness, a player utilizing GTO perfectly could still lose an individual game,

10  but on average is likely to turn a profit.  (*Id.* at ¶ 6.)  GTO requires hundreds of hours of study and

11  practice of all possible hand combinations and which play is best at any given time.  (*Id.* at ¶ 7.)

12  Plaintiff did not employ GTO; he made decisions that appeared capricious, risky, and made little sense

13  when viewed through a statistical lens.  (*Id.* at ¶ 8.)

14  　　　　From July 2018 to September 2019, Plaintiff had net winnings in 94% of Stones Live games.

15  This statistic would make Plaintiff one of the best poker players of all time.  (Brill Decl. at ¶¶ 9-11.)

16  Plaintiff's success in any individual game could be luck or skill, but not such consistent success over

17  more than a year.  (*Id.* at ¶ 12.)  The narrative of a relatively obscure poker player suddenly earning a

18  name for himself is appealing.  But after enough inexplicable play resulting in Plaintiff winning, Brill

19  began to suspect that Plaintiff may have had more information than his competitors.

20  　　　　Stones Live games are broadcast on a 30-minute delay.  (Complaint at ¶ 21.)  Stones Hall uses

21  RFID tech to keep track of all players' cards, and broadcast this information as part of its stream.

22  (Brill Decl. at ¶ 13.)  The 30-minute delay prevents viewers from sharing the info with players.  Stones

23  Hall, however, has all this information in real time, and *could* transmit this to third parties.  (*Id.* at ¶ 14.)

24  This is why Brill began to suspect Plaintiff of cheating.  He regularly brought his phone to Stones Live

25  games and would shield his phone on his lap, while watching it.  (*Id.* at ¶ 15.)  Brill noticed that Plaintiff

26

27  　　[5]　Available at: https://www.youtube.com/watch?v=-hPmOpd_wBs (last accessed Jan. 5, 2021).

1    almost never continued playing after a broadcast ended and he rarely played in games not hosted by

2    Stones Hall. (*Id.* at ¶ 16.)    Considering this suspicious behavior and the inexplicable nature of

3    Plaintiff's success with sub-optimal play, Brill concluded there was a chance that someone in Stones

4    Hall was providing Plaintiff with a non-delayed stream of Stones Live games, allowing him to see the

5    cards other players had in their hand, giving him an unfair advantage, i.e., cheating. (*Id.* at ¶ 17.)

6    Plaintiff did not do as well in games where he was not regularly looking at his phone. (*Id.* at ¶ 18.)

7         In March 2019, Brill spoke to Kuraitis about her suspicions. (*Id.* at ¶ 19.) Other professional

8    players also thought Plaintiff was cheating. (*Id.* at ¶¶ 20-23.)  Stones Hall claims it investigated these

9    complaints and that it believed Plaintiff was not cheating. (*Id.* at ¶ 24.)  This did not settle the matter

10   for Brill, as she suspected that Stones Hall itself was complicit. (*Id.* at ¶ 25.)  The apparent cheating

11   continued unabated.  Immediately after a May 2019 game, Plaintiff made it clear that he was aware of

12   a technical glitch during the game broadcast. He could not have known this unless he had access to

13   the real time feed – confirming Brill's suspicions. (*Id.* at ¶¶ 26-27.)

14        During a September 21, 2019 Stones Live game Plaintiff continued to stare at his phone while

15   shielding it from others,[6] and continued to make decisions that defied all conventional wisdom. (*Id.*

16   at ¶ 30.)  Brill was convinced that Plaintiff cheated, and that Stones Hall would do nothing to stop

17   him, meaning the only way to stop the cheating was to go public. (*Id.* at ¶ 31.)

18        **2.3     Brill's Statements**

19        On September 28, 2019, Brill published 9 tweets on Twitter, all in the same thread.  The tweets

20   are as follows:

21        If someone is displaying a probability of cheating on a live stream you don't make the
          entire room not be able to use their cellphones in an attempt to reduce everyone's
22        anxiety and then still promote the player as one of the best.

23        You take that player off the stream while you launch a proper, objective, investigation
          done by a third-party.  Once it's shown that the player has not been cheating you make
24        your investigation public and let the player back onto the stream.

25

26   _____

       [6]    Plaintiff admits that he looked at his phone during this game and placed it between his legs.
27   (Complaint at ¶ 23.)

RANDAZZA | LEGAL GROUP

**Am I sure that this player is cheating? No.** Do I think that there is a greater than zero % chance that he is? Yes. Have numerous professional poker players voiced their concerns to me regarding this player? Yes.

Also, I brought up my concerns about this player months ago to the person running the live stream. I was told that no one gets this player and that he is just better than everyone. Also that they had some one or some company come in to check their security.

Apparently that didn't help because no one is allowed to have a cellphone while playing even off stream. The thing is that it doesn't take a cell phone to cheat. There could easily be a small device on his leg that lets him know when he's ahead. **I'm just speculating at this point.**

I want to say that off stream he's a nice guy and has always a played [sic] in my game. I wanted to take him off my line up last year because of suspicions but was assured by the guy running the stream that he wasn't cheating. **All the videos are up. You can decide for yourself.**

I feel that with such a high vpip and play style, if we run the SIM a hundred times with players of equal competency he's running in the 95th percentile of results.

(Sept. 28, 2019 Twitter thread, attached to Brill Decl. as **Exhibit A**) (emphasis added.) The last two are links to Stones Live games where Plaintiff played.[7] Plaintiff admits that he first became aware of Brill's statements on Sept. 28, 2019. (Complaint at ¶ 20.) Plaintiff also alleges Brill subsequently made other statements such as "He's cheating" and "Mike Postle is a cheat," but he does not identify where or when such statements were allegedly made, and so it is impossible to determine the context of such statements. (Complaint at ¶ 39.)

## 3.0    LEGAL STANDARD

Anti-SLAPP statutes are meant to provide courts with a mechanism to "eliminate meritless or retaliatory litigation at an early stage of the proceedings." (*Seelig v. Infinity Broad. Corp.* (2002) 97 Cal. App. 4th 798, 806). In analyzing the merits of a plaintiff's claim, courts use "a summary-judgment-like procedure." (*Wallace v. McCubbin* (2011) 196 Cal. App. 4th 1169, 1180-81).

An Anti-SLAPP motion is evaluated in two steps. First, the defendant must show that her alleged actions were made in furtherance of her right to petition or free speech in connection with a

---

[7] *See* "Mike Postle on Stones Live" (available at: https://www.youtube.com/ watch?v=pH8Fjro2oJs&feature=emb_logo); *see also* "Battle of the Ace Highs fo $8k+ 3/14/19" (available at: https://www.youtube.com/watch?v=BATKzg3Wu0I&feature=youtu.be).

RANDAZZA | LEGAL GROUP

1  public issue.  (*See* Cal. Code Civ. Proc. § 425.16(b)).  The burden then shifts to the plaintiff to

2  demonstrate a probability of prevailing on his claims.

3  **4.0     ARGUMENT**

4        **4.1    Plaintiff's Claims Arise from Brill's Protected Conduct**

5        Protected conduct includes "(3) any written or oral statement or writing made in a place open

6  to the public or a public forum in connection with an issue of public interest, or (4) any other conduct

7  in furtherance of the exercise of the constitutional right of petition or the constitutional right of free

8  speech in connection with a public issue or an issue of public interest."  (*Id.* at § 425.16(e)(3)-(4)).

9            **4.1.1    Brill's Statements are in Connection with an Issue of Public Interest**

10       "Public interest" is broad,[8] and such an issue "need not be 'significant' to be protected by the

11  anti-SLAPP statute – it is enough that it is one in which the public takes an interest."  (*Nygard, Inc. v.*

12  *Uusi-Kerttula* (2008) 159 Cal. App. 4th 1027, 1042).  An activity does not need to "meet the lofty

13  standard of pertaining to the heart of self-government" to qualify for Anti-SLAPP protection; "social

14  or even low-brow topics may suffice."  (*Hilton v. Hallmark Cards* (9th Cir. 2009) 599 F.3d 894 905).

15       Speech is of public concern when it touches "on issues in which the public (even a small slice

16  of the public) might be interested."  (*Pan Am Sys., Inc. v. Atl. Ne. Rails & Ports, Inc.* (1st Cir. 2015) 804

17  F.3d 59, 66).  Such issues "are those that can be fairly considered as relating to any matter of political,

18  social, or other concerns to the community."  (*Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, (1st Cir. 1997)

19  127 F.3d 122, 132) (internal quotation omitted).  And "the relevant community need not be very large

20  and the relevant concern need not be of paramount importance or national scope.  Rather, 'it is

21  sufficient that the speech concerns matters in which even a relatively small segment of the general

22  public might be interested.'"  (*Id.*) (quoting *Roe v. City of San Francisco* (9th Cir. 1997) 109 F.3d 578,

23  585).  For example, an internet discussion board regarding the movie "My Big Fat Greek Wedding"

24  was a matter of public interest.  (*See Kronemyer v. Internet Movie Data Base, Inc.* (2007) 150 Cal. App. 4th

25  941, 949.)  A fashion line was found to qualify as a matter of public interest among the "high fashion"

26  _____

27  [8]   The statute explicitly provides that "[t]his section shall be construed broadly."  (*See* Cal. Code
Civ. Proc. § 425.16(a)).

Defendant Veronica Brill's Notice of Motion and Special Motion to Strike Plaintiff's Complaint
Case No. 34-2020-00286265

RANDAZZA | LEGAL GROUP

1  community. (*See Tierney v. Moschino S.p.A.* (C.D. Cal. Jan. 13, 2016) Case No. 2:15-cv-05900, Doc. 49).

2  Statements about a fantasy sport league were found to be of public interest due to the "widespread

3  public interest in … fantasy sports." (*Friedman v. DirecTV* (C.D. Cal. 2015) 262 F. Supp. 3d 1000,

4  1004). Even a gossip column is just as protected as political speech under the Anti-SLAPP statute.

5  (*See Hall v. Time Warner, Inc.* (2007) 153 Cal. App. 4th 1337, 1347 [an interview Marlon Brando's

6  housekeeper named in his will was in connection with the public interest for purposes of Anti-SLAPP

7  statute].

8        The Supreme Court of Nevada, which has an Anti-SLAPP statute modeled on California's,

9  found that a presentation on cheating in the gaming industry is speech in direct connection with an

10  issue of public interest. (*See Taylor v. Colon* (Nev. 2020) 468 P.3d 820, 826). California has found that

11  gambling events such as horse racing are "matter[s] of serious public concern because [they] involve[]

12  gambling on a large-scale basis …." (*Mosesian v. McClatchy Newspapers* (1991) 233 Cal. App. 3d 1685,

13  1702) [statements from plaintiff with the intent of influencing public officials to grant plaintiff a

14  gaming license was a public figure for purposes of qualifications of plaintiff to obtain renewed license].

15        Plaintiff is famous in the professional poker community. He regularly appeared on Stones

16  Live games, obtained an extremely rare win record, and garnered effusive praise and promotion from

17  Stones Hall and the press. He was an up-and-coming star in the community prior to Brill's statements

18  on September 28, 2019. Plaintiff's honesty during poker games was a matter of public interest; every

19  viewer, player, and host has an interest in learning whether a star player is cheating.

### 4.1.2   Plaintiff's Claims Premise Liability on Brill's Protected Conduct

21        Plaintiff's claims premise liability upon Brill's statements in connection with the above-

22  identified issue of public interest. Plaintiff premises all of his causes of action on Defendants'

23  statements that he characterizes as allegations that he cheated. The only allegations specifically against

24  Brill are that she (1) reported her suspicions of Plaintiff cheating to Kuraitis in March, 2019;[9] (2) made

25        [9]   Though Plaintiff mentions these statements, he does not claim they were defamatory and does

26  not allege they caused any harm to him. They thus appear to be included for context, and not because

he is basing his claims on them. If Plaintiff actually does premise liability on these March 2019

27

- 9 -
Defendant Veronica Brill's Notice of Motion and Special Motion to Strike Plaintiff's Complaint
Case No. 34-2020-00286265

RANDAZZA | LEGAL GROUP

1   the statements in her September 28, 2019 tweets in which she shared her opinion that Plaintiff was

2   cheating; and (3) allegedly claimed Plaintiff was a cheater in subsequent YouTube videos.

3          Brill's statements were also made in a public forum. (*See Ampex Corp. v. Cargle* (2005) 128 Cal.

4   App. 4th 1569, 1576) [Yahoo! message board for publicly traded company a public forum]. Because

5   Brill's statements were made on Twitter and YouTube, popular publicly accessible websites, they

6   were made in a public forum.

7          As Brill has met her burden under the first prong of the Anti-SLAPP statute, the burden

8   shifts to Plaintiff to show a probability of prevailing on his claims. He cannot do so.

9          **4.2     Plaintiff Cannot Show a Probability of Prevailing on His Claims**

10         To survive an Anti-SLAPP motion, a plaintiff must provide *prima facie* evidence establishing a

11  probability of prevailing on its claims. Plaintiff must present "substantial evidence that would support

12  a judgment of relief made in the plaintiff's favor." (*S. Sutter, LLC v. LJ Sutter Partners, L.P.*, (2011) 193

13  Cal. App. 4th 634, 670).

14         **4.2.1    Defamation**

15         Plaintiff's first two claims are for libel and slander per se -- defamation. A defamation plaintiff

16  must show the defendant (1) published a false statement of fact (2) of or concerning the plaintiff (3)

17  which is unprivileged; and (4) which either has a natural tendency to injure the plaintiff's reputation

18  or causes special damage. (*See Ringler Associates Inc. v. Maryland Co.* (2000) 80 Cal. App. 4th 1165, 1179).

19         **4.2.1.1    Plaintiff's Defamation Claims are Time-Barred**

20         Cal. Code Civ. Proc. § 340(c) provides a one-year statute of limitations for defamation. The

21  Single Publication Act, Cal. Civ. Code § 3425.1-3425.5, establishes that the statute of limitations begins

22  to run upon initial publication; it is not renewed simply because the statements in the publication are

23  subsequently repeated. (*See Shively v. Bozanich* (2003) 31 Cal. 4th 1230, 1245-46). Brill made her

24  statements on September 28, 2019, and Plaintiff admits he was aware of these statements as of

25  _____

26  statements, they are protected because they are inextricably intertwined with the statements Brill made
    publicly. (*Lauter v. Anoufrieva* (C.D. Cal. 2008) 642 F. Supp. 2d 1060, 1109) (emphasis added); (*see also*

27  *Salma v. Capon* (2008) 161 Cal. App. 4th 1275, 1287) [cause of action based on both protected and
    unprotected activity under California's Anti-SLAPP statute is subject to an Anti-SLAPP motion].

RANDAZZA | LEGAL GROUP

1  September 28. Any republication of these statements was done by third parties or other Defendants,

2  which did not reset the one-year statute of limitations. The defamation claims are time-barred.

3                    **4.2.1.2     Statements of Opinion are Not Defamatory**

4          To be defamatory, a statement must either be a false factual assertion, or must be a statement

5  that implies the existence of undisclosed, false facts. (*See Nygard*, 159 Cal. App. 4th at 1048).

6  Statements of opinion are not subject to defamation claims. Language that is loose, figurative, or

7  hyperbolic negates the impression that a statement is asserting actual facts. Accordingly, vague,

8  unprovable statements and statements of opinion do not give rise to a defamation claim. (*Letter*

9  *Carriers v. Austin* (1974) 418 U.S. 264, 284-286; (*see also Milkovich v. Lorain Journal Co.* (1990) 497 U.S.

10 1, 20). "This provides assurance that public debate will not suffer for lack of 'imaginative expression'

11 or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation."

12 (*Milkovich*, 497 U.S. at 20). A statement of opinion or rhetorical hyperbole, even if objectively

13 unjustified or made in bad faith, is not defamatory. (*See Campanelli v. Regents of University of California*

14 (1996) 44 Cal. App. 4th 572, 578). If a statement of opinion implies allegedly false facts, **there is no**

15 **liability if these facts are disclosed to the reader**. (*See Integrated Healthcare Holdings, Inc. v. Fitzgibbons*

16 (2006) 140 Cal. App. 4th 515, 527). Whether a statement is capable of defamatory meaning is a

17 question of law for the Court to decide. (*See Seelig*, 97 Cal. App. 4th at 809).

18         We must consider the context in which a statement is made and the totality of the

19 circumstances to determine whether it is defamatory. (*See Nygard*, 159 Cal. App. 4th at 1049). Brill

20 made her statements on Twitter. The public is used to seeing fiery rhetoric on online fora, and courts

21 recognize that this context makes it less likely that a reader will interpret statements published in such

22 places as actionable statements of fact. (*See Summit Bank v. Rogers* (2012) 206 Cal. App. 4th 669, 696-

23 97) [finding that readers of statements posted in "Rants and Raves" section of Craigslist were unlikely

24 to view statements as assertions of fact]; (*see also Global Telemedia Internat., Inc. v. John Doe 1* (C.D. Cal.

25 2001) 132 F. Supp. 2d 1261, 1267) [finding that Internet postings "are full of hyperbole, invective,

26 short-hand phrases and language not generally found in fact-based documents, such as corporate press

27 releases or SEC filings"]; (*and see Krinsky v Doe 6* (2008) 159 Cal. App. 4th 1154, 1163).

RANDAZZA | LEGAL GROUP

RANDAZZA | LEGAL GROUP

1

### 4.2.1.3     Brill's Statements are Expressions of Opinion

2      Plaintiff's Complaint relies on inaccurate characterizations of Brill's statements and ignores
3   their context.  Brill discloses that she does not know for certain whether Plaintiff is cheating, but
4   *suspects* that he is and that other players voiced similar concerns.  (Brill Decl. at **Exhibit A**.)  She is
5   disclosing that she is speculating as to the technical method by which Plaintiff may have cheated.  (*Id.*)
6   She concludes by posting videos of Plaintiff playing in Stones Live games and encourages her readers
7   to "decide for yourself."  (*Id.*)  This is far from making an unambiguous statement that Plaintiff is
8   cheating.  Rather, Brill is claiming that Plaintiff has engaged in unusual conduct, has an unusually high
9   win rate, and that others professional players have expressed concerns.  She expressed an opinion that
10  Plaintiff was cheating and provided the factual bases for her opinion.

11      "'When the facts underlying a statement of opinion are disclosed, readers will understand they
12  are getting the author's interpretation of the facts presented; they are therefore unlikely to construe
13  the statement as insinuating the existence of additional, undisclosed facts.'"  (*Franklin v. Dynamic
14  Details, Inc.* (2004) 116 Cal. App. 4th 375, 387) (quoting *Standing Comm. On Discipline of the United States
15  Dist. Court v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1439).  "When the facts supporting an opinion are
16  disclosed, 'readers are free to accept or reject the author's opinion based on their own independent
17  evaluation of the facts.'"  (*Id.*)  *Dynamic Details* dealt with statements by the defendant accusing the
18  plaintiff criminal copyright infringement, but in publishing these statements he disclosed the basis for
19  his conclusion by providing links to the plaintiff's website and a third-party site that he believed
20  showed unlawful copying.  (*Id.* at 387-88.)  It was important that the statements invited the reader to
21  view these sources on their own and come to their own conclusions.  (*Id.* at 388-89.)

22      That is what happened here.  Brill disclosed the facts on which she based her opinion, provided
23  links to videos of Plaintiff's playing, and encouraged readers to view these videos and come to their
24  own conclusions.  Her statements are expressions of opinion and thus cannot be defamatory.  The
25  Court should dismiss Plaintiff's first two claims for relief with prejudice.

26

27

#### 4.2.1.4     Plaintiff is a Limited-Purpose Public Figure

A limited purpose public figure "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." (*Gertz v. Robert Welch* (1974) 418 U.S. 323, 351). The test for limited public figure status in California is as follows:

> First, there must be a public controversy, which means the issue was debated publicly and had foreseeable and substantial ramifications for nonparticipants. Second, the plaintiff must have undertaken some voluntary act through which he or she sought to influence resolution of the public issue. In this regard it is sufficient that the plaintiff attempts to thrust him or herself into the public eye. And finally, the alleged defamation must be germane to the plaintiff's participation in the controversy.

(*Ampex Corp. v. Cargle* (2005) 128 Cal. App. 4th 1569, 1577). This is a question of law for the Court to decide. (*See Khawar v. Globe Internat.* (1998) 19 Cal. 4th 254, 264).

As explained in Section 2.1, *supra*, Plaintiff was a well-known professional poker player who regularly played in televised games. He was on a highly publicized "hot streak" and multiple professional poker players and commentators commented on his unusual degree of success. Stones Hall even publicized Plaintiff as a Christ-like figure due to his inexplicable "skill" as a poker player. Plaintiff was a poker celebrity entirely of his own voluntary actions, there was plenty of discussion of his success and his play style, and Brill's statements were directly connected to the source of his celebrity. For purposes of Brill's statements alleging he cheated, Plaintiff is a public figure.

#### 4.2.1.5     Plaintiff Cannot Show Negligence, Much Less Actual Malice

A public figure bringing a defamation suit must show that a defendant made her statements with "actual malice," i.e., "with knowledge that it was false or with reckless disregard of whether it was true or not." (*New York Times Co.* (1964) 376 U.S. 254, 279-80). A plaintiff must prove that the defendant either knew her statement was false or subjectively entertained serious doubt that her statement was truthful. (*See Bose Corp.*, 466 U.S. at 511 n.30). The question is not "whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." (*Reader's Digest Assn. v. Superior Court* (Cal. 1984) 690 P.2d 610, 617-18). Moreover, "[a] publisher does not have to investigate personally, but may rely on the

RANDAZZA | LEGAL GROUP

1  investigation and conclusions of reputable sources." (*Id.* at 619). A plaintiff must make a showing of
2  actual malice with clear and convincing evidence. (*See Bose Corp.*, 466 U.S. at 511). This is a
3  requirement that presents "a heavy burden, far in excess of the preponderance sufficient for most civil
4  litigation." (*Hoffman v. Capital Cities/ABC, Inc.* (9th Cir. 2001) 255 F.3d 1180, 1186-87) (internal
5  quotation marks omitted).

6       Brill subjectively believed her statements accusing Plaintiff of cheating were true. (Brill Decl.
7  at ¶ 33.) As explained in Section 2.2, *supra,* she conducted her own investigation into Plaintiff, heard
8  of other players voicing suspicions of Plaintiff, and concluded the most likely explanation was that
9  Plaintiff was cheating.

10      Plaintiff offers little more than conclusory claims of actual malice in his Complaint. The only
11  factual allegation relevant to actual malice is that Brill played in and hosted Stones Live games where
12  Plaintiff was present even after reporting her suspicions to Stones Hall. (Complaint at ¶ 33.)
13  Presumably, Plaintiff's argument is that Brill did not believe Plaintiff was a cheater because she waited
14  until September 2019 to publicly denounce one of the most prominent Stones Hall players.

15      The fact that Brill privately communicated her concerns to Stones Hall months before going
16  public with her allegations shows that she genuinely harbored suspicions about Plaintiff for months
17  before publishing her statements at issue. (Brill Decl. at ¶¶ 19-23.) Stones Hall conducting an
18  investigation and finding Plaintiff was not a cheater did not exonerate him in Brill's eyes because Brill
19  believed Plaintiff was being assisted by someone within Stones Hall. (Brill Decl. at ¶¶ 24-25.) The
20  conclusions of subsequent investigations into Plaintiff's cheating have no bearing on Brill's state of
21  mind, as she was not aware of such conclusions at the time of publication.

22          **4.2.2    Trade Libel**

23      A statement must be false and factual to constitute trade libel. (*ComputerXpress, Inc. v. Jackson*
24  (2001) 93 Cal. App. 4th 993, 1010). However, "[t]rade libel is generally distinguished from common
25  law defamation and is said to connote 'an intentional disparagement of the quality of property, which
26  results in pecuniary damage to plaintiff.'" (*Barnes-Hind, Inc. v. Superior Court* (1986) 181 Cal. App. 3d
27  377, 381) (quoting *Erlich v. Etner* (1964) 224 Cal. App. 2d 69, 73). Trade libel applies only to statements

RANDAZZA | LEGAL GROUP

1   regarding the quality of goods or services, not a plaintiff's reputation; for this reason, all trade libel

2   plaintiffs must establish actual malice to prevail. (*See Melaleuca, Inc. v. Clark* (1998) 66 Cal. App. 4th

3   1344, 1360).

4         Plaintiff does not assert a trade libel claim. His allegations relate to harm to his personal and

5   professional reputation, and he refers to the allegedly "false and defamatory" statements. (Complaint

6   at ¶¶ 127-130.) There are no allegations relating to the quality of Plaintiff's goods or services, meaning

7   his trade libel claim is purely duplicative, and actual malice is not met.

8         **4.2.3   False Light**

9         False light claims are invasion of privacy claims, and invasion of privacy claims have a one-

10  year statute of limitations. (*See Cain v. State Farm Mut. Auto. Ins. Co.* (1976) 62 Cal. App. 3d 310, 313).

11  Plaintiff brought his claim more than one year after the fact. His false light claim is time-barred.

12        "A 'false light' cause of action is in substance equivalent to a libel claim and should meet the

13  same requirements of the libel claim, including proof of malice." (*Brodeur v. Atlas Entertainment, Inc.*

14  (2016) 248 Cal. App. 4th 665, 678) (quoting *Aisenson v. American Broadcasting Co.* (1990) 220 Cal. App.

15  3d 146, 161). The same defenses available for defamation claims are available for false light claims.

16  (*See Fellows v. Nat'l Enquirer* (1986) 42 Cal. 3d 234, 245-46) (collecting cases). When a false light claim

17  exists alongside a defamation claim, "the false light claim is essentially superfluous, and stands or falls

18  on whether it meets the same requirements as the defamation cause of action." (*Eisenberg v. Alameda*

19  *Newspapers, Inc.*, (1999) 74 Cal. App. 4th 1359, 1385 n.13).

20        Plaintiff's false light claim is duplicative of the defamation and amounts to mere "surplusage."

21  (*Selleck v. Globe Int'l* (1985) 166 Cal. App. 3d 1123, 1136). It is based on the same facts as the

22  defamation claims and alleges the same kind of injuries. (Complaint at ¶¶ 136-41.) It is duplicative of

23  the defamation claims and even if it were not, the false light analysis is the same as the defamation

24  analysis.

25        **4.2.4   Intentional Interference with Prospective Economic Advantage**

26        Tortious interference requires: "(1) an economic relationship between the plaintiff and some

27  third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's

RANDAZZA | LEGAL GROUP

1    knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the
2    relationship; (4) actual disruption of the relationship; (5) economic harm to the plaintiff proximately
3    caused by the acts of the defendant." (*Westside Center Associates v. Safeway Stores, Inc.* (1996) 42 Cal. App.
4    4th 507, 521-22). There must be a wrongful act beyond the alleged interference itself. (*Korea Supply*
5    *Co. v. Lockheed Martin Corp.* (2003) 29 Cal. 4th 1134, 1154). This claim fails for the same reasons as the
6    defamation claims. (*See Blatty v. New York Times Co.* (1986) 42 Cal. 3d 1033, 1045-47).

7                              **4.2.5    Unfair Competition**

8            California Business & Professions Code § 17200 (the "UCL") prohibits "any unlawful, unfair
9    or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising …." The
10   UCL claim is predicated on Brill's alleged defamation and intentional interference. This fails for the
11   same reasons those claims fail. (*See Integrated Healthcare Holdings, Inc. v. Fitzgibbons* (2006) 140 Cal. App.
12   4th 515, 533) [UCL claim premised on alleged defamation; finding that "[b]ecause we conclude the
13   message did not constitute actionable defamation, IHHI's action for violation of the [UCL] also fails
14   for this reason"].

15                          **4.2.6    Intentional Infliction of Emotional Distress**

16           An intentional infliction of emotional distress ("IIED") claim requires: "(1) extreme and
17   outrageous conduct with the intention of causing, or reckless disregard of the probability of causing,
18   emotional distress; (2) the plaintiff has suffered severe or extreme emotional distress; and (3) the
19   defendant's outrageous conduct was the actual and proximate causation of the emotional distress."
20   (*Jackson v. Mayweather* (2017) 10 Cal. App. 5th 1240, 1265). Emotional distress is only sufficiently
21   severe or extreme if it is "of such substantial quality or enduring quality that no reasonable [person]
22   in civilized society should be expected to endure it." (*Hughes v. Pair* (2009) 46 Cal. 4th 1035, 1051).

23           "Outrageous" conduct is conduct so "extreme as to exceed all bounds of that usually tolerated
24   in a civilized community." (*Id.* at 1050). The tort "does not extend to mere insults, indignities, threats,
25   annoyances, petty oppressions, or other trivialities." (*Id.* at 1051). Even an allegedly false accusation
26   of **sexual assault** made to a human resources department does not constitute extreme and outrageous

27

1 conduct. (*Comstock v. Aber* (2012) 212 Cal. App. 4th 931, 954). Whether conduct is sufficiently extreme

2 and outrageous is a decision for the Court. (*See Chang v. Lederman* (2009) 172 Cal. App. 4th 67, 87).

3      A plaintiff cannot avoid the First Amendment merely by styling a defamation claim as IIED;

4 there must still be a false statement of fact and actual malice for public figures. (*Hustler Magazine v.*

5 *Falwell* (1988) 485 U.S. 46, 56-57). As explained above, there is no actionable statement of fact and

6 Brill did not publish with actual malice. This claim thus fails.

7      The claim also fails because there is no extreme or outrageous conduct alleged, nor is there is

8 any severe emotional distress. Accusing someone of cheating at cards is not "intolerable in a civilized

9 society;" it is the kind of garden-variety insult flung at a player who acts suspiciously at a poker table.

10 And while Plaintiff alleges extreme emotional distress as a result of Defendants' statements, Plaintiff

11 does not allege Brill made any threats against him or that her statements caused him to be "scared to

12 leave his home …." (Complaint at ¶ 160.) The only things potentially causing extreme emotional

13 distress are the actions of third parties, not Brill. Many of the alleged damages do not amount to

14 severe emotional distress, either. Plaintiff complains of "uncertainty about his future, [] humiliation,"

15 and loss of sleep, which are not the kinds of emotional harms with which this tort is concerned.

16 (Complaint at ¶¶ 161-62.) Plaintiff's IIED claim fails.

17 **5.0  CONCLUSION**

18      Based on the foregoing, Defendant Veronica Brill hereby respectfully requests that the Court

19 grant her Special Motion to Strike pursuant to California's Anti-SLAPP Statue.

20      Dated: January 6, 2021.          Respectfully Submitted,

21

22

23                                Marc J. Randazza, SBN 269535

                               Alex J. Shepard, SBN 295058

24                                RANDAZZA LEGAL GROUP, PLLC

                               2764 Lake Sahara Drive Suite 109

25                                Las Vegas, NV 89117

                               Telephone: 702-420-2001

26                                ecf@randazza.com

27                                *Attorneys for Defendant,*

                               *Veronica Brill*

RANDAZZA | LEGAL GROUP

**PROOF OF SERVICE**

*Postle v. Brill, et al.* | Sacramento County Superior Court | Case No. Case No. 34-2020-00286265

At the time of service, I was over the age of 18 and not a party to this action. I am employed in the County of Clark, State of Nevada. My business address is Randazza Legal Group, PLLC, 2764 Lake Sahara Drive, Suite 109, Las Vegas, Nevada 89117.

On January 6, 2021, I served true and correct copies of the foregoing document, entitled:

**DEFENDANT VERONICA BRILL'S NOTICE OF MOTION AND
SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT**

on the interested parties as follows:

Steven T. Lowe, Esq. (SBN 122208)
Jared T. Densen, Esq. (SBN 325164)
**Lowe & Associates, P.C.**
<steven@lowelaw.com>
<jared@lowelaw.com>
8383 Wilshire Blvd., Ste. 1038
Beverly Hills, CA 90211
Phone: (310) 477-5811

*Attorneys for Plaintiff, Michael Postle*

BY UNITED STATES MAIL. I enclosed the documents listed above in a sealed envelope or package addressed to the persons at the addresses above, and deposited the sealed envelope with the United States Postal Service, with postage fully prepaid; and,

BY ELECTRONIC MAIL. I electronically served the documents listed above to the persons at the electronic mail addresses listed above, from my electronic service address, hme@randazza.com.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 6, 2021 at Las Vegas, Nevada.

Employee,
Randazza Legal Group, PLLC

- 18 -
Defendant Veronica Brill's Notice of Motion and Special Motion to Strike Plaintiff's Complaint
Case No. 34-2020-00286265

# <u>EXHIBIT 1</u>

Brendan I Koerner, "The Cheating Scandal That Ripped the Poker World Apart,"
Wired (Sept. 21, 2020)



PHOTOGRAPH: KEIRNAN MONAGHAN & THEO VAMVOUNAKIS

BRENDAN I. KOERNER     SECURITY    09.21.2020 06:00 AM

# The Cheating Scandal That Ripped the Poker World Apart

**Mike Postle was on an epic winning streak at a California casino. Veronica Brill thought he had to be playing dirty. Let the chips fall where they may.**

▶                     0:00 / 36:56

**Audio:** Listen to this article.

MIKE POSTLE WAS on another tear. The moonfaced 42-year-old was deep into a marathon poker session at Stones Gambling Hall, a boxy glass-and-steel casino wedged between Interstate 80 and a Popeye's in suburban Sacramento.

The September 21, 2019, game, which Stones was broadcasting to audiences via YouTube and Twitch, had attracted several top players to the casino's card room, a gaudily lit space done up like an Old West saloon. One pro from Las Vegas had flown in on a chartered jet with $50,000 in cash. Yet, as usual when he appeared on Stones' livestream, Postle was shredding the competition; he was the evening's chips leader by a comfortable margin.

Five hours into the show, a curious hand took shape. Like all games of Texas Hold 'Em, the most widely televised form of poker, the action began with each player receiving two face-down cards—the hole cards. Five community cards were then to be dealt face-up in three rounds, with opportunities for betting in between. The first face-up batch, called the flop, would consist of three cards. After that, the dealer would add a single card ("the turn") followed by one more ("the river"). Players would vie for the pot by assembling the best five-card hands using their hole cards and the shared array.



This feature appears in the October 2020 issue. Subscribe to WIRED.

Even before the flop, though, seven of the nine players chose to fold. Postle, who'd been dealt the queen of diamonds and jack of hearts, pressed forward with the hand. His sole opponent would be Marle Cordeiro, a Las Vegas-based pro with a large social media following.

The flop contained the 8 of spades, 9 of diamonds, and jack of diamonds—a promising trio for Postle, who now had a pair (jacks) and was just a 10 away from a queen-high straight (8–9–10–jack–queen). There were two shared cards left to be dealt. The turn produced the relatively useless 4 of spades, after which Cordeiro placed a $600 bet.

Postle, his white baseball cap nearly concealing his eyes, clutched his right shoulder with his left hand as he mulled his options. Most seasoned players would call or raise in his situation: The statistical likelihood that his hand would yield a favorable monetary outcome was high enough to make proceeding to the river an easy choice. But Postle had an unorthodox style of play, and he often made decisions that his rivals deemed either wildly aggressive or inexplicably meek. Those instincts had served him well in recent months: He was in the midst of an epic winning streak—a "heater"— that had turned him into a local folk hero. He'd become such a force on Stones' livestream, in fact, that casino regulars had taken to calling him the Messiah and even God.

Postle spent half a minute in quiet contemplation, almost motionless in his black leather chair. Then, pursing his lips in resignation, he chucked his cards forward to fold.

Postle's surrender, though counterintuitive, turned out to be a canny move because Cordeiro was holding "the nuts"— poker slang for the most valuable hand. Her hidden hole cards were the 10 of diamonds and queen of spades, so she'd already secured a queen-high straight before the river; she had a 96 percent chance of maintaining her edge once all the cards were dealt.

Justin Kelly, one of the livestream's two commentators, gushed over the genius of Postle's eccentric play. "This is what I'm talking about people!" he exclaimed from his broadcast booth across the room. "Postle takes the weirdest lines and gets people to lay down huge hands all the time. But when he has top pair and a straight draw, he is able to just lay down against the nuts. Postle is just like a freak! He's just a freak of nature."

Kelly's co-commentator, 42-year-old Veronica Brill, did not share his sense of awe. She had been observing Postle up close for a while, both as an opponent at the table and a broadcaster, and she'd come to believe there was a nefarious reason for his success. For months she'd resisted mentioning her suspicions on the livestream, hoping that Stones would handle the matter behind the scenes. But the fold against Cordeiro struck her as so fishy that she could no longer keep quiet. Brill leaned back, gently shook her head, and took a half-step toward calling out God.

"It doesn't make sense," she said, her soft monotone tinged with mockery. "It's like he knows. It doesn't make sense. It's weird." Sounding caught off guard by his cohost's skeptical remarks, Kelly continued effusively—"Absolute insanity, guys!"—before managing to change the subject.

Late that night, as she drove in silence toward her Bay Area home, Brill turned the broadcast over and over in her mind. Her insinuation about Postle, though subtle, had the potential to cause a stir. Fellow players would gossip that jealousy had driven her to smear a more accomplished rival, a decent man who'd just come through a harrowing family drama. Gliding west on Interstate 80, Brill realized she had no choice but to commit one of poker's cardinal sins.

**LIKE MANY OTHERS** who spent huge chunks of time at Stones, Brill had long considered Postle a friend. A generous soul who exuded a puckish charm, Postle was the sort who'd pay for everyone's drinks while regaling the bar with bawdy tales. (He was particularly fond of a story about getting banned from Caesars Palace over a misunderstanding involving a sex worker.) But up until the summer of 2018, few of the pro players at Stones thought much of his poker prowess. "He was playing well enough to support himself, it seemed," says Jake Rosenstiel, a Sacramento pro. "But none of us thought Mike was this great poker player."

Everyone was thus surprised when Postle began to dominate the casino's livestreamed Texas Hold 'Em games starting in July 2018. The once middling Postle suddenly turned formidable, even taking thousands of dollars off some big-time players during their swings through Northern California. (Stones is not ordinarily a mecca for high rollers, but its popular livestreamed games occasionally draw big names from Las Vegas and points south.) As Postle's heater stretched over months, Stones' broadcast team did its best to turn him into a poker celebrity. They created a series of graphics designed to hype his talents: One was a mock book cover that listed Postle as the author of a guide to "crushing souls and running pure"; another showed Postle's face superimposed over that of Jesus.

Brill, a self-described analytics geek whose day job is building medical software, was among those who got clobbered by Postle at the table, and she served as a livestream commentator during much of his streak too. By early 2019, she had seen enough to surmise that Postle's success didn't make mathematical sense. She thought he was winning far too often, particularly for a player whose strategy didn't jibe with game theory optimal, or GTO, the prevailing strategy in Texas Hold 'Em today.

The fundamental idea behind GTO is that there's a single best decision for every imaginable betting scenario—a decision that will maximize a player's winnings over time. In any given hand, a player who perfectly executes game theory optimal may still lose; there's only so much you can do if your opponent lucks into the nuts. But in the course of thousands of hours of poker, a player who adheres to GTO at every moment is virtually guaranteed to come out ahead.

Tremendous effort is required to develop the ability to know which single move to make in the millions of possible betting situations. There are 2,598,960 possible hands in five-card poker, a figure that vastly understates the game's intricacy. Players must also have a feel for how their opponents are likely to react to each gambit. To hone their GTO chops, top pros spend hours a day analyzing past hands with <u>software</u> that pinpoints the precise moments when they flubbed a probability calculation.

---

**Related Stories**

---

DEATH IN OHIO
<u>The Strange Life and Mysterious Death of a Virtuoso Coder</u>
BRENDAN I. KOERNER

---

STREET LIFE
<u>How Cities Reshape the Evolutionary Path of Urban Wildlife</u>
BRENDAN I. KOERNER

---

BACKCHANNEL

Poker and the Psychology of Uncertainty

MARIA KONNIKOVA

Brill could detect no trace of such a cerebral approach to poker in Postle's game. Time and again he made decisions that seemed to fly in the face of game theory optimal. The biggest oddity that stood out to Brill was the high rate at which Postle stayed in games prior to the flop, as measured by a statistic called "voluntarily put in pot," or VPIP. Postle often stuck around with hole cards that would lead most elite players to fold. But he rarely seemed to be punished for his audacity, and Brill thought this might be because he was operating with more complete information than anyone else at the table.

In March 2019, Brill approached Stones' tournament director, Justin Kuraitis, and shared her concerns about Postle. The table used for Stones' livestreamed games is embedded with RFID sensors that scan the hole cards and pipe that information into the livestream. Brill wondered whether there was any way Postle could be peeking at that data, even though the stream is broadcast on a 30-minute delay to prevent cheating.

Kuraitis dismissed Brill's inquiry as ridiculous. "Justin insists Stones is 100% secure and there is zero chance of cheating," Brill texted a friend who asked about the conversation. She added that Kuraitis said that most players simply failed to grasp Postle's brilliance.

Brill was not the only skeptic to confide in Kuraitis that month. On March 13, Kuraitis texted a pro named Kasey Mills to invite her to play in a livestreamed game. Mills asked whether Postle would be there, and then opened up about her misgivings. "I have concerns he may have found a way to cheat somehow," she wrote. "Or else he is a god which is very probable ... I've just never seen anything close to what happens to him and it can't help but draw questions." Kuraitis assured Mills that he conducted quarterly security audits, and that "game fairness is one of my highest priorities." (Mills declined the invitation, but she continued to play against Postle in the months that followed.)

By the late summer, however, there were so many whispers about Postle that his rivals were no longer content to take Kuraitis at his word. Rosenstiel, the Sacramento pro, says he approached the casino's management and proposed they look for potential security flaws that Postle might be taking advantage of. But management refused, assuring him there was no truth to the cheating rumors.

By blurting out her suspicions on the September 21 livestream, Brill had ensured that the buzz about Postle would intensify. She now felt obliged to detail her allegations in public. She didn't anticipate that doing so would make her persona non grata at Stones.

Veronica Brill felt obliged to go public with her suspicions.  PHOTOGRAPH: CHRISTIE HEMM KLOK

ON SEPTEMBER 28, Postle became aware of a story making the rounds on poker Twitter. Shortly before noon that day, Brill had posted an 18-minute video that contained clips of Postle's most unusual hands. "Am I sure that this player is cheating? No," Brill wrote in an accompanying series of tweets. "Do I think that there is a greater than zero % chance that he is? Yes ... I feel that with such a high VPIP and play style, if we run the SIM a hundred times with players of equal competency he's running in the 95th percentile of results." Brill added that even though cell phones were banned at some point, she thought Postle might still be receiving signals, perhaps through "a small device on his leg that lets him know when he's ahead."

By evening, Postle's phone was blowing up with messages and calls from worried friends. "I asked him directly, 'Mike, did you cheat in our game?'" says Joe Blackwell, a poker host who worked the September 21 game. "And he said, 'No, Joe, I respect you too much for anything like that. I would never cheat anybody in this or any other game.' And I believed him."

After a sleepless night, Postle sent a long and rambling text to Brill. He blasted her for going public instead of coming to him to discuss the matter privately, and he wrote several hundred words in defense of his poker skills. "I played against and consistently beat some of the best players in the world," he claimed. "I profited over 2 million online from summer of 2003 until the beginning of 2008." He could not believe that Brill, a person who'd never been anything but nice to him, "would betray me like this and throw me to the wolves of public opinion."

> **Postle became such a poker force that people took to calling him the Messiah and even God.**

Postle was hardly the only person to criticize Brill after her video went viral. She was roundly scolded for presenting a purely circumstantial case against Postle. In poker, it's sacrilege to accuse a peer of cheating without airtight proof. And all Brill had done was offer a speculative hypothesis based solely on math. "I told her, 'You're not providing enough evidence,'" says Matthew Berkey, a well-known pro who has earned more than $4 million during his career. "In this game, trust and your word and your morality is currency ... So I kind of warned her that, hey, you're going to get a lot of backlash for this."

That backlash quickly turned vicious. On October 2, a player on Twitter launched a particularly cruel attack on Brill, one that made her curl up on the floor of her Santa Clara condo and cry. Brill, the author stated with poor punctuation, "couldn't wait for her own baby to die how sick is that."

GROWING UP IN Edmonton in the 1980s, Brill was always slightly embarrassed by her parents' struggle to assimilate to Canadian culture. The family had fled communist Poland when Veronica was 6, and they'd lived in an Austrian refugee camp before moving to Canada. Though he possessed an advanced degree in engineering, Veronica's father had to work as a janitor in his new homeland. He and Veronica's mother both worked punishing hours and refused to treat themselves to even small luxuries.

When she was old enough to take charge of her own social life, Brill indulged her yen to perform: In her twenties she competed in beauty pageants and spun hip hop at Edmonton clubs as DJ Lady V. She took a meandering route through university and became a licensed practical nurse, an occupation that enabled her to buy her first home at 28. (She later became an RN.) The place came with a broken satellite dish that picked up three channels, one of which showed British poker nonstop. To her surprise, Brill found herself glued to these games into the wee hours each night. She was captivated not just by the mathematical intricacies of the action but also by the players' attitude toward money. "Growing up so poor, my parents pinched every single penny," Brill says. "I watched poker players take their money and turn it into a tool. They were able to separate themselves from that monetary value, and they were able to grow this chip stack and use it as a tool and then invest in themselves."

After seeing a boyfriend lose entire weekends to poker, Brill was inspired to teach herself the game through trial and error at a casino in a West Edmonton mall. Soon she was trouncing the well-paid roughnecks who traveled down from

the Fort McMurray oil fields with thousands of dollars to burn. She'd then take her winnings to Las Vegas and lose it all to stronger players—the price a poker novice must pay to get better at their craft.

In 2008, Brill moved to Del Rio, Texas, to marry a US Air Force fighter pilot she'd met while he was taking part in a training exercise in Alberta. Four years later, the couple relocated to Sacramento when her husband was promoted to fly U-2 spy planes out of a nearby base. Though she had little professional experience outside nursing, Brill convinced a local hospital system to hire her for an IT job. She was put in charge of building software that streamlines how medical orders are processed. The new career sparked a deeper interest in advanced analytics, and in 2013 she began pursuing an online master's degree in predictive analytics from Northwestern University. At the time she was several months pregnant with her first child, a boy due to be born that June.

> **"Stones became my one place I could go to not feel any pain, or just to numb it."**

Brill's life was transformed by the arrival of her son, David, whose genetic luck could scarcely have been worse. The infant boy had lissencephaly, a rare disorder that caused him to have frequent seizures. Brill devoted herself to caring for David, who doctors said was unlikely to survive until his first birthday. On the infrequent occasions she was able to leave the house, she headed for local casinos where she could lose herself in the rigid logic of Texas Hold 'Em. Stones Gambling Hall became her favorite haunt.

Brill noticed that Stones, which had opened in July 2014, was trying to boost its visibility by livestreaming its most competitive games. If Stones could build a digital audience, top pros would be more likely to play at the casino and sing its praises on social media. That publicity, in turn, would lure more amateur players—the so-called fish who are the lifeblood of poker rooms in California, which earn their money by taking a cut from every game.

The gregarious Brill cajoled Stones into letting her host a monthly livestreamed game. She proved to be such a magnetic presence at the table that Stones asked her to work as a regular commentator for other games. Brill was a natural, adept at alternating between ribald jokes and deft observations. Few at the casino knew how much she was struggling with her son's illness, or what an alarming amount of red wine she was consuming to cope. "Stones became my one place I could go to not feel any pain," she says, "or just to numb it for a little bit."

David made it to his third birthday and seemed to be thriving, but then a devastating complication arose: He was diagnosed with an aggressive form of cancer, leading to his death in December 2016. Brill's marriage soon failed, a casualty of the couple's overwhelming grief. Desperate for some form of solace, she retreated ever deeper into the booze-soaked poker scene at Stones.

ON OCTOBER 1, as Brill was about to be savaged as a monster who'd neglected her dying son, one of poker's biggest names was busy rallying to her cause. Joey Ingram, a well-known player and host of the *Poker Life* podcast, had taken a keen interest in the video Brill had assembled of Postle's questionable hands. He had experience doing quasi-journalistic investigations of poker scandals—in 2018 he <u>accused</u> a Costa Rican poker website of using bots to undermine its human users. But he'd never heard of shenanigans in a live game streamed from a brick-and-mortar casino where thousands of people watch the players' every move.

Ingram doubted there was anything to Brill's story, but he decided to check out a year-old game on Stones' YouTube channel. Before long he was deep down the Mike Postle rabbit hole, reviewing hours of Texas Hold 'Em footage in lieu of eating or sleeping. "I watched every hand he played. The guy's running and gunning and making these amazing plays, amazing bluffs," Ingram says. "I watched four sessions that first night, and it was the same thing in all four sessions. And I'm like, something's really messed up here."

Around 4 am on October 1, Ingram began to livestream himself evaluating Postle's old games at Stones. For five hours he narrated hands, noting each time Postle made moves that seemed bizarre but still led to wins or minimized losses. He also noted that Postle had a habit of staring down at his lap—the place where he happened to keep his cell phone during games. "I was like, all right, he's looking at his crotch and he seems to be playing like he's a god," Ingram says.

Ingram's livestream was such a hit that he followed it up with another extended session the next day. Tens of thousands of poker aficionados tuned in, captivated not just by the brazenness of the alleged offenses but also by the implications it held for the poker industry at large. According to many poker observers, Postle's supposed deceit had only come to light because he'd gotten greedy and neglected to cover his tracks by occasionally losing on purpose. That meant smarter cheaters might be flying under the radar by keeping their win percentages from getting suspiciously high. "It's like when Sammy Sosa got caught—he wasn't the only one with a corked bat," says Jonathan Sofen, a poker journalist and semipro player. "Or the Houston Astros—they aren't the only ones who cheated in baseball."

Ingram's fans soon began to inundate poker forums with their own investigative work. A thread on a site called Two Plus Two quickly grew to hundreds of pages long, and its contributors posted spreadsheets and graphs that purported to show that Postle had won money in upwards of 86 percent of the Stones livestreamed games he'd taken part in—an accomplishment that should be next to impossible given the mathematical strictures of Texas Hold 'Em.

## Sign Up Today

Sign up for our Longreads newsletter for the best features, ideas, and investigations from WIRED.

The amateur detectives also highlighted several moments and visual details they claimed to be telltale signs of Postle's chicanery. They pointed to a clip from one game, for example, in which Postle appeared to resweep his hole cards over an RFID sensor because they hadn't registered. How, the sleuths asked, would Postle have known to do that unless he had access to the livestream? And was there a bulge beneath his omnipresent baseball cap that might be some sort of bone-conduction headphone, a receiver for inside information?

The crowdsourced investigation caught the attention of Scott Van Pelt, an anchor on ESPN's *SportsCenter*. On the night of October 3, Van Pelt spent three and a half minutes discussing the drama at Stones, and he made clear where his sympathies lay. "If you were this good, why would you be playing in games only with a videofeed at $1/$3 tables at Stones' poker room?" he asked as he wrapped the segment. "Why wouldn't you be in Vegas winning all the money in the world?"

With public opinion turning against him, Postle sought to seize back control of the narrative. He agreed to appear on an October 4 podcast hosted by Mike "The Mouth" Matusow. Sounding groggy and disjointed, Postle pleaded his innocence and argued that he'd been targeted by opponents who envied his minor fame: "There was a secret hatred for me for being made into, I guess, what you would compare to a reality TV star."

When Matusow invited his guest to refute the accusations, Postle replied in vague terms. "There aren't words to describe what I do," he said. "It's creative, diabolical, and predicated on having an MO of always trying to be the most unpredictable player at the table ... There's no book or anything out there that can explain what I do."

The interview did little to quell the poker world's growing belief that Postle was guilty as charged. Strangers started showing up at his house, in a subdivision near Stones; they would bang on his door at odd hours and threaten him with violence. Postle began to worry not just about the future of the only career he'd ever known, but also about the safety of his 8-year-old daughter.

PHOTOGRAPH: KEIRNAN MONAGHAN & THEO VAMVOUNAKIS

EVEN AS A child in Wisconsin, gambling was central to Mike Postle's life. Games he played with his five siblings often involved a wager—when they played Monopoly, for example, real money changed hands. Postle also invented games of skill and chance, including a prize wheel that he installed at the roller rink his father owned. Kids would pay 50 cents a spin for a chance to hit the $5 jackpot. But as Andrew Postle, one of Mike's brothers, recounted on a Stones livestream in August 2019, the game was rigged. "My brother put some quarters behind the wheel so when you spun it, you'd always get so close to the $5 bill," he told one of the evening's commentators. "If there's an angle for my brother to do it, he'll do it."

When he turned 18, as Andrew recalled, Postle got a job at one of the Indian casinos near his home. He started out making change for customers before becoming a dealer, a gig that deepened his interest in poker. In the early 2000s he moved south to work in the casinos of Tunica, Mississippi, a poker hotbed. He soon found that, given his natural

analytical gifts, he could make more money as a player than a dealer. By mid-decade, he was winning big tournaments. In one he claimed nearly $120,000 in prize money. "He was ahead of the curve back then," says Michael Weyer, who came in second to Postle in a 2005 tournament. "He didn't amass that amount of chips by being a dummy."

While riding high in Tunica, Postle joined the masthead of a poker magazine called *Rounder Life*. He wound up dating one of the models featured in the publication, the Las Vegas-born daughter of a professional bowler. When she became pregnant in 2010, the couple moved to Sacramento so Postle's parents, who had relocated there, could help take care of the child. A year after giving birth, Postle's girlfriend told him she'd been diagnosed with a brain tumor that required a risky operation, and that she wanted to get married before she died. Two days after the couple's hasty wedding in December 2011, Postle's now wife had her supposed surgery; for months afterward, she wore bandages on her head and spoke of undergoing follow-up radiation treatments that her husband was not allowed to attend.

But the brain tumor story was a lie: An MRI taken just over a week before her "surgery" showed that her brain was normal. Before Postle became aware of how thoroughly he'd been fooled, he also learned that his wife was struggling with serious mental health and substance abuse issues. The couple tried to work out their problems in therapy, but the marriage was doomed: Postle filed for an annulment in December 2015. (Postle's ex-wife, who has changed her name and is now engaged, told me she regrets some of the ways she acted while drinking to excess during the marriage. She describes her relationship with Postle as "toxic" and says that, toward the end, she was desperate to get "out of the gambling lifestyle.")

An ugly custody dispute ensued, filled with restraining orders and accusations of domestic violence on both sides. In 2016, Postle's soon-to-be ex-wife took their daughter to Idaho to live with her new boyfriend. Postle spent a small fortune to press for his daughter's return—a financial burden in the best of times, but one that he must have felt even more acutely because his career was on the downswing. In the years since his move to California, poker had been overtaken by studious practitioners of game theory optimal, some of whom hold science and engineering degrees. Less scholarly players like Postle found themselves eking out a living at low-stakes tables. "The past five or six years, you have to constantly be improving your game, otherwise you lose," says Jonathan Sofen, the poker journalist. "Everybody today, they're studying game theory optimal, they're watching training videos and reading books. The field of players who don't study? They've mostly gone broke."

Postle was still tangling with his ex-wife in family court when his heater at Stones began in July 2018. His winnings came in handy as he continued paying legal fees. Over the next several months, to Postle's relief, the courts agreed he could have sole physical custody of his daughter, and his ex-wife was granted unsupervised visits. After nearly a decade of heartache and hard luck, all seemed to be going right in Postle's world.

AS THE STONES scandal gained national attention in October 2019, the conventional wisdom held that Postle's results were so anomalous that something hinky must have occurred. But there was still a giant hole in the case against "God": How could he have gotten his opponents' hole-card information in real time?

The man best equipped to answer that question was an Australian named Andrew Milner, the inventor of the RFID-equipped table that makes livestreamed poker possible. A former IT worker who plays Texas Hold 'Em as a hobby, Milner cobbled together his first table in 2008 with an eye toward using it as a training tool. But he found there was a huge

demand from casinos, which sought a low-cost way to reveal hole cards to spectators so they could broadcast games via the internet.

Justin Kuraitis, Stones' tournament director, called Milner in October and asked whether the RFID table had vulnerabilities that Postle could have exploited. Milner all but ruled out a theory that Postle might have tapped into the signal that's relayed from the table's sensors to the room that serves as the casino's broadcast center: That data is encrypted using the same technology employed by online banks, and it seemed unlikely that Postle had the technical skill to overcome such strong security. Milner did think it possible that Postle had installed a tiny webcam on the wall of the broadcast center, pointed at a PC screen that showed the livestream without delay. But the likeliest scenario, he suggested, involved an inside job. "I asked [Kuraitis], do you trust your people?" Milner recalls. "It doesn't matter how secure your environment is, if you can't trust the guys running it, all other measures are irrelevant." (When contacted for this story, Kuraitis' only response was to direct me to a *Rounder Life* story that suggests Brill fabricated the cheating scandal "to become 'a name' in the poker world," a charge she vehemently denies.)

If Postle did have an accomplice at Stones, they would have had little trouble avoiding detection. According to multiple people familiar with how Stones operates, security in the broadcast room was lackadaisical at best. One former contractor told me that he was able to have a masseuse come into the supposedly secure room while he was working on the livestream, and that no one batted an eye. (In a text message exchange with Kasey Mills, Kuraitis says that his rules forbid technicians from even bringing their cell phones into the control room.)

On October 8, the accomplice theory made an appearance in a $30 million federal lawsuit filed by Veronica Brill and ultimately 87 other players—including Mills—who claimed either fraud or negligence by multiple defendants: Stones, Postle, Kuraitis, and an indeterminate number of unnamed collaborators. The plaintiffs' lawyer, Mac VerStandig, is an avid poker player who focuses on casino-related cases. The complaint contended that Postle had won at a clip "not known to have been achieved by any other poker player over such a significant period of time." The document spelled out what VerStandig and his clients believe went down:

"*The Plaintiffs have reason to believe the mechanisms through which these myriad acts of wire fraud were carried out by Mr. Postle, John Does 1–10 and Jane Does 1–10 involved Mr. Postle's cellular telephone being grasped by his left hand while concealed under the poker table and/or Mr. Postle's baseball cap being imbedded [sic] with a communications device creating an artificial bulge in its lining (that is notably absent in photographs of the same baseball cap on Mr. Postle when he is not playing on Stones Live Poker).*"

VerStandig also wrote that the plaintiffs had "a good faith basis upon which to allege the identity of the person who is John Doe 1," but added that he would prefer to refrain from doing so until the discovery process had run its course.

Stones hired the elite law firm of Boies Schiller Flexner to fight the suit, while Kuraitis retained one of Sacramento's top specialists in white-collar crime. Postle, however, decided to represent himself; according to one of his close friends, this was in large part because he was now broke, despite having won an estimated $250,000 during his heater. (Postle has said he earned just $80,000 from the winning streak, and that his accusers have erroneously included chips he bought or loans repaid by fellow players.)

As the legal pressure mounted, the dwindling number of people from the Stones scene who'd stayed in touch with Postle worried that he was buckling under the stress.

PHOTOGRAPH: KEIRNAN MONAGHAN & THEO VAMVOUNAKIS

**I MADE NUMEROUS** attempts to get in touch with Postle this past winter, including by visiting his home. I could tell right away the place was in rough shape. There was a downed tree in the overgrown front yard, the knob on the security door was loose, and the bent second-floor blinds were shut tight. I thought I heard a slight commotion when I rang the bell, but no one ever answered.

On March 7, Postle finally returned one of my many calls. He said he was at the airport on his way to Florida, where he planned to stay for an indeterminate amount of time. Though he declined to address the specific allegations against him, he did tell me that his appetite for poker had largely vanished, and that he'd instead been focusing on spending time with his daughter. He also railed against poker vloggers and social media figures for attacking him for their own cynical, money-grubbing motives. "I didn't really understand the whole fake-news manipulation that happens for the sake of a

story until this happened," he said. "More or less all of the information that's out there? Honestly, none of it's true. The exaggeration, the manipulation? It's just sickening."

In the weeks that followed, Postle promised to respond to a list of written questions about his past, and then apologized multiple times for blowing our agreed-upon deadline for his answers. After a while he stopped bothering to make excuses and fell silent.

Postle finally piped up again on June 4, a day after he'd received some welcome news: The federal court in California had granted Stones' motion to dismiss, largely on the grounds that California's gambling laws generally do not make poker losses recoverable through civil action. The judge left open an opportunity for VerStandig to refile if he could provide more information about how much money Stones had collected from the affected games, but Postle was in the clear. (At the time, Postle was still a defendant in a separate $250,000 lawsuit filed in Nevada by Marle Cordeiro, the player whom he folded against during Brill's last broadcast at Stones. The Nevada court dismissed that case on August 14, citing its lack of jurisdiction in California.)

Postle did not seem to be in a jubilant mood when he reached me by text after his June legal victory. "Veronica is a toxic pathological liar who has proven narcissistic and sociopathic traits and has really gone off the deep end recently," he wrote, citing no evidence. He seemed convinced that Brill had concocted the charges against him to build her following on YouTube, where she was still posting videos about the case. Postle later apologized for his invective but declined to speak any further, stating that he'd only be able to reveal all once he was no longer in legal jeopardy: "I'll be able to give not just the truth, but the shocking events of everything in detail ... with the corresponding truth to corroborate it."

I did not hear from Postle again until mid-August, when he called to request that I delay publication of this story. I said I might be amenable to doing so if he could finally share some evidence to back up his assertion that Brill had plotted against him. After talking in circles for a while, Postle said he'd check with a lawyer and get back to me. In the end he didn't send anything. He also declined repeated requests to answer detailed fact-checking questions for this article.

VERONICA BRILL WAS bewildered by the dismissal of the federal lawsuit in California. "You can cheat on live TV and get away with it," she told me just minutes after learning of the judge's ruling. "So frustrating. It's not the money, per se. It's the lack of accountability."

Several weeks later, Brill received another bit of disconcerting news: Rather than refile an amended complaint, VerStandig asked her and the other plaintiffs to accept a settlement from Stones. Brill refused when she learned that, in exchange for a paltry sum, she would have to sign a public statement conceding there was "no forensic evidence that there was cheating at Stones." (In a statement to WIRED, a Stones representative emphasized that plaintiffs who settled would have to acknowledge that both the casino and Kuraitis "were not involved if there was any cheating by Postle.")

In the wake of the dissolution of her legal case, Brill began receiving a torrent of abuse from anonymous Twitter accounts. "You're a FN idiot!" wrote one user who went by KarmaIsComing4U. "20 years ago we would of beat you ass for even accusing!!!!" (The account has since been deleted.) Brill fears that Postle plans to file a libel suit against her, which she assumes would take her years and her life savings to defend.



Get WIRED

The High-Stakes Data-Driven Poker Takedown

Mike Postle became an online sensation through the world of livestreamed poker. But how did he suddenly become a cheating pariah without any material evidence? Reporter Brendan Koerner takes us ...

00:00:00



SHARE   SUBSCRIBE   COOKIE POLICY   DESCRIPTION

But Brill maintains she has no regrets about calling out Postle, an act she now views as part of a subconscious effort to move on from a dark period of her life. Stones was where she'd gone to mask her grief with an unhealthy amount of red wine and gambling; by blowing up her relationship with the casino, she liberated herself. "The game has gotten harder, I haven't been studying as much, and I'm very frustrated because I'm super-competitive," she says. "I'm actually better at analytics, at IT—y'know, everything else that I'm doing—and I'd rather put my time into that, where I can actually make some gains in lifelong terms."

Postle has an opportunity to put the Stones saga behind him, too. Though he says he's intent on marshaling evidence that will prove he's the victim of a grand conspiracy, there is a far simpler way to reclaim his reputation. "How do you prove you're not cheating at poker? You go play poker," Ingram says. "You would imagine that one of the best players you've ever seen in your life would have no issues saying, Let's play then. I can't really figure out an answer to why he won't do that." The livestream audience for God's return would surely be immense.

*Updated 9/23/2020 6:30 pm ET: A previous version of this story incorrectly stated the rules of Texas Hold 'Em. Players are not required to use their two hole cards when assembling their five-card hand.*

---

*This article appears in the October issue. Subscribe now.*

*Let us know what you think about this article. Submit a letter to the editor at mail@wired.com.*

---

# More Great WIRED Stories

- 🖋 Want the latest on tech, science, and more? Sign up for our newsletters!

- Meet this year's WIRED25: People who are making things better

- A Texas county clerk's bold crusade to transform how we vote

- YouTube's plot to silence conspiracy theories

- The Trump team has a plan to not fight climate change

- You have a million tabs open. Here's how to manage them

- 🏃 •Want the best tools to get healthy? Check out our Gear team's picks for the <u>best fitness trackers</u>, <u>running gear</u> (including <u>shoes</u> and <u>socks</u>), and <u>best headphones</u>

---

<u>Brendan I. Koerner</u> (<u>@brendankoerner</u>) is a contributing editor at WIRED and the author, most recently, of <u>*The Skies Belong to Us: Love and Terror in the Golden Age of Hijacking*</u>.

CONTRIBUTING EDITOR

---

## Featured Video



▶ WATCH
Blackjack Expert Explains How Card Counting Works

**Blackjack Expert Explains How Card Counting Works**

There's a lot more to counting cards in Blackjack than meets the eye. Mike Aponte, former member of the infamous MIT Blackjack Team, takes us through the complicated process of counting cards.

TOPICS   MAGAZINE-28.18   LONGREADS   SPORTS

---



New Year, New Ideas.
1 Year for $5

SUBSCRIBE

# **EXHIBIT 2**

Declaration of Heather Ebert ["Ebert Decl."]

1

2

3

4

5

6

7          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8              **FOR THE COUNTY OF SACRAMENTO**

9

| | |
|---|---|
| 10  **Michael Postle,** an individual; | Case No. 34-2020-00286265 |
| 11         Plaintiff, | |
| 12      vs. | **DECLARATION OF HEATHER EBERT IN SUPPORT OF ANTI-SLAPP SPECIAL MOTION TO STRIKE COMPLAINT UNDER Cal. CODE CIV. PROC. § 425.16** |
| 13  **Veronica Brill,** an individual; **ESPN, Inc.,** a Delaware Corporation; **Joey Ingram,** an individual; **Haralabos Voulgaris,** an individual; **Daniel Negreanu,** an individual; **Upswing Poker, Inc.,** a Nevada Corporation; **iBus Media Limited d/b/a "PokerNews",** and Isle of Man, United Kingdom Private Limited Liability Company Parent; **Jonathan Little Holdings LLC, d/b/a "Poker Coaching",** a Nevada Limited Liability Company; **Solve For Why Academy LLC,** a Nevada Limited Liability Company; **Todd Witteles,** an individual; **Run It Once, Inc.,** a Nevada Corporation; and **DOES 1** through **1,000,** inclusive; | |
| 14 | |
| 15 | |
| 16 | Action Filed:    10/01/2020 |
| 17 | Trial Date:     Not yet set |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22         Defendants. | |

23

24

25

26

27

1    I, Heather Ebert, declare:

2        1.      I am over 18 years of age and have never been convicted of a crime involving fraud

3    or dishonesty.

4        2.      The facts set forth in this Declaration are within my personal knowledge and are

5    true and correct to the best of my knowledge and belief.

6        3.      I am a legal assistant for Randazza Legal Group, PLLC ("RLG").

7        4.      On January 5, 2021, while at the Las Vegas office of RLG, I accessed the URL

8    <https://www.wired.com/story/stones-poker-cheating-scandal/> on a MacBook Air personal

9    computer using the macOS Mojave operating system and the Google Chrome Internet browser.

10   Immediately after visiting this URL, I saved a true and correct copy of the web page to PDF format,

11   a copy of which is attached to Defendant Veronica Brill's Notice of Motion and Special Motion

12   to Strike Plaintiff's Complaint Under Cal. Code Civ. Proc. § 425.16 as **Exhibit 1**.

13       5.      On January 5, 2021, while at the Las Vegas office of RLG, I accessed the URL

14   <https://www.youtube.com/watch?v=uuWuc4hHT-w> on a MacBook Air personal computer

15   using the macOS Mojave operating system and the Google Chrome Internet browser.  Immediately

16   after visiting this URL, I saved a true and correct copy of the web page to PDF format, a copy of

17   which is attached to Defendant Veronica Brill's Notice of Motion and Special Motion to Strike

18   Plaintiff's Complaint Under Cal. Code Civ. Proc. § 425.16 as **Exhibit 3**.

19       6.      I watched the video at this url and personally observed the following exchange

20   between Mike Postle and Justin Kuraitis from the 4 minute 20 second mark of the video to the 4

21   minute 44 second mark of the video:

22   **Kuraitis:** "I mean, who wouldn't want to know the thought process of a poker player that is

23   running like a freaking god.  They nicknamed you in previous streams 'Mike Jesus Postle,'

24   'G.O.D.', it's like – I think it's the other way, I think you may have sold your soul to the devil."

25   **Postle:** "I am running like Zeus right now."

26       7.      On January 5, 2021, while at the Las Vegas office of RLG, I accessed the URL

27   <https://www.youtube.com/watch?v=9L6DueV9aHc> on a MacBook Air personal computer

using the macOS Mojave operating system and the Google Chrome Internet browser. Immediately after visiting this URL, I saved a true and correct copy of the web page to PDF format, a copy of which is attached to Defendant Veronica Brill's Notice of Motion and Special Motion to Strike Plaintiff's Complaint Under Cal. Code Civ. Proc. § 425.16 as **Exhibit 4**.

8.      On January 5, 2021, while at the Las Vegas office of RLG, I accessed the URL <https://www.youtube.com/watch?v=-hPmOpd_wBs> on a MacBook Air personal computer using the macOS Mojave operating system and the Google Chrome Internet browser. Immediately after visiting this URL, I saved a true and correct copy of the web page to PDF format, a copy of which is attached to Defendant Veronica Brill's Notice of Motion and Special Motion to Strike Plaintiff's Complaint Under Cal. Code Civ. Proc. § 425.16 as **Exhibit 5**.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 6, 2021.

_____
Heather Ebert

# **EXHIBIT 3**

Mike Postle Interview with Justin Kuraitis 1-23-2019 (Jan. 4, 2019).
Available at:
https://www.youtube.com/watch?v=uuWuc4hHT-w.

   **YouTube**   



## Mike Postle Interview with Justin Kuraitis 1-23-2019

23,361 views • Jan 24, 2019        👍 34    👎 214    ↗ SHARE    ⎗+ SAVE    •••

 

**Stones Live Poker**
8.17K subscribers

SUBSCRIBE

We broadcast every Monday, Wednesday, and Friday at 7PM PT and the last Sunday of each month on https://www.twitch.tv/stoneslivepoker from Stones Gambling Hall, located in Citrus Heights, California.

SHOW MORE

Up next                                                    AUTOPLAY  ⬤

SKIP NAVIGATION





**#6 MIKE POSTLE INTERVIEW W/ MIKE MATUSOW PART 2 INVESTIGATION**
joeingram1
162K views • Streamed 1 year ago







SHOCKING POKER CHEATING: Why everyone is Freaking Out About Mike Postle

Doug Polk Poker ✓
2.4M views • 1 year ago



**Mike Postle Cheating Scandal Condensed + NEW Hands**
CrushlivePoker
125K views • 3 months ago



**Mike Postle FRANTICALLY PANICS As The Scam Falls Apart**
Doug Polk Poker ✓
1.1M views • 1 year ago



**Warren Buffett & Jay - Z - Billionaire Investing Secrets (Interview with Forbes)**
TradingCoachUK
664K views • 6 years ago



**UNBELIEVABLE Poker Instincts! How Does He Know???**
Doug Polk Poker ✓
154K views • 1 year ago



**Veronica The Mike Postle Whistleblower Joins Me!**
joeingram1
147K views • Streamed 1 year ago



**Mike Postle Cheating First Time?**
GUMPNSTEIN
76K views • 1 year ago



**Chris Glasgow AKA MastaC talks about his time on stones live poker doing commentary**
Veronica Brill
1.1K views • 5 months ago

SKIP NAVIGATION



**Real Estate Investment Trusts for Dummies**
Commercial Property Advisors
90K views • 3 years ago

      



**When Your LIVE READS Pinpoit Their Exact Hand**
Doug Polk Poker ✔
271K views • 1 year ago



**TOP 10 SHADY Mike Postle Hands**
Jeff Boski
272K views • 1 year ago



**STUNNING TWIST In The Postle Investigation (With Matt Berkey)**
Doug Polk Poker ✔
232K views • Streamed 1 year ago

**WPT Action!**
World Poker Tour
1.6K watching
[ LIVE NOW ]

**He KNEW Mike Postle Was Up To Something | (Jaman Burton)**
joeingram1
88K views • Streamed 1 year ago

**How to Run Deep in Online Tournaments [MTT's]**
Jonathan Little - Poker Coaching
88K views • Streamed 7 months ago

**#4 INVESTIGATION MIKE POSTLE CHEATING SCANDAL STONES LIVE**
joeingram1
71K views • Streamed 1 year ago

**Mike Postle CHEATING?**
Jeff Boski
137K views • 1 year ago

Malcolm X - Interview At Berkeley (1963)

# EXHIBIT 4

Screenshot of "Avoid Mike Postle: Crazy 1/3 No-Limit game at Stones Gambling Hall" (Nov. 26, 2018).
Available at: https://www.youtube.com/watch?v=9L6DueV9aHc

 YouTube



## Avoid Mike Postle: Crazy 1/3 No-Limit game at Stones Gambling Hall

121,102 views • Nov 26, 2018           1.5K     92    ➤ SHARE    ≡₊ SAVE    • • •

    **Jaman Burton**
34.9K subscribers                                                        SUBSCRIBE

The exciting conclusion to my latest trip to Stones Gambling Hall.

Support the Vlog: https://www.patreon.com/thedrawingdead

SHOW MORE

SKIP NAVIGATION

    

 The Official World Series of Po...
 PlayWSOP.com     **PLAY NOW**

**Up next**          AUTOPLAY 



**Mike Postle FRANTICALLY PANICS As The Scam Falls Apart**
Doug Polk Poker ✓
1.1M views • 1 year ago



**S4:E9 5/10 Poker in Vegas including the BIGGEST POT I've ever vlogged**
Jaman Burton
44K views • 1 year ago



**#6 MIKE POSTLE INTERVIEW W/ MIKE MATUSOW PART 2 INVESTIGATION**
joeingram1
162K views • Streamed 1 year ago



**He KNEW Mike Postle Was Up To Something | (Jaman Burton)**
joeingram1
88K views • Streamed 1 year ago



**Mix - Jaman Burton**
YouTube



**The two WORST cheating hands!!**
Veronica Brill
36K views • 6 months ago



**Massive BLUFF for a $5,000 Pot!**
RampagePoker

 YouTube        



### SHOCKING POKER CHEATING: Why Everyone Is Freaking Out About Mike Postle
Doug Polk Poker ✓
2.4M views · 1 year ago



### Crushing the VLogger's Game w/ Neeme & Friends @ Stones Gambling Hall | Poker VLOG 25
JohnnieVibes
94K views · 2 years ago



### Charlie Munger's advice on investing and life choices that make a person wealthy
Yahoo Finance ✓
1.1M views · 1 year ago



### Mike Postle CHEATING?
Jeff Boski
137K views · 1 year ago

### TOP 10 SHADY Mike Postle Hands
Jeff Boski
272K views · 1 year ago

### How to Run Deep in Online Tournaments [MTT's]
Jonathan Little - Poker Coaching
88K views · Streamed 7 months ago

### WPT Action!
World Poker Tour
2K watching
[ LIVE NOW ]

### Flopping the NUTS and Getting RAISED at the Bellagio! (Part 1)
Alex Duvall
13K views · 2 weeks ago

# **EXHIBIT 5**

Screenshot of "God Mode (or Cheating?) by Mike Postle in a $5/$10 Cash Game"
(June 6, 2019). Available at: https://www.youtube.com/watch?v=-hPmOpd_wBs

 YouTube                  



## God Mode (or Cheating?) by Mike Postle in a $5/$10 Cash Game

89,713 views • Jun 6, 2019           1K    92    SHARE    SAVE   •••

   **Jonathan Little - Poker Coaching**
77.7K subscribers                                                     SUBSCRIBE

How would you do playing against Mike Postle? Check out this NEW QUIZ to find out!
How to Beat Mike Postle QUIZ: https://pokercoaching.com/poker-quizz...

SHOW MORE

---

Up next                                                     AUTOPLAY 

SKIP NAVIGATION           **NEW EVIDENCE In Mike Postle Investigation**
                         Doug Polk Poker ✓
    378K views • Streamed 1 year ago

    

**YouTube**

1.1M views • 1 year ago



**$20,000,000 Lawsuit against Poker Cheat, Mike Postle - Interview with Lawyer, Mac VerStandig!**
Jonathan Little - Poker Coaching
68K views • 1 year ago



**Playing AK vs a Limper [LIVE CASH GAME STRATEGY]**
Jonathan Little - Poker Coaching
19K views • 10 months ago



**Mix - Jonathan Little - Poker Coaching**
YouTube



**3 Lessons to CRUSH Small Stakes Cash Games**
Jonathan Little - Poker Coaching
325K views • 1 year ago



**Weekly Poker Hand, Episode 249: A nearly nut-low hand decides to get frisky on the river**
Jonathan Little - Poker Coaching
5.1K views • 1 year ago



**#6 MIKE POSTLE INTERVIEW W/ MIKE MATUSOW PART 2 INVESTIGATION**
joeingram1
162K views • Streamed 1 year ago



SKIP NAVIGATION

**SHOCKING POKER CHEATING: Why Everyone Is Freaking Out About Mike Postle**
Doug Polk Poker ✓
2.4M views • 1 year ago



**An Optimistic Bluff at Stones Gambling Hall**
Jonathan Little - Poker Coaching
5.3K views • 1 year ago



     

**Veronica The Mike Postle Whistleblower Joins Me!**
joeingram1
147K views • Streamed 1 year ago

**TOP 10 SHADY Mike Postle Hands**
Jeff Boski
272K views • 1 year ago

**Mastering the Fundamentals: Preflop Strategy**
Jonathan Little - Poker Coaching
124K views • 5 months ago

**HIGH STAKES POKER | DWAN is BACK!**
Jonathan Little - Poker Coaching
50K views • 1 week ago

**UNBELIEVABLE Poker Instincts! How Does He Know???**
Doug Polk Poker ✔
154K views • 1 year ago

**#7 (CLEAR EVIDENCE) CHEATING IS BORN? + New Results For Mike Postle**
joeingram1
284K views • 1 year ago

**#5 MIKE POSTLE INTERVIEW W/ MIKE MATUSOW INVESTIGATION**
joeingram1
146K views • Streamed 1 year ago

**How to Beat Small Stakes Poker AND Move UP!**
Jonathan Little - Poker Coaching
26K views • Streamed 2 weeks ago

# **EXHIBIT 6**

Declaration of Veronica Brill

1

2

3

4

5

6

7    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8    **FOR THE COUNTY OF SACRAMENTO**

9

10   **Michael Postle,** an individual;

11         Plaintiff,

12      vs.

13   **Veronica Brill,** an individual; **ESPN, Inc.,** a
     Delaware Corporation; **Joey Ingram,** an
14   individual; **Haralabos Voulgaris,** an individual;
     **Daniel Negreanu,** an individual; **Upswing Poker,**
15   **Inc.,** a Nevada Corporation; **iBus Media Limited**
     **d/b/a "PokerNews",** and Isle of Man, United
16   Kingdom Private Limited Liability Company
     Parent; **Jonathan Little Holdings LLC, d/b/a**
17   **"Poker Coaching",** a Nevada Limited Liability
     Company; **Solve For Why Academy LLC,** a
18   Nevada Limited Liability Company; **Todd**
     **Witteles,** an individual; **Run It Once, Inc.,** a
19   Nevada Corporation; and **DOES 1** through **1,000,**
     inclusive;
20
21
22         Defendants.

23

24

25

26

27

Case No. 34-2020-00286265

**DECLARATION OF VERONICA**
**BRILL IN SUPPORT OF ANTI-**
**SLAPP SPECIAL MOTION TO**
**STRIKE COMPLAINT UNDER Cal.**
**CODE CIV. PROC. § 425.16**

Action Filed:    10/01/2020
Trial Date:      Not yet set

1       I, Veronica Brill, declare:

2       1.      I am over 18 years of age and have never been convicted of a crime involving fraud

3   or dishonesty. I have first-hand knowledge of the facts set forth herein, and if called as a witness

4   could and would testify competently thereto.

5       2.      I am a defendant in this matter.

6       3.      I am a professional poker player and in 2018 and 2019 I regularly hosted Stones

7   Live poker games run by Stones Hall.

8       4.      I am intimately familiar with Plaintiff Michael Postle's play style and his win

9   record. I have played several poker games with Postle personally, and I have reviewed and

10  analyzed footage of his play during several other poker games.

11      5.      The prevailing theory of play among professional poker players is called game

12  theory optimal ("GTO"). GTO is a theory stating that, for each possible scenario in a poker game,

13  there is a decision that will maximize a player's winnings over time.

14      6.      Due to the inherent randomness of poker, a player utilizing GTO perfectly could

15  still lose an individual game, but on average a player using it over the course of several games is

16  nearly guaranteed to turn a profit.

17      7.      I am familiar with GTO and utilize it myself. Becoming skilled at GTO requires

18  hundreds of hours of study and practice of all possible card and hand combinations and which play

19  is best at any given time.

20      8.      From June 2018 to September 2019, Plaintiff's style of playing poker bore none of

21  the hallmarks of GTO; he regularly made decisions that appeared capricious and unnecessarily

22  risky, and made little sense when viewed through a statistical lens.

23      9.      From July 2018 to September 2019, Plaintiff net winnings in 94% of Stones Live

24  games, despite each game being of fixed duration and elevated variance compared to normal poker

25  games.

26      10.     Plaintiff averaged a profit of more than 60 "big blinds per hour," a metric used by

27  professional poker players to track winnings, adjusting for the different stakes of various games.

1  For context, 5 big blinds per hour is something to which professional players should aspire, and
2  25 big blinds per hour is incredibly rare and shows performance far beyond almost any other
3  professional player.

4    11.    Plaintiff's win record placed him in a league of his own; this statistic would make
5  Plaintiff one of the best poker players of all time.

6    12.    Plaintiff's success in any individual game could be attributed to good luck or skill
7  at reading his opponents, but not such consistent success over more than a year.

8    13.    As a repeat host of Stones Live games, I am aware that Stones Live games are
9  broadcast to its audience on a 30-minute delay.  Stones Hall uses radio frequency identification
10 ("RFID") reader scanner technology that allows it to keep track of the position of all players' cards,
11 and broadcasts this information as part of its stream to allow viewers to better understand what is
12 happening during a game.

13   14.    Stones Hall, as the operator of Stones Live games, has all this information available
14 to it in real time, without a delay, and has the ability to transmit this live feed to third parties.

15   15.    I personally observed that Plaintiff had a regular habit of bringing his phone to
16 Stones Live games and looking at its screen while playing, but placing the phone such that no other
17 players or cameras could view it.

18   16.    I observed that Plaintiff almost never continued playing after a broadcast ended,
19 despite other players regularly doing this, and Plaintiff rarely played in games not hosted by Stones
20 Hall, even though many of them provided larger potential payouts.

21   17.    Considering this suspicious behavior and the inexplicable nature of Plaintiff's
22 success with seemingly sub-optimal play, I concluded there was a chance that someone in Stones
23 Hall was providing Plaintiff with a non-delayed live stream of Stones Live games, thus allowing
24 him to see the cards other players had in their hand, giving him a significant advantage, i.e.,
25 cheating.

26   18.    I was further convinced of this because, in the Stones Live Poker sessions where
27 Plaintiff played poorly, he did not habitually stare at his lap, tended to keep his cell phone in plain

1  view, and evidenced the sort of mediocre poker analytical and decision-making skills indicative of

2  an average or below-average player.

3      19.    In March 2019, I spoke with Justin Kuraitis, the Stones Hall employee in charge of

4  the live-stream production of Stones Live at Stones Hall, about my suspicions of Plaintiff cheating.

5      20.    I am aware other professional poker players around this time also had suspicions

6  that Plaintiff was cheating and voiced these suspicions to Stones Hall.

7      21.    Prior to September 2019, I spoke with Kasey Mills, a professional poker player,

8  who told me that in March 2019 she also spoke with Kuraitis and told him she suspected Plaintiff

9  of cheating.

10      22.    Prior to September 2019, I spoke with Andrew Barber, a professional poker player,

11  who told me that he had multiple conversations with Kuraitis about the possibility of Plaintiff

12  cheating during Stones Live games.

13      23.    Prior to September 2019, I spoke with Bart Hanson, a professional poker player,

14  who told me he spoke with Kuraitis about increasing Stones Hall security due to allegations of

15  potential cheating by Plaintiff.

16      24.    Stones Hall claimed that it performed an investigation following these complaints

17  and that it concluded Plaintiff was not cheating.

18      25.    This statement did not settle the matter for me, because I suspected that Stones Hall

19  itself was allowing Plaintiff to cheat, and so an internal investigation exonerating itself was of little

20  relevance. Indeed, Plaintiff's apparent cheating continued unabated up through September 2019.

21      26.    Plaintiff's cheating was especially apparent during a Stones Live Pot Limit Omaha[1]

22  game in May 2019. During a particular hand, in which only 2 of each player's 4 Hole Cards were

23  captured by the RFID table, Plaintiff can be seen repeatedly looking at his cell phone under the

24  table and trying to spread all 4 of his Hole Cards over the RFID table's sensor, in a deliberate and

25  highly unusual manner. His demeanor throughout the hand is exceedingly strange, and it is

26  

---

27  [1]    Pot Limit Omaha, or "PLO," is a game in which players are dealt 4 Hole Cards. In contrast, during Texas hold 'em, the predominant game on Stones Live Poker, players are only dealt 2 cards.

apparent this technical malfunction (which, in turn, denied him the ability to play the hand with knowledge of his opponents' Hole Cards) is distressing to Plaintiff. This is so even though the malfunction is one of which Plaintiff could have no real-time knowledge unless he was cheating.

27. Following the above hand during the May 2019 game, Plaintiff was interviewed by a commentator and asked, "so what happened on that PLO hand where it only showed two of our cards?" Plaintiff could not have known about this technical malfunction unless he was cheating by watching a non-delayed live stream of the game. The fact that he asked the question immediately afterward shows that he had access to a non-delayed stream.

28. Since beginning to play in Stones Hall games in June 2018, Plaintiff almost exclusively played paid cash poker games with Stones Hall and almost never continued playing after the broadcast ended, despite it being common for players to continue to play after a broadcast ends. Plaintiff was not known to have played with much frequency in other poker games, streamed or unstreamed, despite many of them providing larger potential payouts than Stones Hall.

29. Unless Plaintiff was cheating with the assistance of Stones Hall, this behavior seemed extremely strange. If Plaintiff was actually as good as he appeared, there would be no reason for him to decline to play in games that were not being live streamed by Stones Live.

30. During a September 21, 2019 Stones Live game in which Plaintiff played, I observed that he frequently stared at his cell phone such that no one else could view his screen. Like in other games where I suspected him of cheating, he made decisions that defied all conventional wisdom of the professional poker community and yet did very well for himself.

31. By this point, I was completely convinced that the only possible explanation for Plaintiff's success was that he cheated. I also knew that Stones Hall would do nothing to stop him from cheating. Thus, the only way to stop Plaintiff's cheating was to let the professional poker community know about it by publishing my suspicions online.

32. On September 28, 2019, I published 9 tweets on my Twitter account, all in the same thread. True and accurate copies of these tweets are attached to this Declaration as **Exhibit A**.

33.     In these tweets, I was providing my opinion, based on my observations of Plaintiff's play during several Stones Live games and other observations noted above. I made it abundantly clear that I was providing my opinion, and was not stating with absolute certainty that Plaintiff had cheated or by what method he was cheating. Nevertheless, I was at the time, and still am today, convinced that Plaintiff was cheating during Stones Live games.

34.     I published these statements to inform the professional poker community about Plaintiff's cheating in the hope that this information would stop a habitual cheater and return some respect to the community. I did not publish these statements as part of any personal grudge or dispute with Plaintiff.

35.     I am personally aware that Stones Hall and its employees regularly created and displayed significant promotional material for Plaintiff, speaking of how prominent, skilled, and dominant a player he was. A few examples of such promotional material are attached to this Declaration as **Exhibit B.**

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _1/6/2021_____.

DocuSigned by:

_____
01B4FDD248B045B
Veronica Brill

# EXHIBIT A

Tweets by Veronica Brill published on September 28, 2019

Filed 09/28/21   DocuSign Envelope ID: 7C95982C-E6B6-4A5B-887D-68BEA714A052   Case 21-22632   Doc 27

← **Thread**

🔍 Searc... 

**Veronica Brill**
@Angry_Polak

**Relevan**

If someone is displaying a probability of cheating on a live stream you don't make the entire room not be able to use their cellphones in an attempt to reduce everyone's anxiety and then still promote the player as one of the best.

11:33 AM · Sep 28, 2019 · Twitter for Android

**11** Retweets   **11** Quote Tweets   **476** Likes

💬            ⟲            ♡            ⬆️

**Veronica Brill** @Angry_Polak · Sep 28, 2019
Replying to @Angry_Polak
You take that player off the stream while you launch a proper, objective, investigation done by a third-party. Once it's shown that the player has not been cheating you make your investigation public and let the player back onto the stream.

💬 5          ⟲          ♡ 79          ⬆️

**Veronica Brill** @Angry_Polak · Sep 28, 2019
Am I sure that this player is cheating? No. Do I think that there is a greater than zero % chance that he is? Yes
Have numerous professional poker players voiced their concerns to me regarding this player? Yes.

💬 2          ⟲ 1          ♡ 79          ⬆️

**Veronica Brill** @Angry_Polak · Sep 28, 2019
Also, I brought up my concerns about this player months ago to the person running the live stream. I was told that no one gets this player and that he is just better than everyone. Also that they had some one or some company come in to check their security

💬 3          ⟲          ♡ 63          ⬆️

**Veronica Brill** @Angry_Polak · Sep 28, 2019
Apparently that didn't help because no one is allowed to have a cellphone while playing even off stream. The thing is that it doesn't take a cell phone to cheat. There could easily be a small device on his leg that lets him know when he's ahead. I'm just speculating at this point

💬 4          ⟲          ♡ 59          ⬆️

**Veronica Brill** @Angry_Polak · Sep 28, 2019
I want to say that off stream he's a nice guy and has always played in my game. I wanted to take him off my line up last year because of suspicions but was assured by the guy running the stream that he wasn't cheating. All the videos are up. You can decide for yourself

💬 3          ⟲ 1          ♡ 51          ⬆️

**Veronica Brill** @Angry_Polak · Sep 28, 2019
I feel that with such a high vpip and play style, if we run the SIM a hundred times with players of equal competency he's running in the 95th percentile of results

💬 5          ⟲

**Home**
**Explore**
**Notifications**
**Messages**
**Bookmarks**
**Lists**
**Profile**
**More**



**What's**

US elections
**Georgia S**
line up at
the state

Music · Tren
**The Week**
41.5K Tweet

Hip hop · Tr
**Kanye**
24.8K Twee

COVID-19
**COVID-19**
**for Nevad**

US news ·
**No officer**
**the shooti**
**Kenosha,**
Trending wit
Sheskey

Show more

Terms of Se
Ads info · Mo

**Messages** 📧  ⌃

DocuSign Envelope ID: 7C95982C-E6B6-4A5B-887D-68BEA714A052

(20) Veronica Brill on Twitter: "If someone is displaying a probability of cheating on a live stream you don't make the entire room not be able to use their...

Home

Explore

Notifications

Messages

Bookmarks

Lists

Profile

More

TWEET

**Veronica Brill** @Angry_Polak · Sep 28, 2019



Mike Postle on Stones Live
Compilation of hands
youtube.com

11    4    61

**Veronica Brill** @Angry_Polak · Sep 28, 2019

youtu.be/BATKzg3Wu0l
Someone DMed me to remind me of this one



Battle of the Ace Highs fo $8k+ 3/14/19
We invite you to join us for out broadcasts on
Monday's Wednesday's and Saturday's from ...
youtube.com

16    1    32

Q Searc

Messages

DocuSign Envelope ID: 7C95982C-E6B6-4A5B-887D-68BEA714A052

# **EXHIBIT B**

Stones Hall Promotional Material for Plaintiff

Filed 09/28/21    Case 21-22632    Doc 27
DocuSign Envelope ID: 7C95982C-E6B6-4A5B-887D-68BEA714A052

# Mike "Get There" Postle

## HIS BESTSELLING CLASSIC



# THE POWER OF POSTLE THINKING

## A PRACTICAL GUIDE TO CRUSHING SOULS AND RUNNING PURE

DocuSign Envelope ID: 7C95982C-E6B6-4A5B-887D-68BEA714A052



# EXHIBIT 4

Postle's Motion to Continue Hearing on Veronica Brill's Anti-SLAPP Motion in State Court Case

1

MICHAEL POSTLE
3724 Deer Walk Way
Antelope, CA 95843
916-790-4112

2

3

Plaintiff, In Pro Per

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



RECEIVED
LAW AND MOTION DROP BOX

**FILED/ENDORSED**

FEB 24 2021

By: _____
E. Medina
Deputy Clerk

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SACRAMENTO**

| | |
|---|---|
| MICHAEL POSTLE,<br><br>        Plaintiff,<br><br>vs.<br><br>VERONICA BRILL,<br><br>        Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.: 34-2020-00286265

NOTICE OF MOTION AND MOTION TO
CONTINUE HEARING ON SPECIAL
MOTION TO STRIKE; POINTS AND
AUTHORITIES; DECLARATION OF
MICHAEL POSTLE

Date: March 16, 2021
Time: 1:30 p.m.
Dept: 53
Judge:

Date Action Filed: February 24, 2021

Reservation No.: 2554074

To defendant, Veronica Brill, and to her attorney(s) of record: Marc Randazza, Esq.
NOTICE IS HEREBY GIVEN that on  March 16, 2021, at 1:30PM, or as soon thereafter as the
matter may be heard, in Department 53 of this court, located at 813 6th Street, Sacramento, Plaintiff,
Michael Postle, will, and hereby does, move for an order continuing the trial and mandatory
settlement conference, reopening discovery until 30 days prior to the new trial date, and referring this
matter back to the case management program for trial setting.

        The motion will be made on the grounds that the plaintiff is interviewing new counsel and
needs guidance to answer the opposition. Additionally, the plaintiff has just retained an organization
specializing in internet based First Amendment and defamation issues, substantial discovery remains
to be completed, and the Plaintiff is unable to adequately prepare in the time remaining.

---

1

MOTION TO CONTINUE

1        The motion will be based on this notice of motion, on the declaration(s) of Michael Postle,

2   and the supporting memorandum served and filed herewith, on the records and file herein, and on

3   such evidence as may be presented at the hearing of the motion.

4

5        Pursuant to Local Rule 1.06 (A), the court will make a tentative ruling on the merits of this

6   matter by 2:00 p.m., the court day before the hearing. The complete text of the tentative rulings for

7   the department may be downloaded off the court's website. If the party does not have online access,

8   they may call the dedicated phone number for the department as referenced in the local telephone

9   directory between the hours of 2:00 p.m. and 4:00 p.m. on the court day before the hearing and

10  receive the tentative ruling. If you do not call the court and the opposing party by 4:00 p.m. the court

11  day before the hearing, no hearing will be held.

12  Dated: February 24, 2021             By: _____
                              MICHAEL POSTLE
                              Plaintiff, In Pro Per

SACRAMENTO COUNTY
SUPERIOR COURT OF
CALIFORNIA, COUNTY OF

2021 FEB 24  PM 3: 50

CLERK AND NOTION CLERK COX
RECEIVED

## Memorandum of Points and Authorities in Support of Motion to Continue

### I. Background

This lawsuit arises from a lengthy, calculated course of action that purposefully defamed the plaintiff, caused him to be held in contempt by his peers and the general public, damaged his ability to earn a living, and put his life in danger. The plaintiff was initially represented by counsel, however their lack of experience in online defamation has resulted in their excusing themselves from the case and the Plaintiff interviewing more appropriate counsel. To date, Plaintiff has not retained new counsel and is unable to prepare the case for trial set at the current date. Additionally, the Plaintiff has retained an organization specializing in internet defamation and First Amendment issues to assist when new counsel is retained, both will need time to confer and prepare. Additionally, discovery remains to be competed in this lawsuit.

### II. Legal Argument

GOOD CAUSE EXISTS FOR CONTINUANCE IN THAT PLAINTIFF IS SEEKING NEW COUNSEL, AND SUCH NEW COUNSEL WILL BE UNABLE TO ADEQUATELY PREPARE WITHOUT A CONTINUANCE.

**A. Good Cause.** A court may grant a continuance before or during trial on an affirmative showing of good cause and each request for a continuance must be considered on its own merits (Cal. Rules of Ct., Rule 3.1332(c)).

**B. Significant, Unanticipated Change in Case Status Constitutes Good Cause for Continuance.** The circumstances that may indicate good cause for a continuance include a significant, unanticipated change in the status of the case as a result of which the case is not ready for trial ( Cal. Rules of Ct., Rule 3.1332(c)(7)). Previous counsel excused themselves due to a lack of experience in online defamation.

**C. Continuance Sought as Soon as Reasonably Practical.** A party seeking a continuance of the date set for trial, whether contested or uncontested or stipulated to by the parties, must make the motion or application as soon as reasonably practical once the necessity for the continuance is discovered (Cal. Rules of Ct., Rule 3.1332(b)). The plaintiff is seeking replacement counsel with

---

MOTION TO CONTINUE

1  experience in online defamation. Once retained, it is unlikely that any attorney will have the case

2  prepared in time to answer the opposition.

3          **D. Opportunity for Full Presentation.** A continuance should be granted if failure to allow

4  the continuance would probably or possibly prejudice the party seeking the continuance by depriving

5  that party of the opportunity to fully and fairly present his/her/its case (Cadle Co. v. WorldWide

6  Hospitality Furniture (2006) 144 Cal. App. 4th 504, 513–515, 50 Cal. Rptr. 3d 480; In re Dolly A.

7  (1986) 177 Cal. App. 3d 195, 199, 201, 222 Cal. Rptr. 741; Cohen v. Herbert (1960) 186 Cal. App.

8  2d 488, 494, 8 Cal. Rptr. 922).

9

10  Dated: February 24, 2021                    By: _____

                                                   MICHAEL POSTLE

11                                                 Plaintiff, In Pro Per

RECEIVED
LAW AND MOTION DROP BOX
2021 FEB 24 PM 3:56
GORDON D SCHABER
SUPERIOR COURT
OF CALIFORNIA
SACRAMENTO COUNTY

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF MICHAEL POSTLE

I, MICHAEL POSTLE, am the Plaintiff in this matter, and I declare the following in support of my motion for continuance:

The plaintiff was initially represented by counsel, however their lack of experience in online defamation has resulted in their excusing themselves from the case and the Plaintiff interviewing more appropriate counsel. To date, Plaintiff has not retained new counsel and is unable to prepare the case in the time remaining.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: February 24, 2021                    By: _Michael Postle_____
                                            MICHAEL POSTLE
                                            Plaintiff, In Pro Per

---

5

MOTION TO CONTINUE

RECEIVED
LAW AND MOTION DROP BOX

2021 FEB 24   PM 3: 55

SB350 COURTHOUSE
SUPERIOR COURT
BY C. MARTINEZ
SACRAMENTO COUNTY

1  MICHAEL POSTLE
   3724 Deer Walk Way
2  Antelope, CA 95843
   916-790-4112
3
   Plaintiff, In Pro Per
4

5              **SUPERIOR COURT OF CALIFORNIA**

6                **COUNTY OF SACRAMENTO**

7

8  MICHAEL POSTLE,              )  Case No.: 34-2020-00286265
                                )
9              Plaintiff,       )  [PROPOSED] ORDER CONTINUING
                                )  SPECIAL MOTION TO STRIKE
10     vs.                      )
                                )  Date: March 16, 2021
11                              )  Time: 1:30 p.m.
   VERONICA BRILL,              )  Dept: 53
12                              )  Judge:
                                )
13             Defendant        )
                                )
14                              )
                                )
15  ─────────────────────────── )

16  The motion of Plaintiff, Michael Postle for an order continuing Defendant's Special Motion to Strike

17  conference came on regularly for hearing by the court on _____. Plaintiff appeared by self-

18  representation; defendant appeared in pro per.

19
    On proof made to the satisfaction of the court that the motion ought to be granted,
20
    IT IS ORDERED that the motion be, and hereby is, granted. The existing trial date and mandatory
21
    settlement conference date is/are vacated.  This case is referred back to the Case Management
22
    Program for setting of a trial date.
23
    Dated: _____.
24

25                             _____
                               Judge of the Superior Court
26

27

28
    ─────────────────────────────────────────────────────────────
                                    1
    ORDER CONTINUING HEARING ON DEFENDANT'S SPECIAL MOTION TO STRIKE

*JACKSON v. COLONIAL ENERGY LLC, et al.*
Sacramento County Superior Court
Case No. 34-2018-00230858-CU-PO-GDS

## PROOF OF SERVICE BY ELECTRONIC MAIL ONLY

I, LEAH KOLOGY, am employed by the Law Offices of Ted A. Greene, Inc., 1912 F Street, Suite 110, Sacramento, CA 95811. I am over the age of 18 years and am not a party to this action.

My electronic service address is: **lkology@tedgreenelaw.com**

I electronically served today the following document(s): to the following addresses of the interested parties: **NOTICE OF MOTION AND MOTION TO CONTINUE HEARING ON SPECIAL MOTION TO STRIKE; POINT AND AUTHORITIES; DECALRATION OF MICHAEL POSTLE**

*Attorneys for Defendant*
*Veronica Brill*
Marc Randazza, Esq.
Randazza Legal Group, PLLC
mrj@randazz.com

*Attorneys for Defendant*
*Todd Witteles*
Eric Bensamochan, Esq.
The Bensamochan Law Firm, Inc.
eric@eblawfirm.us

**SERVICE BY ELECTRONIC TRANSMISSION ONLY: PER CALIFORNIA RULES OF COURT EMERGENCY RULE 12 (b)(2) REGARING ELECTRONIC SERVICE,** service has been performed by e-mailing the document(s) to the person(s) at the email address(es) listed above. During the Coronavirus (Covid-19) pandemic, this office will be working remotely and is therefore using only electronic mail. No electronic message or other indication that the transmission was unsuccessful was received within a reasonable time after the transmission.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: February 24, 2021

Leah Kology

RECEIVED
LAW AND MOTION DROP BOX

2021 FEB 24  PM 3:55

Superior Court
of California
SACRAMENTO COUNTY

# EXHIBIT 5

Veronica Brill's Opposition to Postle's Motion to Continue
Hearing on Anti-SLAPP Motions in State Court Case

FILED/ENDORSED

MAR - 5 2021

By: _____ S. Khorn
Deputy Clerk

Marc J. Randazza, SBN 269535
Alex J. Shepard, SBN 295058
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive Suite 109
Las Vegas, NV 89117
Telephone: (702) 420-2001
Email: ecf@randazza.com

*Attorneys for Defendant,*
*Veronica Brill*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF SACRAMENTO**

| | |
|---|---|
| **Michael Postle,** an individual;<br><br>       Plaintiff,<br><br>     vs.<br><br>**Veronica Bill,** an individual; **ESPN, Inc.,** a Delaware Corporation; **Joey Ingram,** an individual; **Haralabos Voulgaris,** an individual; **Daniel Negreanu,** an individual; **Upswing Poker, Inc.,** a Nevada Corporation; **iBus Media Limited d/b/a "PokerNews",** and Isle of Man, United Kingdom Private Limited Liability Company Parent; **Jonathan Little Holdings LLC, d/b/a "Poker Coaching",** a Nevada Limited Liability Company; **Solve For Why Academy LLC,** a Nevada Limited Liability Company; **Todd Witteles,** an individual; **Run It Once, Inc.,** a Nevada Corporation; and **DOES 1** through **1,000,** inclusive;<br><br>     Defendants. | Case No. 34-2020-00286265<br><br>**DEFENDANT VERONICA BRILL'S OPPOSITION TO PLAINTIFF MICHAEL POSTLE'S MOTION TO CONTINUE HEARING ON SPECIAL MOTION TO STRIKE; DECLARATIONS OF MARC J. RANDAZZA AND ALEX J. SHEPARD**<br><br>Judge: Shama H. Mesiwala<br>Dept: 53<br>Date: March 18, 2021<br>Time: 1:30 p.m.<br><br>Action Filed: 10/01/2020<br>Trial Date: Not yet set |

      Defendant, Veronica Brill, by and through her attorneys, Randazza Legal Group, PLLC, hereby files her Opposition to Plaintiff Michael Postle's Motion to Continue Hearing on Special Motion to Strike.

RANDAZZA | LEGAL GROUP

## MEMORANDUM OF POINTS AND AUTHORITIES

**1.0   INTRODUCTION**

Plaintiff Michael Postle filed a frivolous lawsuit to garner publicity. As such, he is trying to hang the specter of litigation over the heads of all Defendants for as long as possible. Special motions to strike under Cal. Code Civ. Proc. § 425.16 ("Anti-SLAPP" motions) are intended to be heard on a priority basis and Plaintiff Veronica Brill already agreed to an overly-generous continuance of the hearing on her Anti-SLAPP motion. Postle's request for a continuance is procedurally improper and does not contain a showing of good cause, but it does contain multiple misrepresentations, including neglecting to mention that he has already retained counsel that served his Motion for him. Postle's Motion is no more than an attempt to delay dismissal of his claims and the Court should deny it.

**2.0   FACTUAL BACKGROUND**

Brill filed and served her Anti-SLAPP Motion to Strike Complaint Under Cal. Code Civ. Proc. § 425.16 (the "Anti-SLAPP Motion") on January 6, 2021, with a hearing set for February 11, 2021.

Postle's attorney sought to withdraw due to Postle's failure "to comply with the written agreement between the firm and the client, and communication has otherwise ceased between client and attorney." (Steven T. Lowe Declaration in Support of Motion to be Relieved as Counsel, attached as **Exhibit 1**.)

After Brill filed her Motion, counsel for Postle, Steven T. Lowe, sent an email to counsel for Brill on January 6, 2021 about continuing the hearing on her Anti-SLAPP Motion. (Declaration of Marc J. Randazza ["Randazza Decl."], attached as **Exhibit 2**, at ¶ 4 and Exhibit A.) In this email, Lowe said that stipulating to a continuance of the hearing date would obviate "the necessity of seeking to do discovery . . . ." (*Id.* at ¶ 5.) Counsel for Brill, Marc J. Randazza, then spoke with Lowe telephonically on January 7, 2021, during which call Lowe informed Randazza that his firm was withdrawing because he could not contact Postle, who had essentially disappeared off the face of the earth. (*Id.* at ¶ 6.) The same day, Randazza consented to continuing the hearing date to March 18, 2021. (*Id.* at ¶ 7.) The following day, Lowe and counsel for Brill, Alex J. Shepard, called the clerk to confirm the stipulated hearing date was available. (Declaration of Alex J. Shepard ["Shepard Decl."],

1   attached as **Exhibit 3**, at ¶¶ 4-5.)  It was not, but counsel for the parties agreed during that call to

2   continue the hearing date to March 16, 2021 instead.  (*Id.* at ¶ 6.)  The parties then submitted a letter

3   to the Court requesting this continuance, which the Court granted on January 15, 2021.  In the interim,

4   the Court granted Lowe's motion to withdraw on January 14, 2021.

5         On January 20, 2021, Randazza spoke to Postle directly via telephone, during which call they

6   discussed the issue of discovery, since Attorney Lowe had raised it. (Randazza Decl. at ¶ 8 and Exhibit

7   B.)  Postle said during this call that he was not planning to hire new counsel, but that he was receiving

8   assistance from unidentified "advisors."  (*Id.*)  On the call, Randazza agreed to stipulate to one, limited,

9   bit of discovery – the deposition of Maurice VerStandig, who is mentioned in the complaint at ¶ 31.

10  (*Id.* at ¶ 9.)  Randazza prepared a stipulation, and sent it to Postle.  (*Id.* at ¶ 11.)  A week passed without

11  any response from Postle, and on January 27, 2021 Randazza sent a letter to Postle withdrawing the

12  offer to stipulate to the deposition.  (*Id.* at ¶ 12 and Exhibit C.)  The same day, Postle responded with

13  an email in which he clearly stated he did not need to take any discovery to oppose Brill's Anti-SLAPP

14  Motion.  (*Id.* at ¶ 13 and **Exhibit D**.)[1]  He claimed in this email that he was "seeking new counsel,"

15  said he was in contact with people advising him on the case,[2] and alluded to "potential future counsel"

16  who recently had "health issues, surgery, and Covid."  (*Id.*)

17  **3.0   ARGUMENT**

18        As an initial matter, Postle's Motion is procedurally defective.  Local Rule 2.30(C) provides

19  that all requests for a continuance "must be made in writing **by letter** to the clerk of the department"

20  (emphasis added).  Postle filed a noticed motion, rather than a letter, in violation of this rule.  This is

21  an issue that came up with Postle's prior counsel, as they unsuccessfully attempted to file a captioned

---

[1]   Postle has now taken the opposite position in his Motion, claiming a continuance is needed because "substantial discovery remains to be completed." (Motion at 1.)  With Postle already expressly disclaiming the need for discovery, the Court should not credit this argument.  Even if he had not contradicted himself, Postle has not requested relief from the Anti-SLAPP statute's stay of discovery, and so a purported need to take discovery does not amount to good cause.

[2]   Postle's mention of unidentified "advisors" assisting him in this case and retention of "an organization specializing in internet based First Amendment and defamation issues" (Motion at 1) raises the significant possibility of someone committing the unlicensed practice of law, or of non-appearing attorneys ghost-writing motions and pleadings for him.

RANDAZZA | LEGAL GROUP

1   stipulation to continue the hearing on Defendant Todd Witteles's Anti-SLAPP Motion. Postle's prior

2   counsel was also reminded of this requirement during the January 8, 2021 call with the Court's Clerk

3   to continue the hearing date on Brill's Anti-SLAPP Motion. (Shepard Decl. at ¶ 7.) For failing to

4   request a continuance by letter, as required by the Local Rules, Postle's Motion should be denied.

5           Substantively, there is no good cause to continue the hearing on Brill's Anti-SLAPP Motion

6   again. Postle claims he needs additional time to retain new counsel, but does not articulate any efforts

7   he has made to locate said counsel. He apparently was in the process of trying to locate counsel in

8   January 2021 and he knew Lowe was withdrawing in early December 2020, meaning he has had three

9   months to locate counsel, but there is no explanation of what his efforts have been or how they have

10  been inadequate. It actually appears his efforts have been entirely adequate, as the certificate of service

11  on Postle's Motion was signed by an employee at the Law Offices of Ted A. Greene, Inc. and shows

12  that this law firm served the Motion on Brill.

13          Postle is also dishonest in explaining why his former counsel withdrew. He claims in his

14  Motion that "their lack of experience in online defamation has resulted in their excusing themselves

15  from the case . . . ." (Postle Decl.) But neither Lowe nor Postle ever mentioned an alleged lack of

16  experience at all, much less that it was related to Lowe's withdrawal. Lowe told Randazza that he was

17  withdrawing because Postle had become impossible to reach regarding the case. (Randazza Decl. at

18  ¶ 6.) Lowe also noted this as the reason for his withdrawal in his motion to withdraw. (**Exhibit 1**.)

19  Postle decided to ignore the case after receiving the publicity he wanted and now wants to put off the

20  consequences of his actions as long as possible by delaying resolution of Brill's Anti-SLAPP Motion.[3]

21          This dilatory motive is evident from communications with Lowe and Postle. Lowe informed

22  Randazza that if Randazza did not stipulate to a continuance of the Anti-SLAPP hearing, he would

23  file a motion requesting discovery despite the stay on discovery effected by Cal. Code Civ. Proc. §

24

25      [3]   Postle states in his Motion that Lowe's withdrawal was "a significant, unanticipated change in
        the status of the case" justifying a continuance under Cal. Rule of Ct., Rule 3.1332(c)(7). This is false.
26      Lowe filed his motion to withdraw in early December 2020, before any other party had filed anything
        in this case, and more than two months before Postle filed his Motion. As of February 2021, there
27      was nothing "unanticipated" about Lowe's withdrawal.

RANDAZZA | LEGAL GROUP

1   425.16(g). Yet, Postle stated in no uncertain terms that he did not want to conduct any discovery to

2   oppose Brill's Motion. (Randazza Decl. at ¶ 13. And Exhibit D.) And now Postle asks not for a

3   continuance of a specified number of days, but rather, apparently, for the Anti-SLAPP motion to be

4   taken off the Court's calendar entirely. There is no "good cause" to delay adjudication of Brill's Anti-

5   SLAPP Motion further, particularly given the Anti-SLAPP statute's commandment that such motions

6   be decided quickly. Cal. Code Civ. Proc. § 425.16(f).

7   **4.0      CONCLUSION**

8          Based on the foregoing, the Court should deny Postle's Motion and allow the hearing on Brill's

9   Anti-SLAPP Motion to take place on March 16, 2021.

10

11     Dated: March 5, 2021.               Respectfully Submitted,

12

13

14                                         Marc J. Randazza, SBN 269535

15                                         Alex J. Shepard, SBN 295058
                                           RANDAZZA LEGAL GROUP, PLLC
16                                         2764 Lake Sahara Drive Suite 109
                                           Las Vegas, NV 89117
17                                         Telephone: 702-420-2001
                                           ecf@randazza.com
18
                                           *Attorneys for Defendant,*
19                                         *Veronica Brill*

20

21

22

23

24

25

26

27

1

## PROOF OF SERVICE

2    *Postle v. Brill, et al.* | Sacramento County Superior Court | Case No. 34-2020-00286265

3    At the time of service, I was over the age of 18 and not a party to this action. I am employed in the
County of Clark, State of Nevada. My business address is Randazza Legal Group, PLLC, 2764 Lake

4    Sahara Drive, Suite 109, Las Vegas, Nevada 89117.

5
On March 5, 2021, I served true and correct copies of the foregoing document, entitled:

6

7    **DEFENDANT VERONICA BRILL'S OPPOSITION TO PLAINTIFF MICHAEL
POSTLE'S MOTION TO CONTINUE HEARING ON SPECIAL MOTION TO**

8    **STRIKE; DECLARATIONS OF MARC J. RANDAZZA AND ALEX J. SHEPARD**

9    on the interested parties as follows:

10
Michael Postle

11                              3724 Deer Walk Way
Antelope, CA 95843

12                              dreamseatpoker@gmail.com
*Plaintiff, pro se*

13

14    BY UNITED STATES MAIL. I enclosed the documents listed above in a sealed envelope or package
addressed to the persons at the addresses above, and deposited the sealed envelope with the United

15    States Postal Service, with postage fully prepaid; and,

16    BY ELECTRONIC MAIL. I electronically served the documents listed above to the persons at the
electronic mail addresses listed above, from my electronic service address, hme@randazza.com.

17

18    I declare under penalty of perjury under the laws of the State of California that the foregoing is true
and correct.

19

20    Executed on March 5, 2021 at Las Vegas, Nevada.

21

22

23                              Employee,
Randazza Legal Group, PLLC

24

25

26

27

RANDAZZA | LEGAL GROUP

# **EXHIBIT 1**

Steven T. Lowe Declaration in Support of
Motion to be Relieved as Counsel

MC–052

**BY FAX**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):* | FOR COURT USE ONLY |
|---|---|

Steven T. Lowe, Esq. (SBN 122208)
Lowe & Associates
8383 Wilshire Blvd, Suite 1038
Beverly Hills, CA 90211
TELEPHONE NO.: 310-477-5811   FAX NO.:
ATTORNEY FOR *(Name):* Plaintiff, Michael Postle

**FILED/ENDORSED**

DEC - 8 2020

By: _____ S. Cade _____
Deputy Clerk

NAME OF COURT: Sacramento Superior Court
STREET ADDRESS: 720 9th Street
MAILING ADDRESS:
CITY AND ZIP CODE: Sacramento, CA 95814
BRANCH NAME: Gordon D. Schaber Superior Court

CASE NAME: Michael Postle. v. Veronica Brill, et al.

| | |
|---|---|
| **DECLARATION IN SUPPORT OF ATTORNEY'S MOTION TO BE RELIEVED AS COUNSEL—CIVIL** | CASE NUMBER: 34-2020-00286265 |
| | HEARING DATE: January 14, 2021 |
| | DEPT.: 53   TIME: 1:30 p.m. |
| | BEFORE HON: Richard K. Sueyoshi |
| | DATE ACTION FILED: 10/01/2020 |
| | TRIAL DATE: |

1. **Attorney and Represented Party.** Attorney *(name):* Steven T. Lowe
is presently counsel of record for *(name of party):* Plaintiff, Michael Postle
in the above-captioned action or proceeding.

2. **Reasons for Motion.** Attorney makes this motion to be relieved as counsel under Code of Civil Procedure section 284(2) instead of filing a consent under section 284(1) for the following reasons *(describe):*
Client has failed to comply with the written agreement between the firm and the client, and communication has otherwise ceased between client and attorney.

☐ Continued on Attachment 2.

3. **Service**
   a. **Attorney has**
      (1) ☐ personally served the client with copies of the motion papers filed with this declaration. A copy of the proof of service will be filed with the court at least 5 days before the hearing.
      (2) ☑ served the client by mail at the client's last known address with copies of the motion papers served with this declaration.
   b. If the client has been served by mail at the client's last known address, attorney has
      (1) ☐ confirmed within the past 30 days that the address is current
         (a) ☐ by mail, return receipt requested.
         (b) ☐ by telephone.
         (c) ☐ by conversation.
         (d) ☐ by other means *(specify):*

Form Adopted for Mandatory Use
Judicial Council of California
MC-052 [Rev. January 1, 2007]
    **DECLARATION IN SUPPORT OF ATTORNEY'S MOTION TO BE RELIEVED AS COUNSEL—CIVIL**     Code of Civil Procedure, § 284;
Cal. Rules of Court, rule 3.1362
www.courtinfo.ca.gov

MC–052

| CASE NAME: | CASE NUMBER: |
|---|---|
| Michael Postle. v. Veronica Brill, et al. | 34-2020-00286265 |

3. b. (2) [✓] been unable to confirm that the address is current or to locate a more current address for the client after making the following efforts:

    (a) [✓] mailing the motion papers to the client's last known address, return receipt requested.

    (b) [✓] calling the client's last known telephone number or numbers.

    (c) [✓] contacting persons familiar with the client (specify):
        **Emailed & called client representative to confirm address on 12/7/20, but no answer.**

    (d) [ ] conducting a search (describe):

    (e) [ ] other (specify):

  c. Even if attorney has been unable to serve the client with the moving papers, the court should grant attorney's motion to be relieved as counsel of record (explain):

    **While client has been unresponsive to phone calls, emails & letters for approximately one (1) month, up to November 3, 2020 firm was in regular email, telephone and text communication with client.**

4. The next hearing scheduled in this action or proceeding

  a. [✓] is not yet set.

  b. [ ] is set as follows (specify the date, time, and place):

  c. [ ] concerns (describe the subject matter of the hearing):

  [ ] Continued on Attachment 4.

5. The following additional hearings and other proceedings (including discovery matters) are presently scheduled in this case (for each, describe the date, time, place, and subject matter):

  [ ] Continued on Attachment 5.

6. Trial in this action or proceeding

  a. [✓] is not yet set.

  b. [ ] is set as follows (specify the date, time, and place):

7. Other. Other matters that the court should consider in determining whether to grant this motion are the following (explain):

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 12/7/20

Steven T. Lowe
      (TYPE OR PRINT NAME)                               (SIGNATURE OF DECLARANT)

8. Number of pages attached:

1

## PROOF OF SERVICE

2   STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3       I am a resident of the United States and employed in the County of Los Angeles, State of
California, over the age of 18 and not a party to the within action or proceedings; my business
4   address is 8383 Wilshire Blvd, Suite 1038, Beverly Hills, California 90211.

5       On December 7, 2020 I served the foregoing document(s) described as:

6   **DECLARATION IN SUPPORT OF ATTORNEY'S MOTION TO BE RELIEVED
AS COUNSEL-CIVIL**

7

on the interested parties and/or through their attorneys of record by depositing the original or true
8   copy thereof as designated below, at Los Angeles, California, addressed to the following as
follows:

9

Eric Bensamochan
10  The Bensamochan Law Firm Inc
9025 Wilshire Blvd, Ste 215
11  Beverly Hills, CA 90211
eric@eblawfirm.us
12

Michael Postle
13  3724 Deer Walk Way
Antelope, CA 95843
14  dreamseatpoker@gmail.com

15

16  **( X )   BY MAIL(C.C.P. §§1013(a)):** I caused said document(s) to be deposited in the United
States Mail in a sealed envelope with postage fully prepaid at Los Angeles, California,
17  following the ordinary practice at my place of business of collection and processing of
mail.
18

19  **( )   BY HAND DELIVERY/PERSONAL SERVICE (C.C.P. §§1011, et seq.):** I caused
said document(s) to be personally served to the addressee listed above.
20

**( )   BY TELECOPY/FACSIMILE (C.C.P. §§1012.5 et seq.):** I caused said document(s) to
21  be telecopied to the addressee listed above; telecopier ("Fax") number:

22  **( )   BY EXPRESS MAIL (C.C.P. §§1013(c)(d), et seq.):** I caused said document(s) to be
deposited with an express service carrier in a sealed envelope designed by the carrier as an
23  express mail envelope, with fees and postage prepaid.

24  **( X )   BY E-MAIL OR ELECTRONIC TRANSMISSION (C.C.P. §§1020, et seq.):** I caused
said document(s) to be sent from e-mail address heather@lowelaw.com to the persons at
25  the e-mail addresses listed in the Service List. I did not receive, within a reasonable time
after the transmission, any electronic message or other indication that the transmission
26  was unsuccessful.

27  **( X )   BY E-MAIL Pursuant to (CCP §§1010.6, et seq.):** LA County Superior Court's Local
Rules and  the LA County Superior Court General Rule concerning Covid-19 including
28  but not limited to California Rules of Court Emergency Rule 12(b)(1) based on the named

1     party's electronic filing in this case and/or otherwise appearing in the matter being
2     deemed assent to required electronic service under the local rules, I sent such document to the individuals(s) identified at the email address referenced above.

3     **( X )**   **BY E-MAIL Pursuant to CCP §§1010.6, <u>et seq</u>.):**   LA County Superior Court's Local
4     Rules and the LA County Superior Court General Rule concerning Covid-19 including but not limited to California Rules of Court Emergency Rule 12(b)(2) based on the
5     serving party's request that the served party accept such service and given they are not self-represented, I sent such document to the individuals(s) identified at the email address
6     referenced above after confirming it was a proper email address for counsel for the party being served.

7

8     **( X )**   (State) I declare under penalty of perjury under the laws of the State of California that the
          above is true and correct.

9     Executed December 7, 2020 at Los Angeles, California.

10

11    Heather Cole

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RECEIVED
LAW AND MOTION DROP BOX

2020 DEC -8   PM 2: 30

GROSS COURTHOUSE
SUPERIOR COURT
OF CALIFORNIA
SACRAMENTO COUNTY

# **EXHIBIT 2**

Declaration of Marc J. Randazza

1
2
3
4
5
6
7      **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8          **FOR THE COUNTY OF SACRAMENTO**

9

10   **Michael Postle,** an individual;                    Case No. 34-2020-00286265

11              Plaintiff,

12        vs.                                          **DECLARATION OF MARC J.
                                                       RANDAZZA IN SUPPORT OF**
13   **Veronica Brill,** an individual; **ESPN, Inc.,** a    **DEFENDANT VERONICA BRILL'S**
     Delaware Corporation; **Joey Ingram,** an          **OPPOSITION TO PLAINTIFF**
14   individual; **Haralabos Voulgaris,** an individual;   **MICHAEL POSTLE'S MOTION TO**
                                                       **CONTINUE HEARING ON SPECIAL**
15   **Daniel Negreanu,** an individual; **Upswing Poker,**   **MOTION TO STRIKE**
     **Inc.,** a Nevada Corporation; **iBus Media Limited**
16   **d/b/a "PokerNews",** and Isle of Man, United
     Kingdom Private Limited Liability Company
17   Parent; **Jonathan Little Holdings LLC, d/b/a**
     **"Poker Coaching",** a Nevada Limited Liability       Action Filed:    10/01/2020
18   Company; **Solve For Why Academy LLC,** a         Trial Date:      Not yet set
     Nevada Limited Liability Company; **Todd**
19   **Witteles,** an individual; **Run It Once, Inc.,** a
     Nevada Corporation; and **DOES 1 through 1,000,**
20   inclusive;

21              Defendants.

22

23

24

25

26

27

I, Marc J. Randazza, declare:

1.      I am over 18 years of age and have never been convicted of a crime involving fraud or dishonesty.

2.      The facts set forth in this Declaration are within my personal knowledge and are true and correct to the best of my knowledge and belief.

3.      I am an attorney with Randazza Legal Group, PLLC ("RLG") and am counsel of record for Defendant Veronica Brill in this matter.

4.      After Ms. Brill served her Anti-SLAPP Special Motion to Strike Complaint Under Cal. Code Civ. Proc. § 425.16 (the "Anti-SLAPP Motion") on Plaintiff Michael Postle, counsel for Postle, Steven T. Lowe, sent an email to me on January 6, 2021, requesting that we stipulate to a continuance of the hearing on Ms. Brill's Anti-SLAPP Motion to March 18, 2021. A true and correct copy of this email is attached as Exhibit A to this Declaration.

5.      Also in this email, Mr. Lowe said that stipulating to a continuance of the hearing date would obviate "the necessity of seeking to do discovery . . . ."

6.      I spoke with Mr. Lowe telephonically on January 7, 2021. During this call Lowe informed me that his firm was withdrawing because he could not contact Postle, who had essentially disappeared off the face of the earth.

7.      The same day, I consented to continuing the hearing date to March 18, 2021.

8.      On January 20, 2021, after the Court granted Lowe's motion to withdraw, I spoke to Postle directly via telephone, during which call we discussed the possibility of taking discovery related to Brill's Anti-SLAPP Motion, since Attorney Lowe had raised it.

9.      During this call, I agreed to stipulate to one, limited, bit of discovery – the deposition of Maurice Verstandig, who is mentioned in Postle's Complaint at ¶ 31.

10.     Postle mentioned during this call that he was not planning to hire new counsel, but that he was receiving assistance from unidentified "advisors."

11.    I memorialized what we discussed on the phone in a letter that I sent to Postle on January 20, 2021, and also prepared a stipulation for the deposition of Mr. Verstandig.  A true and correct copy of this letter is attached to this Declaration as <u>Exhibit B</u>.

12.    A week passed without any response from Postle as to my proposal to take discovery, and on January 27, 2021 I sent a letter to Postle withdrawing the offer to stipulate to Mr. Verstandig's deposition.  A true and correct copy of this letter is attached to this Declaration as <u>Exhibit C</u>.

13.    The same day, Postle responded with an email in which he clearly stated he did not need to take any discovery to oppose Brill's Anti-SLAPP Motion.  He claimed in this email that he was "seeking new counsel," said he was in contact with people advising him on the case, and alluded to "potential future counsel" who recently had "health issues, surgery, and Covid."  A true and correct copy of this email is attached to this Declaration as <u>Exhibit D</u>.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 5, 2021.

Marc J. Randazza

# EXHIBIT A TO DECLARATION OF MARC J. RANDAZZA

January 6, 2021 Email from Steven T. Lowe
to Randazza Legal Group

# RANDAZZA
LEGAL GROUP

Heather Ebert <hme@randazza.com>

## Postle v. Brill et al. | Brill's Motion to Strike

**Steven Lowe** <steven@lowelaw.com>                                                                    Wed, Jan 6, 2021 at 4:23 PM
To: Heather Ebert <hme@randazza.com>
Cc: Jared Densen <jared@lowelaw.com>, Alex Shepard <ajs@randazza.com>, Marc Randazza <mjr@randazza.com>, Staff <staff@randazza.com>

Heather:

As you may or may not be aware, my firm has a motion to be relieved as counsel set for January 14th,2021. As a result of that, and to avoid the necessity of our firm filing an ex parte application to continue the hearing date, counsel for the other defendant who has filed an Anti-SLAPP motion has stipulated and the Court has moved the hearing date to March 18th, 2021.
Please advise if your firm would likewise be willing to continue the hearing date to March 18, 2021 so that my firm can withdraw without the necessity of seeking to do discovery and otherwise not require that we burden the Court with an ex parte application to continue the hearing date.

Thank you for your immediate attention to the foregoing.

Kind regards,



**Steven T. Lowe**
**Managing Partner**
Steven@lowelaw.com
8383 Wilshire Blvd, Suite 1038
Beverly Hills, California 90211
310-477-5811

(Bio Here)
CONFIDENTIALITY NOTICE: This electronic message transmission contains information from Lowe & Associates, which may be confidential or protected by the attorney-client privilege and/or the work product doctrine. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the content of this information is prohibited. If you have received this communication in error, please notify us immediately by e-mail and delete the original message and any attachments without reading or saving in any manner. Thank you in advance for your cooperation.

[Quoted text hidden]

# EXHIBIT B TO DECLARATION OF
# MARC J. RANDAZZA

January 20, 2021 Letter from Randazza Legal Group
to Plaintiff Michael Postle

# RANDAZZA
## LEGAL GROUP

Marc J. Randazza, JD, MAMC, LLM
Licensed in AZ, CA, FL, MA, NV

**20 January 2021**

<u>Via Email Only</u>

Michael Postle
<dreamseatpoker@gmail.com>

    **Re:**    *Postle* v. *Brill* et al. | Stipulation for Discovery

Dear Mike,

Thank you for taking the time to speak with me today. I am glad that we were able to disagree without being disagreeable. I am glad that you realize there is nothing personal here and that I am simply doing my job representing my client. As such, and I know I already said this on the phone, I want to make sure it is clear in writing I am at all times advocating for my client as required under the Rules of Professional Conduct.

That said, we did discuss ways to streamline the Anti-SLAPP process. I asked if there is any discovery you would want, and you said that it would probably be helpful to depose Mac VerStandig. Under Cal. Code Civ. Proc. § 425.16(g), you would have to file a separate motion, making a showing that such discovery would be necessary to defeat the Anti-SLAPP motion and is not readily available to you. Given some of what you said, I think you would have a reasonable argument that could go either way. Accordingly, to avoid motion practice on that, I am attaching a stipulation to this email that I am agreeing to Mr. VerStandig's deposition being taken prior to the motion hearing on March 16, 2021. I am not representing any of your deadlines to you; you should keep track of those on your own. However, I would say that we should do it sooner than later.

Additionally, as I promised on the phone, I am confirming that this stipulation does not prejudice your ability to send me a request to stipulate to additional discovery. However, I am under no obligation to agree to that. At this point, the VerStandig deposition is all I am willing to agree to. If you make a persuasive case to me as to why I should stipulate to additional discovery, I am willing to entertain that.

Additionally, nothing should be deemed to prejudice your right to file a motion under CCP 425.16(g) if you think that you should take additional discovery and I am not willing to agree.

At this time, you indicated you are not represented by counsel and you are not planning to hire new counsel. However, I believe I would be remiss in my duties as an officer of the court if I did not at least express that you should consider retaining new counsel. However, I am not your lawyer and I am not giving you advice one way or another.

---

*Postle* v. *Brill* et al. | Stipulation for Discovery
Page 2 of 2



**RANDAZZA**
LEGAL GROUP

I hope that despite the fact that you and my client are on the worst of terms, we can continue to be polite and cordial with one another.

Sincerely,

Marc J. Randazza

Cc:    Alex Shepard (via email); Client (via separate email)

Encl:    Draft of Stipulation and Proposed Order to Lift Stay of Discovery

# EXHIBIT C TO DECLARATION OF
# MARC J. RANDAZZA

January 27, 2021 Letter from Randazza Legal Group
to Plaintiff Michael Postle



**RANDAZZA**
LEGAL GROUP

Marc J. Randazza, JD, MAMC, LLM
Licensed in AZ, CA, FL, MA, NV

**27 January 2021**

<u>Via Email Only</u>

Michael Postle
<dreamseatpoker@gmail.com>

    **Re:**    *Postle* v. *Brill* et al. | Stipulation for Discovery

Dear Mike,

When we spoke on the phone, you noted that you wanted some discovery prior to the Anti-SLAPP hearing. To streamline that effort, I provided you with a stipulation. My office sent you the stipulation January 20, 2021. You have not signed it. Accordingly, we presume that you have changed your mind and that you are prepared to move forward on the Anti-SLAPP hearing on March 16, 2021 without the need to seek discovery.

I am providing this to you in writing and documenting it because I find that often those who file SLAPP suits use the refrain at the 11th hour and 59th minute that "I need discovery" but they are never able to articulate what the discovery is that they need or why they need it, or provide any other justification for it except that they wish to inflict further financial harm on the defendant.

Given the fact that your case appears to have no support, if you do attempt to raise this issue later on, I will be certain to provide this documentation to the court when your "advisors" tell you that they want you to seek discovery for the sole purpose of delay or to rack up attorneys' fees.

We are withdrawing our willingness to stipulate and expect to have the hearing on the merits of our motion on March 16.

Sincerely,

Marc J. Randazza

Cc:    Alex Shepard (via email)
        Client (via separate email)

2764 Lake Sahara Drive, Suite 109, Las Vegas, Nevada 89117
mjr@randazza.com | 702.420.2001

# EXHIBIT D TO DECLARATION OF
# MARC J. RANDAZZA

January 27, 2021 Email from Plaintiff Michael Postle
to Randazza Legal Group

# RANDAZZA
## LEGAL GROUP

Heather Ebert <hme@randazza.com>

---

## Postle v. Brill et al. | Stipulation for Discovery

**Dream Seat** <dreamseatpoker@gmail.com>                                Wed, Jan 27, 2021 at 2:39 PM
To: Heather Ebert <hme@randazza.com>

Dear Mike,
When we spoke on the phone, you noted that you wanted some discovery prior to the Anti-SLAPP hearing. To streamline that effort, I provided you with a stipulation. My office sent you the stipulation January 20. 2021. You have not signed it. Accordingly, we presume that you have changed your mind and that you are prepared to move forward on the Anti-SLAPP hearing on March 16, 2021 without the need to seek discovery.
I am providing this to you in writing and documenting it because I find that often those who file SLAPP suits use the refrain at the 11th hour and 59th minute that "I need discovery" but they are never able to articulate what the discovery is that they need or why they need it, or provide any other justification for it except that they wish to inflict further financial harm on the defendant.
Given the fact that your case appears to have no support, if you do attempt to raise this issue later on, I will be certain to provide this documentation to the court when your "advisors" tell you that they want you to seek discovery for the sole purpose of delay or to rack up attorneys' fees.

Now it's more clear why you wanted to have a phone conversation over communicating what you told me over the phone... by email.

I will quote you...

"When we spoke on the phone, you noted that you wanted some discovery prior to the Anti-SLAPP hearing".

I want to make very clear that this is false.

There are so many things I'd like to make light of, in regards to our conversation, that I documented.
It was made very clear that an attempt was made to manipulate the situation of myself not being represented by an attorney presently.
I'll refrain from laying that all out in detail.

Getting back to the false quote, I at NO POINT OR TIME, "note that I wanted discovery prior to the hearing"

This was something brought up multiple times by opposing counsel as well as baiting to get me to answer other questions and to commit to things I wasn't ready to commit to.

I made it clear that I was seeking new counsel and would talk to people advising me in the meantime. Saying I wanted anything is a complete fabrication and will offer what I have as proof if needed. In a court room, or otherwise. I don't appreciate any attempts at manipulating or baiting me into something over the phone.

Hopefully I won't have to bring that up in the future and any further communication can be done over email so the temptation isn't there any longer.

I especially take offense to the notion I want to run up any attorney fees. I hadn't served any defendants and your client chose to file the Anti-SLAPP anyway. She's publicly stated she has a multimillionaire backer. Clearly loves attention publicly.
The last thing I want is to play the vicious cycle of what happened to me by her former counsel by filing not one but two frivolous lawsuits against me in two separate states.

Let's try working together since I'd like to break another vicious cycle: One of unwarranted public defamatory statements.
Of course mine wouldn't be unwarranted or defamatory.

I may not be an attorney, but that doesn't give an opposing attorney the right to try and take advantage of a situation after I made it clear that I'm exploring options for new counsel and it's been a struggle due to health issues, surgery, and Covid.
Two of which I've had or have now, and all three my potential future counsel has recently had.

Based on that very curious and documented call, I ask that all further correspondence be emailed until further notice and that respect and fairness is given based on multiple circumstances.


On Jan 27, 2021, at 9:54 AM, Heather Ebert <hme@randazza.com> wrote:


[Quoted text hidden]
<2021.01.27 - MJR Letter to Postle re Follow Up on Stipulation.pdf>

# **EXHIBIT 3**

Declaration of Alex J. Shepard

1
2
3
4
5
6
7

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8

**FOR THE COUNTY OF SACRAMENTO**

9

| | |
|---|---|
| 10  **Michael Postle,** an individual; | Case No. 34-2020-00286265 |
| 11              Plaintiff, | |
| 12       vs. | **DECLARATION OF ALEX J. SHEPARD IN SUPPORT OF** |
| 13  **Veronica Brill,** an individual; **ESPN, Inc.,** a | **DEFENDANT VERONICA BRILL'S OPPOSITION TO PLAINTIFF** |
| 14  Delaware Corporation; **Joey Ingram,** an individual; **Haralabos Voulgaris,** an individual; | **MICHAEL POSTLE'S MOTION TO CONTINUE HEARING ON SPECIAL** |
| 15  **Daniel Negreanu,** an individual; **Upswing Poker, Inc.,** a Nevada Corporation; **iBus Media Limited** | **MOTION TO STRIKE** |
| 16  **d/b/a "PokerNews",** and Isle of Man, United Kingdom Private Limited Liability Company | |
| 17  Parent; **Jonathan Little Holdings LLC, d/b/a** | |
| 18  **"Poker Coaching",** a Nevada Limited Liability Company; **Solve For Why Academy LLC,** a | Action Filed:    10/01/2020 |
| 19  Nevada Limited Liability Company; **Todd** | Trial Date:      Not yet set |
| 20  **Witteles,** an individual; **Run It Once, Inc.,** a Nevada Corporation; and DOES 1 through **1,000,** | |
| 21  inclusive; | |
| 22           Defendants. | |

23
24
25
26
27

1    I, Alex J. Shepard, declare:

2        1.      I am over 18 years of age and have never been convicted of a crime involving fraud

3    or dishonesty.

4        2.      The facts set forth in this Declaration are within my personal knowledge and are

5    true and correct to the best of my knowledge and belief.

6        3.      I am an associate attorney with Randazza Legal Group, PLLC ("RLG") and am

7    counsel of record for Defendant Veronica Brill in this matter.

8        4.      On January 7, 2021, I participated in a phone call with counsel for Michael Postle,

9    Steven Lowe, and the Clerk of the Court to reschedule the hearing on Defendant Veronica Brill's

10   Special Motion to Strike.

11       5.      We proposed during this call that the hearing be continued to March 18, 2021. The

12   Clerk told us, however, that this date was not available.

13       6.      I then proposed March 16, 2021 as a date for the hearing. The Clerk confirmed this

14   date was available, and Mr. Lowe agreed to this date.

15       7.      During this call, the Clerk informed us that for the Court to grant the stipulated

16   continuance, we would be required to submit a *letter*, not a motion, to the Court.

17

18   I declare under penalty of perjury that the foregoing is true and correct.

19

20   Dated: March 5, 2021.

21

22                                                    Alex J. Shepard

23

24

25

26

27

RECEIVED
LAW AND MOTION DROP BOX

2021 MAR -5 PM 12: 02

GORDO COURTHOUSE
SUPERIOR COURT
OF CALIFORNIA
SACRAMENTO COUNTY

# EXHIBIT 6

Veronica Brill's Motion for Attorneys' Fees in State Court Case

Marc J. Randazza, SBN 269535
Alex J. Shepard, SBN 295058
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive Suite 109
Las Vegas, NV 89117
Telephone: (702) 420-2001
Email: ecf@randazza.com

*Attorneys for Defendant,*
*Veronica Brill*



FILED/ENDORSED

APR 1 3 2021

By: _____ E. Medina
Deputy Clerk

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SACRAMENTO

| | |
|---|---|
| **Michael Postle,** an individual;<br><br>     Plaintiff,<br><br>     vs.<br><br>**Veronica Brill,** an individual; **ESPN, Inc.,** a Delaware Corporation; **Joey Ingram,** an individual; **Haralabos Voulgaris,** an individual; **Daniel Negreanu,** an individual; **Upswing Poker, Inc.,** a Nevada Corporation; **iBus Media Limited d/b/a "PokerNews",** and Isle of Man, United Kingdom Private Limited Liability Company Parent; **Jonathan Little Holdings LLC, d/b/a "Poker Coaching",** a Nevada Limited Liability Company; **Solve For Why Academy LLC,** a Nevada Limited Liability Company; **Todd Witteles,** an individual; **Run It Once, Inc.,** a Nevada Corporation; and **DOES 1** through **1,000,** inclusive;<br><br>     Defendants. | Case No. 34-2020-00286265<br><br>**DEFENDANT VERONICA BRILL'S NOTICE OF MOTION AND MOTION FOR COSTS AND ATTORNEYS' FEES UNDER Cal. CODE CIV. PROC. § 425.16(c)(1); DECLARATIONS OF MARC J. RANDAZZA AND ALEX J. SHEPARD**<br><br>Judge:    Shama H. Mesiwala<br>Dept:    53<br>Date:    May 19, 2021<br>Time:    1:30 p.m.<br>Reservation No.    2561076<br><br>Action Filed:    10/01/2020<br>Trial Date:    Not yet set |

RANDAZZA | LEGAL GROUP   BY FAX

RECEIVED
CIVIL DROP BOX

2021 APR 13 PM 4:13

GROSS COURTHOUSE
SUPERIOR COURT
OF CALIFORNIA
SACRAMENTO COUNTY



**TO: ALL PARTIES AND THEIR ATTORNEYS OF RECORD PLEASE TAKE NOTICE THAT:**

On May 19, 2021 at 1:30 p.m. in the courtroom of the Honorable Judge Shama H. Mesiwala, Defendant Veronica Brill will and hereby does move for an award of costs and attorneys' fees under California Code of Civil Procedure § 425.16(c)(1).

Brill filed a Special Motion to Strike under Cal. Code Civ. Proc. § 425.16. Rather than rule on the motion when the date for its hearing came, however, the Court exercised its discretion to entertain Plaintiff Michael Postle's procedurally improper motion for a continuance of the hearing and continued the hearing for 30 days. After this continuance was granted, Postle filed a request for dismissal of all his claims without prejudice. This creates a presumption that Brill is the prevailing party on her Special Motion to Strike, entitling her to a mandatory award of costs and attorneys' fees.

This Motion is based on this Notice; the accompanying Memorandum of Points and Authorities; the declarations and exhibits thereto; and such other authorities and argument as may be submitted in any reply at or before the hearing.

Pursuant to Local Rule 1.06(D), the Court will make a tentative ruling on the merits of this matter by 2:00 p.m. the court day before the hearing. The complete text of the tentative rulings for the department may be downloaded off the court's website. If the party does not have online access, they may call the dedicated phone number for the department as referenced in the local telephone directory between the hours of 2:00 p.m. and 4:00 p.m. on the court day before the hearing and receive the tentative ruling. If you do not call the court and the opposing party by 4:00 p.m. the court day before the hearing, no hearing will be held.

Dated: April 13, 2021.        Respectfully Submitted,

Marc J. Randazza
Alex J. Shepard
RANDAZZA LEGAL GROUP, PLLC
*Attorneys for Defendant*
*Veronica Brill*

- ii -
Defendant Veronica Brill's Notice of Motion and Motion for Costs and Attorneys' Fees
Case No. 34-2020-00286265

RANDAZZA | LEGAL GROUP

1

# TABLE OF CONTENTS

2 MEMORANDUM OF POINTS AND AUTHORITIES.................................................................1

3 1.0 INTRODUCTION AND FACTUAL BACKGROUND............................................................2

4 2.0 LEGAL STANDARD.................................................................................................................2

5 3.0 ARGUMENT 2

6 3.1 *Brill is Entitled to an Award of Costs and Attorneys' Fees* ...............................................2

7

8 3.2 *The Attorneys' Fees Brill Incurred are Reasonable*.........................................................4

9 3.2.1 The Hourly Rates of Brill's Attorneys are Reasonable...........................................5

10 3.2.1.1 Experience of Brill's Attorneys ........................................................................7

11 3.2.1.2 Recognition of Rates by Other Courts .............................................................9

12 3.2.1.3 Other Reasonable Rate Factors.......................................................................10

13 3.2.2 The Number of Hours Expended is Reasonable...................................................11

14 3.3 *Anticipated Future Fees*....................................................................................................12

15 4.0 CONCLUSION..........................................................................................................................12

16

17

18

19

20

21

22

23

24

25

26

27

# TABLE OF AUTHORITIES

**CASES**

*ARP Pharmacy Serv., Inc. v. Gallagher Basset Serv., Inc.*
  (2006) 138 Cal. App. 4th 1307 .................................................................3

*Beeman v. Anthem Prescription Management, LLC*
  (2013) 58 Cal. 4th 329) ...........................................................................3

*Clifford v. Trump,*
  2018 U.S. Dist. LEXIS 211297, *19 (C.D. Cal. Dec. 11, 2018) ..............10

*Coltrain v. Shewalter*
  (1998) 66 Cal. App ............................................................................2, 3, 4

*eCash Techs., Inc. v. Guagliardo,*
  210 F. Supp. 2d 1138 (C.D. Cal. Oct. 30, 2000) ....................................3

*Gilabert v. Logue,*
  2013 U.S. Dist. LEXIS 179128, *5-6 (C.D. Cal. Dec. 20, 2013) ............4

*Guo v. Cheng,*
  Case No. A-18-779172-C ...............................................................5, 6, 9

*Harman v. City and County of San Francisco*
  (Cal. App. 1st Dist. 2006) 136 Cal. App. 4th 1279,..............................11

*iQTAXX, LLC v. Boling,*
  No. A-15-728426-C, 2016 BL 154334 .....................................................9

*Ketchum v. Moses*
  (2001) 24 Cal. 4th 1122 ...........................................................................4

*Las Vegas Resort Holdings, LLC v. Roeben,*
  Case No. A-20-819171-C ...............................................................5, 6, 7, 9

*Liu v. Moore*
  (1999) 69 Cal. App. 4th 745......................................................................3

*Mann. v. Quality Old Time Service, Inc.*
  (2006) 139 Cal. App. 4th 328....................................................................2

*Melnyk v. Robledo*
  (Cal. App. 2d Dist. 1976) 64 Cal. App. 3d 618................................5, 10

*Moraga-Orinda Fire Protection Dist. v. Weir*
  (2004) 115 Cal. App. 4th 477....................................................................3

*Nemecek & Cole v. Horn*
  (Cal. App. 2d Dist. 2012) 208 Cal. App. 4th 641 ...................................5

*New Cingular Wireless PCS, LLC v. Public Utilities Com.*
  (2016) 246 Cal. App. 4th 784....................................................................2

*Open Source Sec., Inc. v. Perens,*
  2018 U.S. Dist. LEXIS 98169, *7-8 (N.D. Cal. June 9, 2018) ..............10

*Pfeiffer Venice Properties v. Bernard*
  (2001) 101 Cal. App. 4th 211....................................................................3

*Syers Properties III, Inc. v. Rankin*
  (Cal. App. 1st Dist. 2014) 226 Cal. App. 4th 691, 700 ...........................5

*Thayer v. Wells Fargo Bank*
  (Cal. App. 1st Dist. 2001) 92 Cal. App. 4th 819......................................................................4

*Tobinick v. Novella,*
  207 F. Supp. 3d 1332 (S.D. Fla. 2016) ...................................................................................9

*Vella v. Hudgins*
  (Cal. App. 2d Dist. 1984) 151 Cal. App. 3d 515.....................................................................5

*Wanland v. Law Offices of Mastagni, Holstedt & Chiurazzi*
  (2006) 141 Cal. App. 4th 15.....................................................................................................4

*White v. Lieberman*
  (2002) 103 Cal. App. 4th 210...................................................................................................3

*Wynn v. Chanos,*
  2015 U.S. Dist. LEXIS 80062, *6 (N.D. Cal. June 19, 2015) ..............................................10

**STATUTES**

Cal. Code Civ. Proc. § 425.16 .................................................................................................2,4

**OTHER AUTHORITIES**

Marc J. Randazza, "Freedom of Expression and Morality-Based Impediments to the Enforcement
  of Intellectual Property Rights, 16 Nev. L.J., 107 (Jan. 15, 2016).) ........................................8

Marc Randazza, "Nevada's Anti-SLAPP Law Update," NEVADA LAWYER (Sept. 2016)........................8

Marc Randazza, "Nevada's New Anti-SLAPP Law: The Silver State Sets the Gold Standard,"
  NEVADA LAWYER (Oct. 1, 2013)................................................................................................8

# MEMORANDUM OF POINTS AND AUTHORITIES

## 1.0    INTRODUCTION AND FACTUAL BACKGROUND

Plaintiff is a professional poker player. During games at one particular casino, his play was erratic, irrational, and led to mathematically impossible results. This led virtually everyone who looked at the situation to come the opinion that Plaintiff cheated. Brill also expressed this opinion publicly and provided the factual bases for her statements. Other players, viewers, and commentators found her observations valid and concurred.

Postle then filed a defamation suit against apparently anyone who weighed in on the controversy. Postle used the suit to smear Defendants and to garner publicity for an upcoming film. But, he panicked when Brill called his bluff and filed her Anti-SLAPP motion. He tried to delay the end of the case for as long as possible, but once he realized that the case could not be held open until his film was released, he then attempted to voluntarily dismiss his claims to avoid liability for Brill's attorneys' fees. (Request for Dismissal, attached as **Exhibit 1**.)

Postle fails to appreciate that when you fold your hand, you do not get to take your bet back out of the pot. Similarly, when a SLAPP plaintiff drops a case in the face of an Anti-SLAPP motion, he loses the Anti-SLAPP motion, and becomes liable for the defendant's fees and costs.

Brill incurred $961.91 in costs and $67,677.50 in attorneys' fees in preparing her Anti-SLAPP Motion and then dealing with Postle's bad-faith attempts to delay resolution of that motion. (*See* Declaration of Marc J. Randazza ["Randazza Decl."], attached as **Exhibit 2**, at ¶¶ 15-26; *see also* spreadsheet of billing entries, attached as **Exhibit 3**.) Brill offered Postle a compromise of her fees but received no response. (Randazza Decl. at ¶ 30; April 2, 2021 letter from Marc Randazza to Postle, attached as **Exhibit 4**.) Either Brill is presumed to be the prevailing party on her Anti-SLAPP Motion in light of Postle's voluntary dismissal, or she is entitled to a ruling on the merits of the Anti-SLAPP Motion to determine her entitlement to a fee award. Brill is the prevailing party on her Anti-SLAPP Motion. The Court should award her between $70,639.41 and $78,639.41 in costs and attorneys' fees, which includes between $2,000 and $10,000 in anticipated future fees incurred before this Motion is

RANDAZZA | LEGAL GROUP

1 | granted, depending on whether Postle opposes the motion.[1]

2 | **2.0     LEGAL STANDARD**

3 |     Under Cal. Code Civ. Proc. § 425.16(c)(1), costs and attorneys' fees are mandatory for the

4 | prevailing party on an Anti-SLAPP motion. This requirement serves to "discourage meritless SLAPP

5 | claims by compelling a SLAPP plaintiff to bear a defendant's litigation costs incurred to eliminate the

6 | claim from the lawsuit." *Mann. v. Quality Old Time Service, Inc.* (2006) 139 Cal. App. 4th 328, 344.

7 | **3.0     ARGUMENT**

8 |     **3.1     Brill is Entitled to an Award of Costs and Attorneys' Fees**

9 |     Cal. Code Civ. Proc. § 425.16(c)(1) provides that "a prevailing defendant on a special motion

10 | to strike **shall** be entitled to recover his or her attorney's fees and costs" (emphasis added). The term

11 | "prevailing defendant" does not require an order granting an Anti-SLAPP motion. A SLAPP plaintiff

12 | dismissing voluntarily automatically makes the filing defendant the "prevailing party," and entitles her

13 | to fees. *See Coltrain v. Shewalter* (1998) 66 Cal. App. 4th 94, 102 (stating that "[t]he vast majority of

14 | attorney's fees statutes do not explicitly provide for the event of voluntary dismissal"); *see also New

15 | Cingular Wireless PCS, LLC v. Public Utilities Com.* (2016) 246 Cal. App. 4th 784, 817 n.29 (stating that

16 | "[w]hile historically the term 'prevailing party' was construed in such statutes to mean the defendant

17 | must win a judgment on the merits . . ., the modern trend of authority allows such a showing even in

18 | the absence of a judgment on the merits").

19 |     Voluntary dismissal makes the defendant the prevailing party on the Anti-SLAPP motion.

20 | *Shewalter*, 66 Cal. App. 4th at 107. In determining whether an Anti-SLAPP defendant is "a prevailing

21 | defendant," the "*critical issue is which party realized its objectives in the litigation. Since the defendant's goal is to

22 | make the plaintiff go away with its tail between its legs, ordinarily the prevailing party will be the defendant.*" *Id.*

23 | (emphasis added). To rebut this presumption, the plaintiff "may try to show it actually dismissed

24 | because it had substantially achieved its goals through a settlement or other means, because the

25 |     [1]    At the hearing, Brill's counsel will be prepared with up-to-date billing data. However, as of

26 | the time of writing this motion, Brill cannot perfectly assess the cost of her Reply. That said, Brill's
counsel does this kind of thing often enough that the estimate is likely to be quite close to the actual

27 | fees that will be incurred.

Defendant Veronica Brill's Notice of Motion and Motion for Costs and Attorneys' Fees
Case No. 34-2020-00286265

RANDAZZA | LEGAL GROUP

1  defendant was insolvent, or for other reasons unrelated to the probability of success on the merits."

2  *Id.* A plaintiff merely claiming that he has run out of money is not sufficient to rebut this presumption,

3  and in fact provides evidence that a suit is a SLAPP suit. *Id.* In other words, Postle could claim he

4  has no money, he could not find a lawyer, or any other excuse – but he filed this case, the case does

5  not have even minimal merit, and the California Legislature made it clear that he must pay the price.

6  He achieved no *legitimate* goals in filing this case. The *illegitimate* goals of using the litigation privilege

7  to defame the defendants and using the complaint so that he could claim there is a "pending lawsuit"

8  while shopping his film are not "goals" that he could claim were met by filing this suit. When you file

9  a defamation case in California, you must accept that the cost to buy in to that game is the defendants'

10  attorneys' fees. Postle filed, he bluffed, Brill called his bluff, so he folded. That is not a cost-free

11  decision. Nevertheless, it was a smart decision – as running up the tab further would simply have

12  made the inevitable end of this case more costly for him.

13      California case law is consistent that a plaintiff cannot avoid an award of attorneys' fees by

14  voluntarily dismissing their claims after an Anti-SLAPP motion is filed. *See ARP Pharmacy Serv., Inc. v.*

15  *Gallagher Basset Serv., Inc.* (2006) 138 Cal. App. 4th 1307 (overruled on unrelated grounds in *Beeman v.*

16  *Anthem Prescription Management, LLC* (2013) 58 Cal. 4th 329) (stating that "[a] plaintiff may not avoid

17  liability for attorney[s'] fees and costs by voluntarily dismissing a cause of action to which an anti-

18  SLAPP motion is directed"); *eCash Techs., Inc. v. Guagliardo*, 210 F. Supp. 2d 1138, 1154-55 (C.D. Cal.

19  Oct. 30, 2000) (citing *Shewalter* and noting that attempt to voluntarily dismiss claims after filing of

20  Anti-SLAPP motion did not affect moving party's entitlement to attorneys' fees); *Moraga-Orinda Fire*

21  *Protection Dist. v. Weir* (2004) 115 Cal. App. 4th 477, 480 (noting that "resolution of the underlying

22  action does not moot a fee request under the SLAPP statute"); *White v. Lieberman* (2002) 103 Cal. App.

23  4th 210, 220-21 (allowing award of attorneys' fees and costs pursuant to Anti-SLAPP statute even

24  though the trial court sustained defendant's demurrer without leave to amend without ruling on the

25  pending anti-SLAPP motion); *Liu v. Moore* (1999) 69 Cal. App. 4th 745, 752-53; *see Pfeiffer Venice*

26  *Properties v. Bernard* (2001) 101 Cal. App. 4th 211, 218-19. Federal courts in the Ninth Circuit have also

27  recognized that allowing a plaintiff to start frivolous litigation, causing defendants to run up a

RANDAZZA | LEGAL GROUP

1  significant legal bill, and then calling it quits before an Anti-SLAPP motion is decided, would allow

2  plaintiffs "to circumvent the SLAPP liability mandated by California law." *Gilabert v. Logue*, 2013 U.S.

3  Dist. LEXIS 179128, *5-6 (C.D. Cal. Dec. 20, 2013).

4          Brill is entitled to her attorneys' fees. She is clearly the prevailing party on her Anti-SLAPP

5  motion under *Shewalter*. She sought dismissal of all Postle's claims, which has happened. Postle has

6  not achieved any legitimate objective of his suit, as he never so much as made a settlement offer, Brill

7  has not paid him any money, and none of Brill's speech has been removed. Brill's Anti-SLAPP Motion

8  is meritorious for the reasons explained in her motion, none of which Postle has addressed, and by

9  voluntarily dismissing, he has waived every right to oppose.

10         Brill is entitled to more than just fees incurred in drafting the Anti-SLAPP Motion. It is well-

11  established that an award of Anti-SLAPP costs and fees includes fees incurred after the motion is

12  granted or, in this case, fully briefed, including fees incurred in bringing a motion for attorneys' fees.

13  *Wanland v. Law Offices of Mastagni, Holstedt & Chiurazzi* (2006) 141 Cal. App. 4th 15, 21. Brill attempted

14  to compromise on the amount of fees and obviate the need for this Motion the day after Postle filed

15  his Request for Dismissal. (Randazza Decl. at ¶ 30; **Exhibit 4**.) Postle did not respond.

16         **3.2      The Attorneys' Fees Brill Incurred are Reasonable**

17         California uses the lodestar method to determine what a reasonable reward of attorneys' fees

18  is. *Ketchum v. Moses* (2001) 24 Cal. 4th 1122, 1131 (stating that "by its terms, Code of Civil Procedure

19  section 425.16 permits the use of the so-called lodestar adjustment method under our long-standing

20  precedents"). In a lodestar analysis, the court takes the number of hours the attorney should have

21  reasonably spent working on the case and multiplies it by a reasonable hourly rate to determine the

22  value of that attorney's services. *Id.* at 1132. Once the court has fixed the lodestar amount, it may

23  increase or decrease that amount by applying a positive or negative "multiplier" to take into account

24  a variety of other factors, including the quality of the representation, the novelty and complexity of

25  the issues, the results obtained, and any contingent risk presented. *Thayer v. Wells Fargo Bank* (Cal.

26  App. 1st Dist. 2001) 92 Cal. App. 4th 819, 833.

27

RANDAZZA | LEGAL GROUP

### 3.2.1   The Hourly Rates of Brill's Attorneys are Reasonable

To determine reasonable hourly rates, a court looks at the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skill, experience, and reputation. "The determination of the 'market rate' is generally based on the rates prevalent in the community where the court is located." *Syers Properties III, Inc. v. Rankin* (Cal. App. 1st Dist. 2014) 226 Cal. App. 4th 691, 700. In determining a reasonable rate, California courts routinely look to the Adjusted Laffey Matrix, attached as **Exhibit 5**, for guidance and find rates consistent with the Laffey Matrix to be reasonable even when the actual fees charged were less. *Id.* at 700; *see Nemecek & Cole v. Horn* (Cal. App. 2d Dist. 2012) 208 Cal. App. 4th 641, 650. Courts may consider several factors in determining a reasonable rate, "including the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances in the case." *Melnyk v. Robledo* (Cal. App. 2d Dist. 1976) 64 Cal. App. 3d 618, 623-24. The terms of a fee contract may be considered, but "do not compel any particular award." *Vella v. Hudgins* (Cal. App. 2d Dist. 1984) 151 Cal. App. 3d 515, 520.

Ms. Brill's counsel charged their standard hourly rates for work performed on this case.[2] Attorney Marc Randazza's normal billing rate is $800 per hour. (Randazza Decl. at ¶ 15.) Attorney Ronald Green's rate is $600 per hour. (*Id.* at ¶ 16.) Attorney Jay Wolman's rate is $600 per hour. (*Id.* at ¶ 17.) Due to Mr. Green and Mr. Wolman's limited role in this case, RLG has chosen to write off their time entirely as a proposed compromise. (*Id.* at ¶¶ 16-17.) Attorney Alex Shepard's rate is $450 per hour. (*Id.* at ¶ 18.) Law Clerks Trey Rothell and Bryttni Yi's rate is $200 per hour. (*Id.* at ¶¶ 20-21.) Paralegals Jasmyn Montano, Heather Ebert, and Cassidy Curran's rate is $175 per hour. (*Id.* at ¶¶ 22-24.)

The firm's rates have been found reasonable recently in Clark County, Nevada in *Guo v. Cheng*, Case No. A-18-779172-C and *Las Vegas Resort Holdings, LLC v. Roeben*, Case No. A-20-819171-C, both

---

[2]   Out of respect for the important First Amendment concerns raised in this case, and out of regard for access to justice issues, Randazza agreed to provide a discount if Ms. Brill made prompt payments, with the compromise that counsel could seek full rates in a fee motion. (Randazza Decl. at ¶ 14.)

Anti-SLAPP cases, where the court found reasonable hourly rates of $800 and $450 for attorneys Marc J. Randazza and Alex J. Shepard, respectively, as well as $200/hour for Trey Rothell and $175/hour for paralegals. (*See* Order granting motion for attorneys' fees in *Guo v. Cheng*, attached as **Exhibit 6**, at 2-4 (recognizing Mr. Randazza as "a nationally recognized expert on Anti-SLAPP legislation and free speech issues, has assisted the judiciary committees in both Nevada and Pennsylvania on Anti-SLAPP legislation, and has also published numerous other law review articles on free speech issues," and has been a commentator on Fox News and CNN on free speech and First Amendment issues); *see also* Order granting motion for attorneys' fees in *Las Vegas Resort Holdings, LLC v. Roeben*, attached as **Exhibit 7** (finding that "Defendant's counsel is nationally regarded for their experience in defamation and Anti-SLAPP litigation, and has specialized knowledge and experience regarding the issues in this case").

The number of hours each timekeeper worked is as follows:

| Timekeeper | Hours Worked |
|---|---|
| Marc J. Randazza | 32.3 |
| Alex J. Shepard | 82.5 |
| Trey A. Rothell | 1.1 |
| Bryttni Yi | 1.2 |
| Jasmyn Montano | 1.5 |
| Heather Ebert | 22.6 |
| Cassidy Curran | 1.7 |
| **Total Hours** | **142.9** |

The total amount billed by each timekeeper is as follows:

| Timekeeper | Amount Billed |
|---|---|
| Marc J. Randazza | $25,840 |
| Alex J. Shepard | $37,125 |

RANDAZZA | LEGAL GROUP

| Trey A. Rothell | $220 |
|---|---|
| Bryttni Yi | $240 |
| Jasmyn Montano | $262.50 |
| Heather Ebert | $3,692.50 |
| Cassidy Curran | $297.50 |
| **Total Fees** | **$67,677.50** |

Brill's counsel thus billed a total of $67,677.50 in fees at their customary hourly rates, as well as $961.91 in costs. Brill should be awarded lodestar fees based on the rates Randazza Legal Group's attorneys and staff would be justified in charging under the Adjusted Laffey Matrix, and consistent with the fee awards the firm has received in the past. (*See* Declaration of Joseph P. Garin ["Garin Decl."], attached as **Exhibit 8**, at ¶ 38.)[3]

### 3.2.1.1     Experience of Brill's Attorneys

Marc Randazza's hourly rate is justified, as he is an experienced attorney who specializes in First Amendment litigation and is licensed to practice in the states of Nevada, California, Arizona, Florida, and Massachusetts. Randazza was instrumental in the passage of Nevada's 2013 Anti-SLAPP legislation, and played a significant role in shaping the statute's 2015 amendments. (Randazza Decl. at ¶¶ 11-12; Senate Committee on Judiciary hearing on Nev. SB 286 (May 6, 2013), attached as **Exhibit 9**.) When Nevada's Anti-SLAPP statute was amended in 2015, Randazza successfully led the lobbying effort to save the statute from repeal, and was instrumental in crafting the language in the statute today. (Randazza Decl. at ¶ 12; Minutes of Assembly Committee on Judiciary hearing on SB 444, April 24, 2015, attached as **Exhibit 10**, at 35-38.)

Randazza is a nationally recognized expert on Anti-SLAPP legislation and free speech issues, and has assisted the legislatures in Nevada, Pennsylvania, Ohio, Missouri, New Hampshire, and New

---

[3]     This declaration was submitted in the *Roeben* case in Las Vegas, Nevada. It is used to support the reasonableness of the hourly rates of Randazza Legal Group's attorneys and staff, rather than the reasonableness of the number of hours worked.

RANDAZZA | LEGAL GROUP

1    York on Anti-SLAPP legislation. (*See* Randazza Decl. at ¶ 13; **Exhibits 9-10**; video of public hearing

2    on Pennsylvania Senate Bill 1095, April 23, 2014, at 32:30-43:47.)[1]  He is the author of Nevada Lawyer

3    articles on the Anti-SLAPP statute. (*See* Marc Randazza, "Nevada's New Anti-SLAPP Law: The Silver

4    State Sets the Gold Standard," NEVADA LAWYER (Oct. 1, 2013), attached as **Exhibit 11**; Marc

5    Randazza, "Nevada's Anti-SLAPP Law Update," NEVADA LAWYER (Sept. 2016) attached as

6    **Exhibit 12**.)  He has also published numerous other law review articles on free speech issues. (*See*

7    *curriculum vitae* of Marc Randazza, attached as **Exhibit 13**.)

8         Randazza has been a commentator for CNN on Free Speech issues. (*See* Randazza Decl. at

9    ¶ 10.)  And, he previously has been a commentator on FOX News for First Amendment issues. (*See*

10   *id.*)   Randazza holds a JD from Georgetown University Law Center, a Master's in Mass

11   Communications from the University of Florida (with a media law focus), and an international degree

12   in the form of an LLM from the University of Turin, Italy, where he wrote and published a thesis on

13   freedom of expression issues. (**Exhibit 13**; Marc J. Randazza, "Freedom of Expression and Morality-

14   Based Impediments to the Enforcement of Intellectual Property Rights, 16 Nev. L.J., 107 (Jan. 15,

15   2016).)  Mr. Randazza has been a practicing attorney for 19 years. (Garin Decl. at ¶ 33; Randazza

16   Decl. at ¶ 3.)  Randazza has taught First Amendment law at the law school level. (**Exhibit 13**.)  And,

17   he gives presentations to attorneys in CLE courses on how to handle Anti-SLAPP litigation. (*Id.*)

18   Former Nevada senator Justin Jones described Mr. Randazza as "one of the preeminent experts on

19   the issue" of Anti-SLAPP litigation. (**Exhibit 9** at 3.)

20        According to the Adjusted Laffey Matrix, the reasonable billing rate for such an experienced

21   attorney, with no other qualifications, is $759 per hour. (**Exhibit 5**.)  This hourly rate is for attorneys

22   of Randazza's years of experience, but not for attorneys with specialized expertise in First Amendment

23   law and Anti-SLAPP litigation.  Randazza's specialized expertise justifies him billing at even a higher

24   rate than $759 per hour. (Garin Decl. at ¶ 16.)

25        Attorney Alex Shepard earned his JD from Washington University School of Law, is licensed

---

27   [1]    Available at: <http://judiciary.pasenategop.com/senate-bill-1095-slapp-suits/> (last visited
     April 12, 2021).

RANDAZZA | LEGAL GROUP

to practice in both Nevada and California, and has over seven years of experience primarily in intellectual property and First Amendment litigation, including Anti-SLAPP cases. (Randazza Decl. at ¶ 18.) According to the Adjusted Laffey Matrix, the standard acceptable billing rate for an attorney of his experience is $465 per hour. (*See* **Exhibit 5**). Shepard's hourly rate of $450 is thus reasonable.

Trey Rothell is a law clerk with over six years of paralegal experience and is currently attending Florida State University College of Law. (Randazza Decl. at ¶ 20.) Bryttni Yee is a law clerk with 1 year of legal experience and is currently attending Brooklyn Law School. (Randazza Decl. at ¶ 21.) Under the Adjusted Laffey Matrix, they are able to command a fee of $206 per hour. (*See* **Exhibit 5**.) Rothell and Yee's hourly rate of $200 is thus reasonable.

Jasmyn Montano, Heather Ebert, and Cassidy Curran are paralegals with one to three years of experience each. (Randazza Decl. at ¶¶ 22-24.) According to the Adjusted Laffey Matrix, they are each able to command a fee of $206 per hour. (**Exhibit 5**.) Their hourly rate of $175 is thus reasonable.

### 3.2.1.2    Recognition of Rates by Other Courts

Other courts have found the hourly rates of Brill's counsel to be reasonable.

The court in *Tobinick v. Novella*, 207 F. Supp. 3d 1332 (S.D. Fla. 2016) approved of hourly rates for attorneys similar to those sought here,[5] and ultimately awarded $223,598.75 to the defendant for fees in connection with the plaintiff's Lanham Act claims. In 2016 in *iQTAXX, LLC v. Boling*, No. A-15-728426-C, 2016 BL 154334 (Nev. Dist. Ct. May 10, 2016), attached as **Exhibit 14**, the court found hourly rates of $650 for Mr. Randazza and $325 for Mr. Shepard to be reasonable and awarded $40,852.58 in attorneys' fees.

More recently, in *Guo v. Cheng*, **Exhibit 6**, the court approved of hourly rates of $800 for Mr. Randazza, $450 for Mr. Shepard, $200 for Mr. Rothell, and $175 for paralegals reasonable, and awarding $184,955.55 in attorneys' fees. In *Las Vegas Resort Holdings, LLC v. Roeben*, **Exhibit 7**, the court approved the same hourly rates as in *Guo v. Cheng*, and awarded $93,573 in attorneys' fees.

---

[5]    The defendant in that matter sought rates of $650/hour for Randazza, $325/hour for Shepard, and $180/hour for paralegal time.

1       These rates are particularly reasonable, and in fact, low when compared to those in various

2   Anti-SLAPP cases involving highly qualified counsel and public figure plaintiffs or defendants.  The

3   court in *Wynn v. Chanos*, 2015 U.S. Dist. LEXIS 80062, *6 (N.D. Cal. June 19, 2015) found it was

4   reasonable for the defendant's attorneys to charge an hourly rate between $1,035 and $1,085 despite

5   their lack of specialized experience in defamation law.  Randazza's rate of $800 per hour is a bargain

6   compared to this, especially considering his special expertise in the areas of law germane to this case.

7   The *Chanos* court additionally found that associate attorney rates of $570 to $710 per hour (for

8   associates with four and six years of experience, respectively) were reasonable.  Mr. Shepard's rate of

9   $450 per hour is remarkably cheap in comparison.

10      More recently in California is *Clifford v. Trump*, 2018 U.S. Dist. LEXIS 211297, *19 (C.D. Cal.

11  Dec. 11, 2018), where the court awarded nearly $300,000 in attorneys' fees and costs under the Texas

12  Anti-SLAPP statute, which similarly allows for a mandatory fee award to a prevailing defendant, for

13  work performed in connection with dismissing a single defamation claim that implicated much simpler

14  issues of defamation law than those presented here.  The court found that, for highly qualified

15  defamation attorneys, partner hourly rates ranging from $841 to $611 were reasonable, and associate

16  hourly rates from $586 to $307 were reasonable.  In the Northern District of California case of *Open*

17  *Source Sec., Inc. v. Perens*, 2018 U.S. Dist. LEXIS 98169, *7-8 (N.D. Cal. June 9, 2018), the prevailing

18  Anti-SLAPP defendant was found to be entitled to hourly rates of $880 to $995 for experienced

19  partners, and rates from $355 to $535 for associates.

20                          **3.2.1.3    Other Reasonable Rate Factors**

21      Consideration of the other factors laid out in *Robledo*, 64 Cal. App. 3d at 623-24, also weigh in

22  favor of the reasonableness of the requested fees.  Postle brought seven causes of action under both

23  common law and California statutes, alleging a complex and coordinated campaign of falsehoods

24  against him based on allegations of cheating at poker.  Presenting the bases for Brill's allegedly

25  actionable statements required technical discussion of how professional poker is played and the

26  technical security measures employed by Stones Live Poker.  Postle's Complaint also references prior

27  litigation by Brill and others against Postle regarding this cheating, necessitating review of that

RANDAZZA | LEGAL GROUP

1 | litigation for arguments and possible admissions by Postle that could be relevant in this litigation.

2 | Though Postle never intended to prosecute this case, Brill had no way of knowing that at the outset

3 | of litigation and had to retain counsel with specialized experience in defamation law. Addressing the

4 | issues raised by Postle's claims required significant research and drafting. Brill being proactive in her

5 | defense was especially reasonable given Postle's request for an award of tens of millions of dollars.

6 | ### 3.2.2    The Number of Hours Expended is Reasonable

7 | "[C]ounsel for prevailing parties should be paid, as is traditional for attorneys compensated

8 | by a fee-paying client, 'for all time reasonable expended on a matter.'" *Harman v. City and County of San*

9 | *Francisco* (Cal. App. 1st Dist. 2006) 136 Cal. App. 4th 1279, 1310 (*citing Norman v. Housing Authority of*

10 | *City of Montgomery*, 836 F.2d 1292, 1301 (11th Cir. 1988)).

11 | All the hours spent on this case were necessary. Postle's claims presented several complex

12 | issues of defamation and First Amendment law, requiring a full analysis of Postle's public-figure status,

13 | the lack of Brill's actual malice, the distinction between factual statements and Brill's opinions based

14 | on disclosed facts, and procedural issues such as the applicable statute of limitations based on

15 | ambiguous factual allegations as to the timing and content of several statements. Brill's counsel

16 | exercised billing discipline by assigning the majority of research and drafting work to a lower-cost

17 | associate, Attorney Shepard, while Attorney Randazza primarily performed work in developing Brill's

18 | defense strategy, performing final review of motion briefing, negotiating with Postle and his prior

19 | counsel, and attending the hearing on Postle's motion for a continuance. (Randazza Decl. at ¶¶ 15 &

20 | 28.)

21 | Aside from the Anti-SLAPP Motion itself, Postle required Brill to spend significant hours on

22 | this case even after Postle had apparently made the decision to dismiss his claims to avoid fee liability.

23 | As previously explained in Brill's Opposition to Postle's motion for a continuance of the hearing on

24 | Brill's Anti-SLAPP Motion, Brill stipulated to an initial continuance of the Anti-SLAPP hearing

25 | because Postle's prior counsel threatened to file a motion to conduct discovery otherwise, even though

26 | Brill later learned Postle never had any intention of taking discovery. Brill's counsel engaged in

27 | negotiations with Postle to stipulate to limited discovery, though Postle later disclaimed the need for

RANDAZZA | LEGAL GROUP

RANDAZZA | LEGAL GROUP

1   any such discovery. Then Postle sought a months-long continuance of the already-continued Anti-

2   SLAPP hearing, arguing that discovery was needed and he was having difficulty retaining new counsel.

3   This necessitated an opposition from Brill to ensure that her Anti-SLAPP Motion would be heard in

4   a timely manner. Postle never provided any evidence or explanation of his efforts to retain counsel

5   and refused to agree to a reasonable continuance, requiring Brill's attorneys to prepare for and attend

6   the hearing on Postle's motion for a continuance. And finally, Postle completely ignored Brill's

7   attempt to compromise on the amount of fees to cut his fee liability short, necessitating this motion.

8          Furthermore, Brill's counsel spent 5.3 hours of work, totaling $3,310 in fees, related to the

9   HONR Network's involvement in this suit. This organization was advising Postle on litigation

10  strategy and was actively involved in attempting to negotiate a lengthy continuance of the hearing on

11  Brill's Anti-SLAPP Motion. (Randazza Decl. at ¶ 39; Declaration of Alex J. Shepard ["Shepard

12  Decl."], attached as **Exhibit 15**.) In doing so, the HONR Network and its representative, Alexandrea

13  Merrell, likely committed the unlicensed practice of law. Brill's counsel were thus forced to spend

14  time determining whether claims should be brought against the HONR Network and Postle, as well

15  as to correct misrepresentations made in the press by the HONR Network regarding its unlicensed

16  practice of law. (Randazza Decl. at ¶¶ 39-41.) As this work stemmed directly from the HONR

17  Network's attempt to secure a lengthy and unwarranted continuance of the hearing on Brill's Anti-

18  SLAPP Motion, these hours are properly compensable.

19         **3.3    Anticipated Future Fees**

20         To obviate the need for a subsequent fee motion to include fees spent on a reply in support

21  of this Motion (assuming Postle files an opposition) and attending the hearing on this Motion, Brill

22  requests an estimated $10,000 in additional fees if Postle files an opposition, and $2,000 in additional

23  fees if he does not. This is a reasonable estimate based on Randazza's familiarity with the work

24  involved in briefing and arguing motions for attorneys' fees. (Randazza Decl. at ¶ 31.)

25  **4.0    CONCLUSION**

26         Based on the foregoing, Defendant Veronica Brill hereby respectfully requests that the Court

27  award her $961.91 in costs and between $67,677.50 and $77,677.50 in attorneys' fees, for a total award

1 | of between $70,639.41 and $78,639.41.

2 |     Dated: April 13, 2021.              Respectfully Submitted,

3 |

4 |

Marc J. Randazza, SBN 269535
Alex J. Shepard, SBN 295058
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive Suite 109
Las Vegas, NV 89117
Telephone: 702-420-2001
ecf@randazza.com

*Attorneys for Defendant,*
*Veronica Brill*

RANDAZZA | LEGAL GROUP

1

## PROOF OF SERVICE

2    *Postle v. Brill, et al.* | Sacramento County Superior Court | Case No. Case No. 34-2020-00286265

3    At the time of service, I was over the age of 18 and not a party to this action. I am employed in the
     County of Clark, State of Nevada. My business address is Randazza Legal Group, PLLC, 2764 Lake
4    Sahara Drive, Suite 109, Las Vegas, Nevada 89117.

5
     On April 13, 2021, I served true and correct copies of the foregoing document, entitled:
6
     **DEFENDANT VERONICA BRILL'S NOTICE OF MOTION AND MOTION FOR**
7    **COSTS AND ATTORNEYS' FEES UNDER Cal. CODE CIV. PROC. § 425.16(c)(1)**

8    on the interested parties as follows:

9                                      Michael Postle
10                                    3724 Deer Walk Way
                                      Antelope, CA 95843
11                                 dreamseatpoker@gmail.com
                                      *Plaintiff, pro se*
12
     BY UNITED STATES MAIL. I enclosed the documents listed above in a sealed envelope or package
13   addressed to the persons at the addresses above, and deposited the sealed envelope with the United
     States Postal Service, with postage fully prepaid; and,
14
15   BY ELECTRONIC MAIL. I electronically served the documents listed above to the persons at the
     electronic mail addresses listed above, from my electronic service address, hme@randazza.com.
16
17   I declare under penalty of perjury under the laws of the State of California that the foregoing is true
     and correct.

18   Executed on April 13, 2021 at Las Vegas, Nevada.

19

20

21

22                                        Employee,
                                          Randazza Legal Group, PLLC
23

24

25

26

27

- 14 -
Defendant Veronica Brill's Notice of Motion and Motion for Costs and Attorneys' Fees
Case No. 34-2020-00286265

# Exhibit 15

Declaration of Alex J. Shepard ["Shepard Decl."]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF SACRAMENTO**

| | |
|---|---|
| **Michael Postle,** an individual;<br><br>Plaintiff,<br><br>vs.<br><br>**Veronica Brill,** an individual; **ESPN, Inc.,** a Delaware Corporation; **Joey Ingram,** an individual; **Haralabos Voulgaris,** an individual; **Daniel Negreanu,** an individual; **Upswing Poker, Inc.,** a Nevada Corporation; **iBus Media Limited d/b/a "PokerNews",** and Isle of Man, United Kingdom Private Limited Liability Company Parent; **Jonathan Little Holdings LLC, d/b/a "Poker Coaching",** a Nevada Limited Liability Company; **Solve For Why Academy LLC,** a Nevada Limited Liability Company; **Todd Witteles,** an individual; **Run It Once, Inc.,** a Nevada Corporation; and **DOES 1 through 1,000,** inclusive;<br><br>Defendants. | Case No. 34-2020-00286265<br><br>**DECLARATION OF ALEX J. SHEPARD**<br><br>Action Filed:    10/01/2020<br>Trial Date:      Not yet set |

I, Alex J. Shepard, declare:

1.     I am over 18 years of age and have never been convicted of a crime involving fraud or dishonesty.

2.     The facts set forth in this Declaration are within my personal knowledge and are true and correct to the best of my knowledge and belief.

3.     I am an associate attorney with Randazza Legal Group, PLLC ("RLG") and am counsel of record for Defendant Veronica Brill in this matter.

4.     On March 17, 2021 at approximately 3:25 p.m. Pacific time, I called Plaintiff Michael Postle. Also on the line during this call was Alexandrea Merrell, the Director of Public Relations and Policy for the HONR Network.

5.     During this call, Ms. Merrell explained the services offered by the HONR Network. She explained the efforts Mr. Postle allegedly had made to retain counsel.

6.     During this call, Ms. Merrell also explained that the HONR Network was in the process of going through a large volume of statements allegedly published by Defendants in this matter about Mr. Postle to determine which statements were actionable. She stated that a 180-day continuance of the hearing on Ms. Brill's Anti-SLAPP Motion was necessary due to how time-intensive this alleged search was.

7.     While I do not recall whether Mr. Postle or Ms. Merrell explicitly stated that Mr. Postle had retained the HONR Network, it was obvious to me during the course of this call that this was the case. I was convinced of this because Ms. Merrell did most of the talking during this conversation without objection from Mr. Postle and she was making representations on his behalf, such as his alleged efforts to retain counsel and the need for a continuance due to the HONR Network's time-intensive efforts in obtaining examples of allegedly actionable statements. I do not find it remotely plausible the HONR Network would go through such efforts on Mr. Postle's behalf without being retained to do so.

8.     During this call, I was also left with the distinct impression Ms. Merrell and/or the HONR Network was providing legal advice to Mr. Postle. By Ms. Merrell's own admission, the

1    HONR Network was collecting evidence of statements published online and advising Mr. Postle

2    as to what statements were potentially actionable.

3        9.    Furthermore, Ms. Merrell was directly participating in a court-ordered meet and

4    confer conference between me and Mr. Postle by explaining Mr. Postle's alleged basis for seeking

5    a continuance.

6        10.    Ms. Merrell also explained during this call that she had recently spoken to counsel

7    for Defendant Todd Witteles, and represented to me that counsel for Mr. Witteles had agreed to a

8    continuance of the Anti-SLAPP hearings of 90-120 days.  She then stated that Ms. Brill should

9    agree to a continuance of a similar length, and that if she refused to do so Ms. Brill would look

10   unreasonable to the Court.

11       11.    I later learned that Ms. Merrell's account of her conversation with Mr. Wittele's

12   counsel was a misrepresentation and that he had never agreed to such a continuance.

13       I declare under penalty of perjury that the foregoing is true and correct.

14       Dated: April 13, 2021.

15

16   _____
     Alex J. Shepard

17

18

19

20

21

22

23

24

25

26

27

# EXHIBIT 7

Veronica Brill's Opposition to Postle's Supplemental Brief on
Attorneys' Fees in State Court Case



1  Marc J. Randazza, SBN 269535
   Alex J. Shepard, SBN 295058
2  RANDAZZA LEGAL GROUP, PLLC
   2764 Lake Sahara Drive Suite 109
3  Las Vegas, NV 89117
   Telephone: (702) 420-2001
4  Email: ecf@randazza.com

5  Attorneys for Defendant
   Veronica Brill

6

7              SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                  FOR THE COUNTY OF SACRAMENTO

9

10 Michael Postle, an individual;              Case No. 34-2020-00286265

11              Plaintiff,

12      vs.                                     RESPONSE TO PLAINTIFF
                                                MICHAEL POSTLE'S
13 Veronica Bill, an individual; ESPN, Inc., a  SUPPLIMENTAL [SIC] BRIEF
   Delaware Corporation; Joey Ingram, an individual;
14 Haralabos Voulgaris, an individual; Daniel   Judge: Shama H. Mesiwala
   Negreanu, an individual; Upswing Poker, Inc., a  Dept: 53
15 Nevada Corporation; iBus Media Limited d/b/a Date:   June 16, 2021
   "PokerNews", and Isle of Man, United Kingdom  Time:  1:30 p.m.
16 Private Limited Liability Company Parent; Jonathan  Reservation No.   2561076
   Little Holdings LLC, d/b/a "Poker Coaching",
17 a Nevada Limited Liability Company; Solve For  Action Filed:  10/01/2020
   Why Academy LLC, a Nevada Limited Liability  Trial Date:    Not yet set
18 Company; Todd Witteles, an individual; Run It
   Once, Inc., a Nevada Corporation; and DOES 1
19 through 1,000, inclusive;

20              Defendants.

21

22

23          Defendant Veronica Brill hereby files her response to "Plaintiff's Supplimental [sic] Brief,"

24 filed on June 9, 2021 ("Supp. Brief"), presumably in response to Brill's Motion for Costs and

25 Attorneys' Fees Under Cal. Code Civ. Proc. § 425.16(c)(1) (the "Fee Motion").

26

27

**1.0　INTRODUCTION**

Plaintiff Mike Postle's Supp. Brief is not a proper response to Brill's Fee Motion. It is a procedurally improper and untimely rogue document that is nothing more than a vehicle for irrelevant mud-slinging directed at both Brill and her counsel. Postle has failed to challenge Brill's entitlement to attorneys' fees under California's Anti-SLAPP statute and has failed to demonstrate that the hourly rates of Brill's counsel are unreasonable or that any billing entries are objectionable. The Court should strike the Supp. Brief in its entirety due to its voluminous irrelevant and improper content or, at the very least, ignore it when deciding the Fee Motion.

**2.0　ARGUMENT**

**2.1　Postle's Supp. Brief Should be Ignored as an Untimely, Rogue Filing**

Brill filed and served her Fee Motion on April 13, 2021. Per Cal. Code Civ. Proc. §§ 1005(b) and 1010.6(a)(4)(B), Postle was required to file and serve his response to the Fee Motion no later than 11 court days prior to the initially scheduled May 19, 2021 hearing on the Fee Motion, which was May 4, 2021. He did not do so. That hearing was continued *sua sponte* to June 16, 2021. While Postle's deadline to oppose the Fee Motion was not extended by this continuance, even if it had been, his opposition would have been due June 1, 2021.

To this day, Postle has not filed an opposition to the Fee Motion. Instead, on June 8, 2021, he filed a "Supplimental [sic] Brief." As to what brief he is supplementing, we are left to guess. The Supp. Brief is a rogue document not filed pursuant to any rule or statute and should thus be ignored. Even if it is charitably construed as an opposition to the Fee Motion, however, it is untimely. While Postle claims he attempted to file the Supp. Brief on June 3, 2021, he did not serve Brill with the Supp. Brief until June 9, 2021, a mere five court days before the hearing. (Declaration of Alex J. Shepard ["Shepard Decl."], attached as **Exhibit 1**, at ¶ 4.) Postle did not seek leave to file a late opposition and does not provide any good cause for why he filed it late; he simply pretends this Court's timing requirements don't apply to him.

Postle's Supp. Brief is thus procedurally improper and untimely, and should be ignored. For the sake of completeness, however, and in the event the Court entertains the Supp. Brief, Brill will

RANDAZZA | LEGAL GROUP

1 | address the points raised in it – for as improper as it is procedurally, it fails even more spectacularly if
2 | its merits are considered.

3 | **2.2    Postle Fails to Object to Brill's Entitlement to Fees, Billing Rates, or Any**
4 | **Billing Entries**

5 | As an opposition to a fee motion, Postle's Supp. Brief is fatally flawed. First, he provides no
6 | argument or authority contesting Brill's entitlement to an award of attorneys' fees. Under Cal. Code
7 | Civ. Proc. § 425.16(c)(1), costs and attorneys' fees are mandatory for the prevailing party on an Anti-
8 | SLAPP motion. A SLAPP plaintiff dismissing voluntarily in the face of an Anti-SLAPP motion
9 | presumptively makes the filing defendant the "prevailing party," and entitles her to fees. *See Coltrain*
10 | *v. Shewalter* (1998) 66 Cal. App. 4th 94, 102. Postle does not even acknowledge this presumption,
11 | much less attempt to rebut it. Brill is the prevailing party and is entitled to her fees. The only question
12 | is how much in fees should be awarded.

13 | Postle pounds on the table that the fees of Brill's counsel are excessive, but he does not identify
14 | a single objectionable billing entry. He does not argue that anyone's hourly rates are unreasonable. He
15 | does not argue that any trends in the billing entries are unreasonable or that any billing practices are
16 | objectionable. He simply makes the conclusory statement that the amount of fees is excessive, with
17 | no elaboration. This is not a proper opposition to a fee motion and the Court should disregard it.
18 | Further, Postle's "argument," if it can be called that, fails to establish any basis for his opinion, nor
19 | why this Court should disregard the expert report of Joseph P. Garin submitted as *Exhibit 8* to the
20 | Fee Motion, or why this Court should disregard the legion of cases submitted where judges have
21 | upheld Randazza Legal Group's rates and billing practices.

22 | **2.3    Brill's Fundraising Efforts Do Not Affect Her Entitlement to Fees**

23 | Postle claims that, because Brill has been crowdfunding her legal defense, she should not
24 | receive the requested fees. This is utterly irrelevant. Brill is a defendant, not a plaintiff. She is not
25 | seeking an award of *damages* for a tort Postle committed, but an award of attorneys' fees *guaranteed*
26 | under Cal. Code Civ. Proc. § 425.16. The existence of a third-party payor, such as insurer, does not
27 | reduce the amount of fees to which a party is entitled. (*See Sonoma Land Trust v. Thompson* (2021) 63

RANDAZZA | LEGAL GROUP

1   Cal. App. 5th 978, 984 [in declining to reduce fee award by amount paid by insurer, noting that "a court
2   may award attorney fees regardless of whether an insurer, or other third party, paid the fees"]; *see also*
3   *Staples v. Hoefke* (1987) 189 Cal. App. 3d 1397, 1410 [awarding fees despite insurance coverage]).

4         California's Anti-SLAPP statute has no exception for cases where a prevailing defendant has
5   a third party assist with their legal fees.   California's policy of deterring SLAPP suits would be
6   completely undermined if a SLAPP plaintiff could be absolved of all responsibility to pay a fee award
7   simply because the defendant sought assistance in paying their legal fees.  Indeed, indigent defendants,
8   the ones most in need of external assistance, would be harshly punished under such a rule.  What
9   Postle seems to want is for this Court to issue an order that would undermine access to justice for
10  those without the means to defend themselves.  Because Brill was able to have access to justice, despite
11  being unable to afford it, does not give Postle a pass for filing a frivolous SLAPP suit.

12        Postle provides no authority to support his position, simply assuming his conclusion and then
13  moving on to provide irrelevant evidence[1] as to Brill's fundraising efforts. There is no danger of double
14  recovery because any excess funds obtained from these efforts are earmarked for donation, not the
15  personal benefit of Brill or her counsel. ( *See* Declaration of Veronica Brill, attached as **Exhibit 2**, at
16  ¶¶ 6-8.)  These efforts have no bearing on Brill's entitlement to fees or what the amount of the fee
17  award should be.

18        2.4     **The Vast Majority of Postle's Supp. Brief Has No Relevance to the Fee Motion**
19                **and Should be Stricken**

20        Postle's Supp. Brief is concerned primarily with defaming Brill and her counsel.  None of these
21  arguments are relevant to Brill's entitlement to fees or the amount of a fee award, and the Court should
22  strike Postle's filing.

23        First, Postle claims attorney Marc Randazza has a "history of fraudulent billing practices," then
24  proceeds not to identify any fraudulent billing practices. His reference to "a long and well documented

25

26   [1]   As a general note, nearly every piece of evidence Postle attaches to his Supp. Brief is
     inadmissible, as there is no attempt to authenticate any of these documents, whether by a declaration
27   or otherwise.

Response to Plaintiff's Supplemental [sic] Brief
Case No. 34-2020-00286265

1   history of financial fraud, including billing fraud, bribery, and extortion" is supported by a Huffington

2   Post blog post,[2] which is inadmissible hearsay in addition to not being authenticated. But even if the

3   Court were to pay attention to this blog, it only recounts the findings in an interim arbitration award

4   that was never confirmed by any court and was, in fact, later vacated. (Order vacating interim

5   arbitration award, attached as **Exhibit 3**.) And even then, the conduct at issue was far afield of bribery

6   or fraud. Randazza's only misconduct was in discussing, but not consummating, potentially

7   representing an opposing party in order to secure a more favorable settlement for his client, in an

8   unknowing violation of Nevada Rule of Professional Conduct 5.6, as well as permissibly advancing

9   litigation funds to Randazza's client but memorializing that advance in a 0% interest promissory note

10  without a written disclaimer that his client should seek independent counsel. This conduct occurred

11  in 2012 and caused no harm to his client or the courts. Randazza was disciplined in Nevada for this

12  conduct and the State of California imposed reciprocal discipline, in the form of a probation that has

13  since expired. The one Court to hold an evidentiary hearing did not afford the interim arbitration

14  award any weight and found there was insufficient evidence that Randazza's conduct constituted an

15  unethical conflict of interest. (Florida Supreme Court Referee Report in *The Florida Bar v. Randazza*,

16  attached as **Exhibit 4**, at 6-7.) In considering a recent pro hac vice application, a Rhode Island court

17  observed:

18
19      I was actually happy to see that the issue that sparked the disciplinary proceedings in
        Nevada which then traveled around the country was not related to an issue of candor
20      to the court or attorney misconduct as it relates to activities before any court, and
        instead appear all to be related to, you know, conflicts of interest involving one
21      particular and it's [sic] related entities . . . So despite initially being sort of taken aback
        by the application, I have concluded that the discipline against Mr. Randazza does not
22      rise to the level where I would be uncomfortable admitting him to practice in this case.

23  (Transcript of hearing on *pro hac vice* motion in *St. Angelo v. Kearney*, attached as **Exhibit 5**, at 6:4-22.)

24

25  _____
    [2]   This blog post was authored by a party with an axe to grind with one of Randazza's clients.
26  As the author did not wish for that client to have representation, he harassed Randazza to try and
    convince him to withdraw from representing the party. Randazza refused, and the unhinged tantrum
27  of a third-rate blogger ensued. This is hardly the kind of thing that a Court should credit.

RANDAZZA | LEGAL GROUP

1    Randazza has never engaged in financial fraud, billing fraud, bribery, or extortion, and Postle

2  provides no evidence of any of these claims. The Court should not be sidetracked by these grossly

3  inappropriate and immaterial allegations, and Brill will not address the remainder of them unless the

4  Court wishes to explore them at the hearing.

5    Postle also complains of the personal conduct of Brill and Randazza, though he fails to explain

6  how this is relevant to the Fee Motion. He grossly misrepresents the contents of his and Alexandrea

7  Merrel's conversation with Randazza; Randazza never used any misogynistic slurs, as Postle falsely

8  claims. (*See* Declaration of Cassidy Curran, attached as **Exhibit 6**, at ¶ 10.)  Of course, Postle tries to

9  inflame the court with this perjurious statement, supported by a declaration by a party that has been

10  acting as counsel in this case – without being licensed as an attorney.  (Supp. Brief at **Exhibit 14**,

11  Declaration of Alexandrea Merrell.)

12    He then criticizes Randazza's statements on Twitter, claiming Randazza "doxed" him by

13  publishing documents that Postle himself filed in this case.  Postle freely provided his address when

14  he decided to represent himself and never requested that this information be treated as confidential.

15  Further, Postle does not even live at that address, and his claims of "doxing" are the equivalent of a

16  poor soccer player throwing himself on the ground upon the slightest contact with an opposing player,

17  hoping to substitute his poor playing skills with acting skills.  Posting documents from a public docket

18  is not improper and a SLAPP plaintiff is in no position to complain if the suit he filed starts to get

19  attention on social media.

20    Postle finally spends several pages attempting to argue that Brill engaged in various forms of

21  misconduct.  To the extent he is attempting to argue that his claims have merit, the time for that has

22  passed, and Postle fails to explain how his renewed allegations of falsity bear on the merits of Brill's

23  Fee Motion.  These claims are primarily irrelevant mud-slinging, though, and the Court should ignore

24  it. However, to avail herself of the ability to respond to these allegations on the public record, Brill

25  addresses them in her declaration. (*See, generally,* **Exhibit 2**.)  Whether Postle is a "good person" does

26  not change the fact that he filed a SLAPP suit then cut and ran at the first sign of resistance.  Brill is

27  entitled to an award of attorneys' fees.  Because Postle's Supp. Brief consists primarily of irrelevant,

RANDAZZA | LEGAL GROUP

1 | false, and improper material, the Court should strike it on its own initiative under Cal. Code Civ. Proc.

2 | § 436.

3 | **3.0     CONCLUSION**

4 |      The Court should strike Postle's Supp. Brief in its entirety for its overwhelmingly impertinent

5 | and irrelevant material intended only to defame Brill and her counsel. If it chooses not to do so, the

6 | Court should ignore the Supp. Brief when deciding the pending Fee Motion. Brill will inform the

7 | Court of the fees incurred in connection with Postle's Supp. Brief at the hearing on the Fee Motion

8 | and will seek recovery of these amounts.

9 |      Dated: June 14, 2021.          Respectfully Submitted,

Marc J. Randazza, SBN 269535
Alex J. Shepard, SBN 295058
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive Suite 109
Las Vegas, NV 89117
Telephone: 702-420-2001
ecf@randazza.com

Attorneys for Defendant
Veronica Brill

RANDAZZA | LEGAL GROUP

<u>**PROOF OF SERVICE**</u>

*Postle v. Brill, et al.* | Sacramento County Superior Court | Case No. 34-2020-00286265

At the time of service, I was over the age of 18 and not a party to this action. I am employed in the County of Clark, State of Nevada. My business address is Randazza Legal Group, PLLC, 2764 Lake Sahara Drive, Suite 109, Las Vegas, Nevada 89117.

On June 14, 2021, I served true and correct copies of the foregoing document, entitled:

**RESPONSE TO PLAINTIFF MICHAEL POSTLE'S SUPPLIMENTAL [SIC] BRIEF**

on the interested parties as follows:

> Michael Postle
> 3724 Deer Walk Way
> Antelope, CA 95843
> dreamseatpoker@gmail.com
> *Plaintiff pro se*

<u>BY UNITED STATES MAIL.</u> I enclosed the documents listed above in a sealed envelope or package addressed to the persons at the addresses above, and deposited the sealed envelope with the United States Postal Service, with postage fully prepaid; and,

<u>BY ELECTRONIC MAIL.</u> I electronically served the documents listed above to the persons at the electronic mail addresses listed above, from my electronic service address, tar@randazza.com.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 14, 2021 at Las Vegas, Nevada.

> Employee,
> Randazza Legal Group, PLLC

# EXHIBIT 1

Declaration of Alex J. Shepard

1

2

3

4

5

6

7          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8              **FOR THE COUNTY OF SACRAMENTO**

9

10   | **Michael Postle**, an individual;

                                                        Case No. 34-2020-00286265

11              Plaintiff,

12          vs.                                         **DECLARATION OF ALEX J.**
                                                        **SHEPARD**
13   **Veronica Brill**, an individual; **ESPN, Inc.**, a

14   Delaware Corporation; **Joey Ingram**, an
     individual; **Haralabos Voulgaris**, an
15   individual; **Daniel Negreanu**, an individual; **Upswing Poker,**    Action Filed:    10/01/2020
     **Inc.**, a Nevada Corporation; **iBus Media Limited**    Trial Date:      Not yet set
16   **d/b/a "PokerNews"**, and Isle of Man, United
     Kingdom Private Limited Liability Company
17   Parent; **Jonathan Little Holdings LLC, d/b/a**
     **"Poker Coaching"**, a Nevada Limited Liability
18   Company; **Solve For Why Academy LLC**, a
     Nevada Limited Liability Company; **Todd**
19   **Witteles**, an individual; **Run It Once, Inc.**, a
     Nevada Corporation; and **DOES 1 through 1,000**,
20   inclusive;

21
22              Defendants.

23

24

25

26

27

I, Alex J. Shepard, declare:

1.    I am over 18 years of age and have never been convicted of a crime involving fraud or dishonesty.

2.    The facts set forth in this Declaration are within my personal knowledge and are true and correct to the best of my knowledge and belief.

3.    I am an associate attorney with Randazza Legal Group, PLLC ("RLG") and am counsel of record for Defendant Veronica Brill in this matter.

4.    I am aware that Plaintiff Mike Postle claims he attempted to file his Supplimental [sic] Brief in this matter on June 3, 2021. Whether or not he attempted to do so on this date, Ms. Brill was not served with it. Ms. Brill was not served with the Brief until June 9, 2021.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 14, 2021.

Alex J. Shepard

- 2 -
Declaration of Alex J. Shepard
Case No. 34-2020-00286265

# EXHIBIT 2

Declaration of Veronica Brill

1

2

3

4

5

6

7                     **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8                         **FOR THE COUNTY OF SACRAMENTO**

9

| | |
|---|---|
| 10  **Michael Postle**, an individual; | Case No. 34-2020-00286265 |
| 11            Plaintiff, | |
| 12    vs. | **DECLARATION OF VERONICA BRILL IN SUPPORT OF RESPONSE TO PLAINTIFF'S SUPPLIMENTAL [SIC] BRIEF** |
| 13  **Veronica Bill**, an individual; **ESPN, Inc.**, a Delaware Corporation; **Joey Ingram**, an individual; | |
| 14  **Haralabos Voulgaris**, an individual; **Daniel Negreanu**, an individual; **Upswing Poker, Inc.**, a | Action Filed:  October 1, 2020 |
| 15  Nevada Corporation; **iBus Media Limited d/b/a** | Trial Date:      Not Yet Set |
| 16  **"PokerNews"**, and Isle of Man, United Kingdom Private Limited Liability Company Parent; **Jonathan** | |
| 17  **Little Holdings LLC, d/b/a "Poker Coaching"**, a Nevada Limited Liability Company; **Solve For** | |
| 18  **Why Academy LLC**, a Nevada Limited Liability Company; **Todd Witteles**, an individual; **Run It** | |
| 19  **Once, Inc.**, a Nevada Corporation; and **DOES 1** | |
| 20  through **1,000**, inclusive; | |
| 21            Defendants. | |

22

23        I, Veronica B. Brill, declare:

24        1.        I am over 18 years of age and have never been convicted of a crime involving fraud or

25  dishonesty.

26

27

2.     The facts set forth in this Declaration are within my personal knowledge and are true and correct to the best of my knowledge and belief.

3.     I am providing this Declaration in support of my Response to Plaintiff Mike Postle's Supplimental [sic] Brief.

4.     To assist in funding my legal defense against Postle's meritless SLAPP suit, I coordinated with Randazza Legal Group, PLLC ("RLG") to set up a crowdfunding page on the GoFundMe crowdfunding platform.

5.     Though Cassidy Curran's name is mentioned on the GoFundMe page for my legal defense, she is not part of my fundraiser and I was not aware of her until retaining RLG for my defense in this case. I set up the fundraising campaign so that I could pay for my defense in this matter. Ms. Curran is not a beneficiary of the campaign.

6.     There is no danger of me receiving any kind of windfall through an award of attorneys' fees. My GoFundMe page clearly states that "[i]n the case that I will move forward with the suit and win, and get Mike to pay for my legal bills, I will give all reimbursed legal fees to KL Cleeton."

7.     KL Cleeton is a quadriplegic who is in need of a handicap accessible vehicle. I will donate all money raised through the GoFundMe campaign not applied to my legal defense, as well as what is refunded to me from upon receiving an award of attorneys' fees, to assist KL Cleeton acquire this vehicle.

8.     Postle alleges that Bill Perkins established a trust worth roughly $200,000 to pay my legal fees. This is false, as the amount Mr. Perkins donated is far less than $200,000. I have already repaid Mr. Perkins any funds I haven't used for this litigation and plan to repay as much of his donation as I can. I will not personally see any of the funds I have received either from GoFundMe or Mr. Perkins.

9.     Contrary to Postle's false claims, I have never filed any sexual assault charges or complaints with any place of employment in my life. Postle provides no evidence to substantiate his claim that I have done this, and I suspect he has no such evidence. But even if this claim were true, it

1    is disgusting for Postle to insinuate I am somehow untrustworthy for trying to seek redress for being

2    the victim of sexual assault or harassment. This is merely another desperate attempt at deflection.

3        10.    In the same breath, Postle claims I made romantic overtures to him. This is

4    categorically false. I did no such thing, and I was in a long-term relationship for most of the time I

5    spent doing commentary at Stones Hall.

6        11.    Postle claims that "on the final day of [my] employment at Stones Gaming Hall, [I]

7    used [my] show to attempt to get [him] banned from the casino by claiming 'Mike must be cheating.'"

8    (Supp. Brief at 11.) This is false. I was not employed by Stones Hall at the time I acted as a

9    whistleblower regarding his cheating. I was and still am gainfully employed in the technology sector.

10        12.    Postle next claims that I made my statements against him to seek notoriety. (Supp.

11    Brief at 12.) This is false, and on its face is completely unsupported speculation meant only to attack

12    my character. The gentleman that Postle is referring to is Roger Bailey, who cornered me in the

13    commentary booth at Stones casino and asked me "how much would it cost?" I assumed that Roger

14    Bailey was drunk and I never filed any sexual harassment claims against him. It's a shame when women

15    are legitimately sexual harassed and would like to file these claims with the authorities, yet people like

16    Postle make them feel as though they are in the wrong.

17        13.    Postle claims there is something suspicious about the number of people who agreed

18    with my conclusion that he was cheating at poker. (Supp. Brief at 12.) However, this only shows that

19    almost every single authority within poker and almost every single professional poker player has agreed

20    with me that Postle did indeed cheat not only because of the way he played but also because of the

21    statistical improbability of his winning streaks given his play style.

22        14.    Postle falsely claims that my prior attorney, Maurice Verstandig, "had to issue a

23    statement that no cheating was found." (Supp. Brief at 12.) This statement, however, only pertained

24    to Stones Hall, Stones Live Poker, and Justin Kuraitis. Notably absent from Mr. Verstandig's

25    statement is any mention of Postle or his cheating. This statement in no way exonerates him.

26

27

15. Postle claims that I stated that "the DOJ was bought and paid for by the casinos." (Supp. Brief at 12.) This is false. In reality, I only said that the funding provided to the DOJ is partially from casino revenue in the form of taxes, just as with every other government agency.

16. Postle complains that I posted "the video of the last court procedure, making fun of me because I was nervous and didn't speak as well as I would have liked." (Supp. Brief at 13.) I posted a link to the Court's publicly accessible YouTube page. His reference to my violation of a court order in doing so is puzzling, as the Court uploaded the video itself and there are no orders restricting dissemination of these videos.

17. I have been repeatedly harassed by Postle and his supporters online. I have repeatedly been harassed through multiple fake online accounts that all use similar verbiage and sentence construction in their harassing statements. These accounts have also published videos of me because Postle is angry that I uncovered his cheating and I refuse to be fearful of his constant threats.

Under penalty of perjury, I declare the foregoing is true and correct to the best of my knowledge.

Dated: 6/14/2021 _____

Veronica B. Brill

- 4 -
Declaration of Veronica Brill

# EXHIBIT 3

Order Vacating Interim Arbitration Award
*In re Marc John Randazza*, Case No. BK-S-15-14956-ABL
Doc. No. 261



Honorable August B. Landis
United States Bankruptcy Judge

Entered on Docket
August 02, 2018

Jessica R. MacGregor, Esq., Ca Bar No. 168777
*(Pro Hac Vice)*
Long & Levit LLP
465 California Street, 5th Floor
San Francisco, CA  94104
Telephone: 415-397-2222
Facsimile: 415-397-6392
Email: jmacgregor@longlevit.com

Lawrence A. Jacobson, Esq., Ca Bar No. 057393
*(Pro Hac Vice)*
Cohen and Jacobson, LLP
66 Bovet Road, Suite 285
San Mateo, CA  94402
Telephone: 650-261-6280
Facsimile: 650-368-6221
Email: laj@cohenandjacobson.com

*Attorneys for JAMS, Inc. and Stephen Haberfeld*

Jeanette E. McPherson, Esq., NV Bar No. 5423
Schwartzer & McPherson Law Firm
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Telephone: 702-228-7590
Facsimile: 702-892-0122
E-Mail: bkfilings@s-mlaw.com

*Local Counsel for JAMS, Inc. and Stephen Haberfeld*

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No. BK-S-15-14956-ABL |
| MARC JOHN RANDAZZA, | Chapter 11 |
| Debtor. | **ORDER REGARDING ORDER TO SHOW CAUSE WHY STEPHEN HABERFELD AND JAMS, INC. SHOULD NOT BE COMPELLED TO COMPLY WITH THE ORDER APPROVING SETTLEMENT AGREEMENT AND/OR HELD IN CONTEMPT AND SANCTIONED FOR WILLFUL VIOLATIONS OF THE AUTOMATIC STAY** |
| | Hearing Date:  July 31, 2018 <br> Hearing Time:  1:30 p.m. |

Order re OSC

1

1   The Order To Show Cause Why Stephen Haberfeld And Jams, Inc. Should Not Be

2   Compelled To Comply With The Order Approving Settlement Agreement And/Or Held In

3   Contempt And Sanctioned For Willful Violations Of The Automatic Stay ("OSC") having come

4   before this Court on July 31, 2018; Marc John Randazza (the "Debtor") appearing by and through

5   his counsel, Matthew Zirzow, Esq. of Larson Zirzow & Kaplan, LLC, JAMS, Inc. ("JAMS") and

6   Hon. Stephen E. Haberfeld (Ret.) ("Judge Haberfeld") (JAMS and Haberfeld collectively referred

7   to herein as the "JAMS Parties") appearing by and through their counsel Jessica MacGregor, Esq.

8   of Long & Levit, Lawrence Jacobson, Esq. of Cohen and Jacobson, LLP, and Jeanette E.

9   McPherson, Esq. of Schwartzer & McPherson Law Firm; the Court having reviewed the pleadings

10   on file and having heard the argument and proposals of the Debtor and the JAMS Parties; and in

11   full resolution of the OSC and for good cause shown, it is hereby

12   ORDERED that to effectuate the Court's order approving the settlement between the

13   Debtor and the Excelsior Parties, the Court further orders that the Interim Arbitration Award

14   issued in the Arbitration is hereby deemed vacated and dismissed; and

15   ORDERED that the automatic stay be and is hereby modified to authorize and allow

16   JAMS and Stephen Haberfeld to terminate the arbitration proceeding and close its file with no

17   other action to be taken; and

18   ORDERED that the parties to the OSC, the Debtor and the JAMS Parties, shall bear their

19   own attorneys' fees and costs; and

20   ORDERED that nothing in this order shall be deemed a finding of contempt; and

21   ORDERED that the court reserves jurisdiction over the interpretation and enforcement of

22   this order; and

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Order re OSC

1    ORDERED that upon entry of this Order, the hearing scheduled for September 4, 2018 at

2    9:30 a.m. regarding the OSC shall be vacated.

3    Submitted by:

4    /s/ Jessica R. MacGregor

     Jessica R. MacGregor, Esq.
5    Long & Levit LLP

6        -and-

7    Lawrence A. Jacobson, Esq.
     Cohen and Jacobson, LLP

8    *Attorneys for JAMS, Inc. and Stephen Haberfeld*

9        -and-

10    Jeanette E. McPherson, Esq.
     Schwartzer & McPherson Law Firm

11    *Local Counsel for JAMS, Inc. and Stephen Haberfeld*

12    **Approved**/Disapproved:

13    /s/ Matthew Zirzow

     Matthew Zirzow, Esq.
14    Larson Zirzow & Kaplan, LLC

15    *Attorneys for Debtor*

16               **LR 9021 CERTIFICATION**

17    In accordance with LR 9021, counsel submitting this document certifies that the order accurately
     reflects the court's ruling and that (check one):
18

19        ☐    The court waived the requirement of approval under LR 9021(b)(1).

20        ☐    No party appeared at the hearing or filed an objection to the motion.

21        ☒    I have delivered a copy of this proposed order to all counsel who appeared
             at the hearing, and any unrepresented parties who appeared at the hearing, and each
22              has approved or disapproved the order, or failed to respond, as indicated above.

23        ☐    I certify that this is a case under Chapter 7 or 13, that I have served a copy
24              of this order with the motion pursuant to LR 9014(g), and that no party has
             objection to the form or content of the order.
25

26    /s/ Jeanette E. McPherson
     Jeanette E. McPherson, Esq.
27    Schwartzer & McPherson Law Firm

28                       # # #

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Order to OSC

3

# EXHIBIT 4

Report of Referee
*The Florida Bar v. Randazza*, No. SC19-188

IN THE SUPREME COURT OF FLORIDA
(Before a Referee)

THE FLORIDA BAR,

    Complainant,

v.

MARC JOHN RANDAZZA,

    Respondent.

_____/

Supreme Court Case
No. SC19-188

The Florida Bar File
No. 2020-00,216(2B) NFC

## REPORT OF REFEREE

### I. SUMMARY OF PROCEEDINGS

Pursuant to the undersigned being duly appointed as referee to conduct disciplinary proceedings herein according to Rule 3-7.6, Rules of Discipline, the following proceedings occurred:

This is a reciprocal discipline case. The Respondent filed The Notice of Discipline by a Foreign Jurisdiction (Nevada) in the Florida Supreme Court and had as attachments the Nevada Order Approving a Conditional Guilty Plea and the underlying Conditional Guilty Plea. Respondent's Exhibit 3; Tr. Vol. II, page 235, lines 8-10. On January 6, 2019, The Florida Bar filed its Formal Complaint against Respondent. On February 19, 2019, The Florida Bar noticed respondent that a case Management Conference would be conducted by the referee on March 8, 2019. On May 3, 2019, the referee commenced the Final Hearing in this matter.

Mr. Fisher, counsel for The Florida Bar, Mr. Weiss, counsel for the Respondent

and the Respondent, Mr. Randazza, were present. Needing additional time to

conclude the Final Hearing, the parties rescheduled the second day. Due to events

beyond everyone's control, the Final Hearing was rescheduled again. The second

day of the Final Hearing convened on January 8, 2020. All items properly filed

including pleadings and exhibits in evidence and the report of referee constitute the

record in this case and are forwarded to the Supreme Court of Florida.

## II. FINDINGS OF FACT

Jurisdictional Statement. Respondent is, and at all times mentioned during

this investigation was a member of The Florida Bar subject to the jurisdiction and

Disciplinary Rules of the Supreme Court of Florida.

Narrative Summary Of Case.

Because this is a reciprocal discipline action, it is based on the Findings of

Fact, Conclusions of Law and Recommendation of the Southern Nevada

Disciplinary Board of the State Bar of Nevada dated July 10, 2018 and Order

Approving Conditional Guilty Plea Agreement of the Supreme Court of the State

of Nevada, dated October 10, 2018. The Supreme Court of the State of Nevada

imposed a 12 month suspension, stayed for 18 months of probation subject to

conditions. Those findings of fact and Order are attached to The Florida Bar's

Formal Complaint.

In or about June 2009, the Respondent drafted and signed a Legal Services Agreement with Excelsior Media Corp. (Excelsior) which provided that the Respondent would become "in-house" general counsel. The Agreement did not prohibit the Respondent from maintaining ad private practice or providing legal services to other clients so long as there was no conflict of interest with Excelsior. Excelsior had a subsidiary or affiliate company, Liberty Media Holdings, LLC (Liberty), which engaged in the production and distribution of pornography. The Respondent provided legal services to both entities, but did not have a separate agreement with Liberty.

In February 2011, Excelsior relocated its corporate offices to Las Vegas, Nevada. The Respondent followed in June 2011 and was admitted to the Nevada Bar in January 2012. Until his admission, the Respondent did not engage in the practice of law in the State of Nevada, except as a member of the bar of the U.S. District Court for the District of Nevada.

On or about June 20, 2012, the Respondent filed a lawsuit against FF Magnat Limited d/b/a Oron.com (Oron) for alleged violations of Liberty's intellectual property. On or about June 21, 2012, the Respondent obtained and injunction against Oron freezing certain accounts and funds of Oron. On July 1, 2012, the Respondent and attorneys for Oron signed a Settlement Letter with regard to the Oron litigation and a similar case between the two parties in Hong

3

Kong. The parties agreed that Oron would pay Liberty $550,000 payable to the

Respondent's trust account. A dispute arose after the Settlement Letter was

signed. Liberty filed a Motion to Enforce the settlement letter which the United

States District Court granted on August 7, 2012. Liberty obtained a Judgment

against Oron for $550,000. As part of the Post-Judgment settlement negotiations,

Oron informed the Respondent that it wanted to enter into an agreement to

retainthe Respondent for bona fide legal services. Specifically, Oron wanted the

Respondent to advise it how to avoid this type of litigation in the future and how to

restructure the company so as to not be subject to jurisdiction in the United States.

Tr. II, page 215, lines 2-25, 216, lines 1-14. Subject to the agreement of Liberty

and its execution of a Post-Judgment agreement, the Respondent negotiated a

separate agreement with Oron whereby he would receive $75,000 of Oron's frozen

funds. On August 6, 2012, while still in litigation representing Excelsior against

Oron, the Respondent executed a $75,000 non-refundable, "earned upon receipt

retainer" to represent FF Magnat, the parent company of Oron. Tr. II, page 254,

lines 17-28 and page 258, lines 8-14, The retainer agreement clearly stated that it

could not take effect unless and until Liberty's dispute with Oron was fully

resolved. See Transcript, Vol. II, at 215:20-216:1 & 239:25-240:7. The

Respondent presented and subsequently discussed the Post-Judgment Agreement,

which included payment of the $550,000 and the $75,000 retainer for future

services with Oron, with the CEO of Liberty, Mr. Gibson. The agreement was never consummated because Mr. Gibson disapproved it. Tr. II, page 214-216, line 14; 217, lines 3-7. The Respondent did not receive the retainer fee of $75,000.

On August 21, 2012, the Court ordered Pay Pal, Inc. to transfer $550,000 of Oron funds to the Randazza Legal Group trust account. A full and proper accounting occurred with Liberty receiving its share.

Concurrent with the United States litigation between Liberty and Oron, the Respondent and Mr. Gibson also discussed pursuing litigation against Oron and/or its affiliates in Hong Kong. The Respondent estimated those costs, excluding attorney's fees, to be approximately $50,000. Mr. Gibson said Liberty to advance $25,000 if the Respondent would personally advance $25,000. The Respondent agreed and requested and Liberty executed a promissory note to him for $25,000. The Respondent did not advise Liberty, in writing, to seek the advice of independent counsel regarding the promissory note. The Respondent and Excelsior parted ways on or about August 29, 2012. They dispute whether he resigned or was terminated.

Following his departure from Excelsior, the Respondent engaged in litigation against Excelsior, Liberty and Jason Gibson, individually over among other things money he alleged was owed to him by his former employers. The parties submitted the matter to arbitration. After a five day trial, the Arbitrator

5

issued an Interim Arbitration award (IAA) in favor of the employers and against

the Respondent. The Florida Bar's Exhibit 1. The Referee does not give any

weight to the IAA for several reasons. First, the IAA was vacated in its entirety,

after a court refused to confirm it, by voluntary agreement and by order of a court

of competent jurisdiction. Respondent's Exhibit 12; Tr. Vol. II, page 196, lines 18-

23. Second, the burden of proof for the IAA is a preponderance of the evidence,

not the clear and convincing standard as required by these proceedings. Third, the

Arbitrator's findings that the Respondent engaged in unethical conduct based on

testimony and evidence that occurred over a five day trial and that has not been

presented or observed by this Referee are of little weight. The IAA was not a basis

for any discipline by the State Bar of Nevada. While the Referee may be

sympathetic to the amount of time, energy and money that the Respondent's

employers spent to litigate the IAA issues, sympathy should play no part in the

Referee's recommendation.

The Florida Bar argued and presented evidence of other alleged conflicts of

interest engaged in by the Respondent when he represented other clients whose

interests were allegedly adverse to Excelsior or Liberty. There is no clear and

convincing evidence to suggest that anything the Respondent may have done on

behalf of his other clients was actually adverse to Excelsior or Liberty. The

Respondent testified it was not. Tr. II, page 203, line 1-204, line 24 and 246, line

6

4-248, line 7. The Respondent was authorized under his employment agreement to do so. Tr. Vol. II, page 198: 23-25. The Florida Bar's witness, Mr. Dunlap, offered no examples of a single matter where such representation was adverse. Tr. Vol. II, page 281, line 23-284, line 23. The only instance in which there was a conceivable conflict was with respect to the representation of XVideos, but as soon as a potential conflict arose, Respondent acted to withdraw and the conflict never ripened. Tr. Vol. II, page 248, lines1-7. Mr. Dunlap's testimony regarding 10 Group fails to show that the Respondent represented 10 Group in that transaction. There was no conflict of interest where he briefly represented 10 Group regarding an unrelated litigation matter. The Nevada bar investigated these conflicts and no such conflicts were found. Tr. Vol. II, page 265, lines 3-11.

Since the imposition of the Nevada Order, every other state in which Respondent is admitted has issued reciprocal discipline tracking the Nevada Order. Specifically:

1. Arizona: The Presiding Disciplinary Judge issued a Final Judgment and Order of Reprimand and Probation placing Mr. Randazza on 18 months of probation, concurrent with the Nevada discipline. Respondent's Exhibit 4; Tr. Vol. II, page 189, line 11-13.

2. California: The Supreme Court of California issued a one-year suspension, stayed for one year, to be terminated upon satisfying the terms of the stay, which includes quarterly reporting and passing the MPRE. Respondent's Exhibit 9; Tr.Vol. II, page 188, lines 15-24

3. Massachusetts: The Supreme Judicial Court issued an Order of Term Suspension/Stayed, suspending Mr. Randazza for 12 months, stayed for 18

months, retroactive to the date of the Nevada discipline, with the suspension to be lifted upon compliance with the Nevada Order. Respondent's Exhibit 10; Tr. Vol. II, page 189, lines 5-10.

None of these jurisdictions found any factors in aggravation warranting any discipline in excess of that imposed by Nevada. Tr. Vol. II, page 224, line 22-225,, line 11. To date, Respondent's right to practice law has not been suspended.

Additionally, proceeding in the Federal Appellate Courts (10th, 11th and Federal Circuit) all deferred to the Nevada Order.  Respondent's Exhibit 4.  The Supreme Court of the United States and the U.S. Courts of Appeals for the 1st, 2nd, 4th, 6th, 7th and 9th Circuits to date, have not taken any action despite timely notice. Tr. Vol. II, page 241, lines 2-9.

Despite being put on notice of the Nevada Order, the U.S. District Courts for the Northern & Middle Districts of Florida, the Northern District of Texas, the Northern, Central, Eastern, & Southern Districts of California, the Eastern District of Wisconsin, the Eastern District of Michigan, the Northern District of Ohio, and the District of Montana (admitted pro hac vice) have taken no action toward reciprocal discipline. Tr. Vol. II, page 241, lines 2-9. The matter was referred to an investigatory subcommittee of the Ad Hoc Committee on Attorney Admissions, Peer Review and Attorney Grievance of the U.S. District Court for the Southern District of Florida following Respondent's response to a show cause order.  Since the Final Hearing, on May 8, 2020, the U.S. District Court for the Southern District

of Florida adopted the disciplinary measures imposed by Nevada.  See In re: Marc John Randazza, Case No. 18 MC 25230  (S.D. Fla. Feb. 6, 2019).  This document is of record pursuant to the granting of the Respondent's Motion to Supplement the Record. The U.S. District Court for the District of Massachusetts, upon the consent of Respondent, imposed reciprocal discipline in the nature of a 12-month suspension, stayed for 18 months, retroactive to October 10, 2018, conditioned upon compliance with the Nevada Order. See Respondent's Exhibit 4, In re: Marc J Randazza, Misc. Bus. Dict. No. 18-mc-81490-FDS (D. Mass. sept. 26, 2019).

Only the U.S. District Court for the District of Nevada, which did not act on the prompt notice of the Nevada Order until September 2019, issued an order placing the Respondent on active suspension until the expiration of the Nevada state probation, subject to reinstatement upon discharging all conditions. See In re: Marc J. Randazza, Case No. 2: 19-cv-01765-MMD (D. Nev. Oct. 22, 2019). The reason given was that the court had "neither the obligation, resources, nor inclination to monitor Mr. Randazza's compliance with the probationary conditions the [Nevada Supreme Court] imposed on him." Id. at 1; Tr. Vol. II, page 241, lines 10-14.

Finally, the Referee does not find persuasive the numerous character letters submitted by the Respondent nor the testimony of his character witnesses, who were unfamiliar with the facts surrounding his discipline. Like the IAA award, the

9

Referee does not give any weight to these letters whether sent directly to the Referee's chambers or filed as an exhibit.

III.    RECOMMENDATIONS AS TO GUILT.

I recommend that Respondent be found guilty of violating the following Rules Regulating The Florida Bar: 4-1.8(a) and Rule 4-5.6(b).

STANDARDS FOR IMPOSING LAWYER SANCTIONS

I considered the following Standards prior to recommending discipline: 3.0, 4.3, 9.1, 9.2 and 9.3.

IV.    RECOMMENDATION AS TO DISCIPLINARY MEASURES TO BE APPLIED

I recommend that Respondent be found guilty of misconduct justifying disciplinary measures, and that he be disciplined by:

A.    One year of probation with a public reprimand and that the Respondent successfully complete the thirty hours of Florida continuing legal education ethics hours, and

B.    Payment of The Florida Bar's costs in these proceedings.

V.    PERSONAL HISTORY, PAST DISCIPLINARY RECORD

Prior to recommending discipline pursuant to Rule 3-7.6(m)(1)(D), I considered the following:

Age: 50 Years of Age.

Date of Bar Admission: March 3, 2003

Prior Discipline:   None

Aggravating Factors:  Standard 9.2

       (d)    multiple offenses; and
       (i)    substantial experience in the practice of law.

Mitigating Factors:

       (a)   absence of a prior disciplinary record.

## VI.  STATEMENT OF COSTS AND MANNER IN WHICH COSTS SHOULD BE TAXED

I find the following costs were reasonably incurred by The Florida Bar:

| | |
|---|---|
| Investigative Costs | $105.25 |
| Administrative Costs | $1250.00 |
| Court Reporter's Fees | $1532.00 |
| Total | $2887.25 |

It is recommended that such costs be charged to Respondent and that interest at the statutory rate shall accrue and be deemed delinquent 30 days after the judgment in this case becomes final unless paid in full or otherwise deferred by the Board of Governors of The Florida Bar.

Dated this 7th day of July 2020.

/S/ Dawn Caloca Johnson
Dawn Caloca-Johnson, Referee
301 South Monroe Street
Tallahassee, FL 32301-1861

11

Originals To:

Clerk of the Supreme Court of Florida; Supreme Court Building; 500 South Duval Street, Tallahassee, Florida, 32399-1927

Conformed Copies to:

James Keith Fisher, Bar Counsel, at jfisher@floridabar.org, and

John A. Weiss, Counsel for Respondent, at jweiss@rumberger.com

# EXHIBIT 5

Transcript of Hearing on Motion for
Admission *Pro Hac Vice*
*St. Angelo v. Kearney*, No. PC-2021-00224

1          STATE OF RHODE ISLAND

2     PROVIDENCE, SC.                              SUPERIOR COURT

3

4

5

6     ASHLEY ST. ANGELO PPA              )
      ANTHONY ST. ANGELO                 )
7                                        )
      vs.                               )          PC-2021-00224
8                                        )
      AIDAN KEARNEY, JULIANNE KEARNEY    )
9

10

11

12                    HEARD BEFORE

13     THE HONORABLE JUSTICE MELISSA A. DARIGAN

14             ON THURSDAY, JUNE 3, 2021

15                     VIA WEBEX

16

17

18

19     APPEARANCES:

20     FOR THE PLAINTIFFS........EDWARD P. MANNING, JR., ESQUIRE

21     FOR THE DEFENDANTS........SEAN M. MCATEER, ESQUIRE
                                MARC J. RANDAZZA, ESQUIRE
22

23

24                     PAULA CAMPAGNA
25                 OFFICIAL COURT REPORTER

```
1                    THURSDAY, JUNE 3, 2021, VIA WEBEX

2                           MORNING SESSION

3             THE CLERK:  The case before the court is

4    Ashley St. Angelo PPA Anthony St. Angelo versus Aidan Kearney,

5    Julianne Kearney.  This is PC-2021-00224.  Counsel please

6    identify yourself for the record.

7             MR. MCATEER:  Sean McAteer for the defendants.

8             MR. MANNING:  Edward Manning for the plaintiff, Ashley St.

9    Angelo.

10            THE COURT:  Mr. Randazza.

11            MR. RANDAZZA:  For the defense.

12            THE COURT:  How do you pronounce your last name, sir?

13            MR. RANDAZZA:  You pronounced it perfectly.

14            THE COURT:  Okay.  And you are the subject of the motion

15   to admit pro hac vice?

16            MR. RANDAZZA:  Yes, Your Honor.

17            THE COURT:  So this matter has had a long and bumpy road

18   for a case that was only filed in January of this year.  It's

19   been extremely bumpy.  And what we're going to deal with today

20   is the motion for admission for pro hac vice, and then we're

21   going to go off the record and have a conversation about where

22   this case is headed.  Mr. Manning, have you had an opportunity

23   to review the petition to admit Mr. Randazza?

24            MR. MANNING:  Thank you, Your Honor.  Your Honor, yes,

25   I've have an opportunity to speak with Mr. Randazza and I've had
```

1    an opportunity to review his petition.  So far Mr. Randazza has

2    been extremely courteous and cooperative.  I told him in the

3    beginning that I did not have an objection, and that was based

4    upon our conversations.  Then I learned that he was possibly

5    going to try to move this case to federal court because of the

6    First Amendment.  And so I'm not sure if that's still his

7    intention.  The second question I had asked him was how many

8    times he had practiced in Rhode Island.  And he told me that he

9    didn't remember.

10          Having said all that, I think that Your Honor knows the

11   client should have their choice of attorney.  Attorney McAteer

12   has been a very upstanding member of this community and he

13   supports and vouches for Mr. Randazza.  But I think that if the

14   Court wants to make sure that Mr. Randazza has not practiced in

15   Rhode Island, that's a question that he should answer, if he

16   hasn't had more than three entries in the last five years, I

17   believe is the standard.  But having said that, like I said,

18   Your Honor, he's been very professional and very cooperative.

19          THE COURT:  Staying on that point regarding

20   Mr. Randazza's prior admissions in Rhode Island, the attorney

21   certificate indicates there have been no prior admissions in the

22   last five years; is that correct,  Mr. Randazza?

23          MR. RANDAZZA:  Yes, Your Honor.  I do have one other one

24   that is pending, but I have not ever been admitted pro hac vice

25   in Rhode Island before.

1      THE COURT:  Where is your admission pending in Rhode

2      Island?

3           MR. RANDAZZA:  In Kent, Your Honor.

4           THE COURT:  Okay.  The certification that you signed asks

5      for a list of all proceedings in which you have applied for pro

6      hac vice admission.  When did you apply for pro hac vice

7      admission in Kent County?

8           MR. RANDAZZA:  As local counsel two days ago, Your Honor.

9      So technically it's not even pending before the Court yet, but I

10     still think it's appropriate to discuss it.

11          THE COURT:  All right.  So you're saying that at the time

12     you prepared and executed this affidavit you did not have a

13     request for admission pending?

14          MR. RANDAZZA:  Not yet filed, yes, Your Honor.

15          THE COURT:  Mr. McAteer, I assume you physically did these

16     filings.  I did not see a client certification in the file which

17     is required by the Supreme Court rule.  Did I miss that?

18          MR. MCATEER:  I'm afraid you didn't.  I'm sorry.  I was

19     not aware of that until right now.

20          THE COURT:  All right.

21          MR. MCATEER:  It says I need to attend immediately.  I

22     don't want to sound like the previous hearing lacking their

23     important affidavit.  But subject to that, we can get it this

24     afternoon.

25          THE COURT:  I presume that would be the case.  And the

1     client certification simply is a certification by the client

2     that the client understands that they need to pay the two

3     lawyers; the local lawyer who must participate in all hearings,

4     proceedings, and sign all pleadings, as I know counsel knows, as

5     well as the out-of-state counsel. So the certificate is simply

6     an acknowledgement by the client that they understand that by

7     seeking to have a second attorney enter an appearance in this

8     case, they are going to be responsibile for two attorneys. And

9     I presume that that can be obtained without difficulty.

10         MR. MCATEER: And without delay.

11         THE COURT: So I was a little surprised when I opened up

12    Mr. Randazza's application package. It's infrequent to see

13    either as a judicial officer or my 27 years as counsel in

14    private practice, to see an attorney certificate as detailed and

15    contained as many instances of discipline as are shown in Mr.

16    Randazza's application.

17         But I read the application and I understand from reading

18    the application that really there are two instances of

19    discipline; one relating to the 2012 representation of one

20    company and its sister company, and the other one relating to a

21    deposition issue that took place in 2013. All of the other

22    disciplinary activities in states other than Nevada flow from

23    the 2012 issue with regard to Mr. Randazza's service as

24    corporate counsel, in-house counsel. So I look at this as

25    really being sort of - - although there's multiple disciplinary

1    actions that were addressed in multiple states, it's primarily

2    reciprocal discipline relating to one situation.  So I read

3    everything that was presented in Mr. Randazza's application from

4    all of the courts.  And again, I was actually happy to see that

5    the issue that sparked the disciplinary proceedings in Nevada

6    which then traveled around the country was not related to an

7    issue of candor to the court or attorney misconduct as it

8    relates to activities before any court, and instead appear all

9    to be related to, you know, conflicts of interest involving one

10   particular client and it's related entities.  And it goes back a

11   number of years.

12        So the fact that the primary instances of discipline again

13   in multiple states all stem from an activity that does not go to

14   candor to the court or conduct through the Court, or even, you

15   know, mistreatment of a client, although I suppose you could

16   argue that the conflict of interest issues was a mistake, not

17   exactly mistreatment of a client.  It was a conflict of interest

18   that wasn't appropriately addressed or perceived and dealt with

19   at the time.  So despite initially being sort of taken aback by

20   the application, I have concluded that the discipline against

21   Mr. Randazza does not rise to the level where I would be

22   uncomfortable admitting him to practice in this case.  Again,

23   conduct doesn't relate to candor to the tribunal, it doesn't

24   relate to conduct before the Court and doesn't relate to an

25   actual mistreatment of a client.  So my concerns upon initially

1    seeing the application were alleviated once I understood what

2    was going on in Mr. Randazza's professional life. The 2013

3    deposition issue also doesn't cause me any concern. Things

4    happen. The record on that case is not as detailed as the

5    record on the Nevada and related disciplinary actions, but it

6    does appear that whatever happened at that deposition back in

7    2013 was appropriately addressed and was addressed with the

8    consent of Mr. Randazza according to the order that I read in

9    the package. So subject to the filing of the client

10   certification, the motion for admission of Mr. Randazza pro hac

11   vice is granted.

12        MR. MCATEER:  Thank you, Your Honor. We'll file that

13   certification forthwith.

14        THE COURT:  You can file that certification and you can

15   also file the order, Mr. McAteer.

16        MR. MCATEER:  Yes, Your Honor.

17        MR. RANDAZZA:  Thank you, Your Honor.

18        THE COURT:  You're welcome. All right. So I have a live

19   hearing in the courtroom that I need to attend to, but I would

20   like to take 10 minutes with counsel off the record to talk

21   about where we're going in this case. All right. So I'm going

22   to excuse our court reporter and our clerk. I'm going to go off

23   of the streaming record, and we'll just chat for a few minutes

24   about what we're doing here.

25                    (ADJOURNED)

1          C-E-R-T-I-F-I-C-A-T-I-O-N

2

3          I, **Paula J. Campagna**, hereby certify that the succeeding

4      pages 1 through 8, are a true and accurate transcript of my

5      stenographic notes, produced to the best of my ability, of the

6      WEBEX hearing.

7

8      *ST. ANGELO*

9      *vs*
       *KEARNEY*

10     *PC-2021-00224*

11

12

13

14

15

16

17

18

19

20

21     *Paula Campagna*

22     PAULA J. CAMPAGNA, CCR
       OFFICIAL COURT REPORTER

23

24

25

# EXHIBIT 6

Declaration of Cassidy Curran

1   Marc J. Randazza, SBN 269535
    Alex J. Shepard, SBN 295058
2   RANDAZZA LEGAL GROUP, PLLC
    2764 Lake Sahara Drive Suite 109
3   Las Vegas, NV 89117
    Telephone: (702) 420-2001
4   Email: ecf@randazza.com

5   *Attorneys for Defendant,*
    *Veronica Brill*
6

7               SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                     FOR THE COUNTY OF SACRAMENTO

9

10  **Michael Postle**, an individual;            Case No. 34-2020-00286265

11              Plaintiff,

12  vs.                                            **DECLARATION OF CASSIDY S.
                                                   CURRAN**
13  **Veronica Brill**, an individual; **ESPN, Inc.**, a
    Delaware Corporation; **Joey Ingram**, an individual;
14  **Haralabos Voulgaris**, an individual; **Daniel**       Action Filed: 10/01/2020
    **Negreanu**, an individual; **Upswing Poker, Inc.**, a   Trial Date:    Not Yet Set
15  Nevada Corporation; **iBus Media Limited d/b/a**
    **"PokerNews"**, and Isle of Man, United Kingdom
16  Private Limited Liability Company Parent; **Jonathan**
    **Little Holdings LLC, d/b/a "Poker Coaching"**,
17  a Nevada Limited Liability Company; **Solve For**
    **Why Academy LLC**, a Nevada Limited Liability
18  Company; **Todd Witteles**, an individual; **Run It**
    **Once, Inc.**, a Nevada Corporation; and **DOES 1**
19  **through 1,000**, inclusive;

20
                Defendants.
21

22

23      I, Cassidy S. Curran, declare:

24      1.      I am over 18 years of age and have never been convicted of a crime involving fraud or

25  dishonesty.

26

27

                                    - 1 -
                        Declaration of Cassidy S. Curran

2.     The facts set forth in this Declaration are within my personal knowledge and are true and correct to the best of my knowledge and belief.

3.     I am a Legal Assistant and Paralegal employed at Randazza Legal Group, PLLC ("RLG").

4.     On March 17, 2021, I was located in the same office as Attorney Randazza.

5.     Attorney Randazza, in preparing for his call with Mr. Postle, asked me to carefully listen to his portion of their phone conversation, as Mr. Postle was not represented by counsel, and Attorney Randazza wanted to be extremely careful in his discussion.

6.     This is our common practice unless I am asked to leave the room for a confidential conversation, as Attorney Randazza and I share an office, divided only by cubicle walls, and I actively listen to his phone conversations when deadlines and next steps of a case will be discussed to ensure we do not overlook a deadline or task and to ensure a level of familiarity with his work and projects.

7.     I could not hear Mr. Postle's portion of the phone conversation.

8.     It appeared that Attorney Randazza was speaking to two people, but I was not aware that Alexandrea Merrell was the third party present on the call until Attorney Randazza stated such afterwards.

9.     I am aware that Mr. Postle and Attorney Randazza spoke regarding the continuance of the Anti-SLAPP hearings, and Attorney Randazza agreed to 60 days.

10.     At no time during this call did I hear Attorney Randazza state "you're a fucking cunt" or "you fucking bitch." Had I overheard the use of the word "cunt" I would have taken note of this or shared my discomfort and concern with Attorney Randazza or our Human Resources department.

11.     I did hear Attorney Randazza tell someone to "shut the fuck up" and he also called someone "a fucking liar."

12.     It was not until after the call that Attorney Randazza stated that he made those comments due to the phone parties speaking over each other, and Ms. Merrell constantly interrupting the ongoing conversation, and trying to take control of the conversation.

13.     He explained that he called Ms. Merrell a "fucking liar" because she had previously claimed that Attorney Mark Bankston would be participating in the case, but he had made a call to Mr. Bankston, who said that this was not true and he did not know who Mike Postle was.

I declare that the foregoing is true and correct to the best of my knowledge.

Dated: June 14, 2021.

*Cassidy Curran*

Cassidy S. Curran

RECEIVED
LAW AND MOTION DROP BOX

2021 JUN 14 PH 2: 42

SUPERIOR COURTHOUSE
SUPERIOR COURT
OF CALIFORNIA
SACRAMENTO COUNTY

# EXHIBIT 8

Postle's Supplemental Brief on Attorneys' Fees
in State Court Case

Michael Postle
3724 Deer Walk Way
Antelope, CA 95843
Phone | 916-790-4112
Email – dreamseatpoker@gmail.com

> **FILED/ENDORSED**
>
> **JUN - 9 2021**
>
> By: _E. Medina_
> Deputy Clerk

### SUPERIOR COURT FOR THE STATE OF CALIFORNIA

### COUNTY OF SACRAMENTO

| | |
|---|---|
| MICHAEL POSTLE, | Case No.: 34-2020-00286265 |
|     Plaintiff, | |
| vs. | **PLAINTIFF'S SUPPLEMENTAL BRIEF** |
| VERONICA BRILL, | Judge: Shama Mesiwala |
|     Defendant | Dept: 53 |
| | Trial Date: June 16, 2021 |

Original file date June 3, 2021

Refiled June 8, 2021

## INTRODUCTION

As it was inclined to do in the recent hearing Postle vs Witteles, the Court should construe that the defendant's petition for legal fees is excessive and unreasonable. The defendant's counsel (Mr. Randazza) has already been financially compensated due to a GoFundMe campaign established for Ms Brill's legal fees and paid to an employee of the Randazza Legal Group. Mr. Randazza has a well-established history of disciplinary action due to fraudulent billing practices that are substantially similar to the extraordinary billing submitted to the court. Mr. Randazza has engaged in a course of conduct designed to prevent me from retaining assistance in in this case, perverting the course of justice.

## BACKGROUND

On May 11, 2021, the Court ruled that the identical case, brought by Mr. Witteles against me, was worth $27,000 in legal fees, setting a standard for which Mr. Randazza should be compensated.

# ARGUMENT

Mr. Randazza and his firm have already been compensated for legal services. Ms Brill and the Randazza firm launched a GoFundMe campaign, on October 3, 2020, which states clearly that the proceeds are specifically earmarked to pay for this anti-SLAPP motion against me. To date Ms Brill has raised over $27,681.00 on that campaign, which is listed on behalf of Cassidy Curran. You will please note that in Mr. Randazza's petition for fees, Cassidy Curran is listed as an employee of the Randazza Law Firm. **Exhibit #1 – GoFundMe Campaign, motion for costs identifying Cassidy Curran as an employee of Randazza Legal Group, announcement of the GoFundMe campaign on Twitter**

While California's collateral source rule would allow Ms Brill to collect from multiple parties for the same damages in order to compensate pain and suffering, this isn't a pain and suffering case. The exception to that rule, which prevents professionals (generally doctors) from being compensated multiple times for the same bill, I believe, applies here. Ms Brill's legal bill has already been covered by 3rd parties. In this case 329 individuals who donated specifically to cover her legal expenses in the anti-SLAPP. Ms. Brill also states that Mr. Randazza informed her that the anti-SLAPP would cost her about $20,000.00 but would be cheaper if she could get other people to come into the case with her.

Additionally, Ms Brill has publicly declared that Bill Perkins, a wealthy hedge-fund manager and poker player, has established a trust worth roughly $200,000.00 specifically to pay Ms Brills's legal fees. **Exhibit #2 Tweet from Ms Brill regarding Mr Perkins paying her legal fees, a transcript from PokerNews 3/26/2021 where Ms Brill announces that Mr. Perkins is paying her legal fees, and a transcript from Mental Health Matt Show 3/26/2020**

which details the amount that Mr. Randazza projects the anti-SLAPP suit to cost and that

Mr. Perkins sent her nearly $200,000 dollars for her legal fees.

By Ms Brill's own statements, despite stating that the anti-SLAPP would cost her

around $20,000.00, Mr. Randazza is in possession of over $200,000.00 in a trust set up

specifically to pay Ms. Brill's legal fees in this anti-SLAPP. I didn't notice anywhere in Mr.

Randazza's lengthy petition for fees where he mentions that he is in possession of this account.

The trust account aside, Mr. Randazza's firm has already been compensated to the

tune of at least $27,681.00, which is $7,681.00 more than he quoted Ms Brill to cover and entire

Anti-SLAPP case.

### History of Fraudulent Billing Practices

Mr. Randazza, in support of his request for nearly $80,000 in legal fees, did make

the point that he has more extensive experience than Mr. Bensamochan, providing 200 pages of

his own resume, court cases with which he has been involved, and his own testimony. I admit

that I was surprised that with the extensive (and in comparison to Mr. Bensamochen's 21 page

application for fees) weighty, recitation of his accomplishments and recognitions, that he failed

to mention a few for which he is most well-known.

By bringing his history to the attention of the court in support of legal fees twice

the amount as was asked for by Mr. Bensamochan, and four times the amount quoted to Ms.

Brill, I believe that Mr. Randazza has "opened the door" for supplemental information to be

provided in regards to his history.

Mr. Randazza has a long and well documented history of financial fraud,

including billing fraud, bribery, and extortion. In fact, in one of his previous disciplinary actions

he used some of the same methodology that seems to be at work in this case, for which he was

sanctioned. This is documented in a December 27, 2018 Huffington Post Article entitled: *Alex Jones' Lawyer Violated Legal Ethics By Soliciting Porn Bribes. Just How Dirty Is Marc Randazza?* **Exhibit #3** In the article Mr. Randazza's extensive history of lying to his clients and to the courts is discussed.

   However, I don't want anyone to take my word, in regards to someone else's character. A website dedicated to informing the public about Mr. Randazza (www.corrupotrandazza.com) details at least 19 law suits against him for all sorts of unethical and illegal behavior including financial fraud against his own clients. **Exhibit #4 – CorruptRandazza.com**

   Additionally, I have included complete documentation that I believe is relevant:

   **Exhibit #5 *Nevada Bar Amended Complaint Against Randazza***

   **Exhibit #6 *Interim Arbitration Award***

   **Exhibit #7 Utah Federal court ruling chastising Randazza for dishonesty,**

   The Huffington Post article is extremely long, so I have highlighted perhaps the most relevant passages, as well as added them here:

> *The backstory to what he'd done was complicated, the details sordid. The short of it is this: While working as the in-house general counsel for gay pornographers a few years ago, he solicited bribes, embraced conflicts of interest, relied on ill-gotten privileged information to gain a legal advantage, made misrepresentations about his fees to various courts and despoiled evidence of his treachery, according to an arbitrator's findings, sworn statements in legal proceedings, interviews with opposing counsel, Randazza's own admissions and thousands of pages of court records.*

  And

> *Randazza misled people on multiple fronts. When he started his Liberty job, he accurately described himself in court as the "in-house counsel for Liberty Media Holdings." But a year later, he was giving judges, journalists and potential clients the*

*impression that he was an outside attorney, rather than a Liberty employee. He swapped out his Liberty email address and letterhead for a personal email address and the letterhead of the "Randazza Legal Group," a firm he'd set up in Florida. He handed out personal business cards that made no reference to his Liberty job.*

*In court filings, Randazza referred to himself as "counsel for Plaintiff" or "an attorney for the Plaintiff." He told courts that Liberty had "incurred" his fees or that he'd "charged" the company at billing rates of $425 to $500 per hour. To support those rates, he sometimes filed affidavits from a paralegal who stated under oath that he was Liberty's "Vice President for Intellectual Property Management," a position Dunlap said the paralegal never held. Randazza also submitted affidavits from lawyer friends of his, along with time sheets showing his rates, even though he was a salaried employee.*

And

*"All the stuff that is misleading is tailored for him to win that fee award," said Adam Springel, a Las Vegas attorney and expert in commercial and business law who examined a number of Randazza's fee filings at HuffPost's request. "He was clearly trying to get the judge to rubber-stamp his fee requests."*

The article includes extensive, perhaps unrelated scandals, but I did want to draw this part to your attention in particular:

*The extent of Randazza's web of deception became apparent in Liberty's 2012 federal lawsuit against Oron, a file-sharing site. When Randazza tried to recover fees in the case, he not only failed to identify himself as Liberty's in-house counsel but also bundled his own "charged" fees with the fees of outside attorneys he'd brought on at his firm. He claimed the Randazza Legal Group had billed Liberty almost 366 hours, causing the porn company to "incur" $214,964 in attorneys' fees and costs. Of that total, Randazza told the court, $90,833.98 resulted from his nearly 182 hours of work at $500 per hour.*

*He also reported that his employees billed Liberty at their "standard hourly rates." For his partner, Ronald Green, that meant $400 per hour. For paralegals, it was $125 per hour. In reality, the Randazza Legal Group gave Liberty a massive discount, sometimes 75 percent off market rates, on work done by its lawyers — a fact that Randazza withheld from the court.*

### History of Lying to Court and Ethics Violations

Please note that per your previous instruction, I have only included testimony, disciplinary actions, etc. that concern Mr. Randazza's dishonesty in billing and financial matters. I have not provided documentation in support of the other ethics allegations including that after being booted out of the military after only five months, he continued to present himself as a paratrooper or detail his lies to courts in regards to his ability to actually practice in a particular state, or perhaps most shocking, his attempt to violate the shield that protects victims of rape so that his client, the accused rapist, could use social media followers to harass and intimidate.

However, an additional Huffington Post article from March 20, 2019 *Connecticut Judge: Marc Randazza Is Too Unethical to Defend Alex Jones* **Exhibit #8** does detail ethics violations and disciplinary action including lying to the court, bribery, and financial fraud in Arizona, California, Connecticut, Florida, Massachusetts, Montana, and Nevada.

### Efforts to Intimidate Me and Anyone Offering Assistance

What may be of more concern however is my ability to retain counsel and receive assistance. Part of that problem has been Mr. Randazza himself who through his reputation of doxing, using trolls to harass, and attacking not only client opposition, but also opposing counsel is resulted in many attorneys simply saying that it isn't worth the hassle to help me if it means that they have to be subjected to him.

A simple browse through his Twitter account @marcorandazza and you will see Mr. Randazza calling opposing counsel idiots or worse and since he represents some very nasty people, calling out his opposition in this extremely unprofessional way means that followers also attack in solidarity. This is the reality for an attorney Paul Berger. *Florida Bar Complaint Against Randazza Exhibit #9*

But it isn't simply a matter of lawyers not respecting him or being concerned that he will use his troll farms to harass and harm, he has actively prevented me from responding appropriately to this court and has attempted to intimidate those who attempted to assist me.

On March 17, 2021, I received a notice from the court directing me to contact Mr. Bensamochan (Mr. Witteles's attorney) and Mr. Randazza to work out an extension time frame, a response to which had to be received by the court before 4pm. I had been working with the HONR Network for several weeks at that point. The HONR Network is a non-profit organization founded by Lenny Pozner whose son Noah was the youngest victim of the Sandy Hook school shooting. Originally founded to remove defamation, hate, and harassment online that targeted Noah and the other 25 children and teachers killed, HONR had expanded to offer reporting and removal assistance for anyone who was being targeted online. The organization also helps victims find specialized legal assistance, mental health referrals, etc. I have attached a copy of the letter that was filed with the court previously regarding the HONR Network's assistance.

**Exhibit #10** *Letter from the HONR Network*

I had asked the HONR Network if they would have someone help me to explain the steps that they were taking to help me find a lawyer and the cataloging of the defamation perpetrated by Ms. Brill and Mr. Witteles. Alexandrea Merrell, who is an executive at a crisis management firm and is the Director of PR and Policy for the HONR Network agreed to join me on the calls to Mr. Bensamochan and Mr. Randazza to explain the amount of time needed to catalog the abuse and the organization's involvement. She had explained to me the difference between defamatory and harassing content that the HONR Network could "action" or petition to have removed, and content that they couldn't action (generally stories from legitimate news

sources, and content that was offensive, but otherwise not a violation of the various social media platforms terms of service.)

I initially contacted Mr. Bensamochan as you can see from my phone record, I called Ms Merrell and conferenced the three of us into a call 3:10pm and we spoke for 10 minutes. **Exhibit #11 Phone Record of call to Mr. Bensamochan** At that point, Mr. Bensamochan agreed to up to a 90 day extension.

I called Ms Merrell and then Mr. Randazza's office at 3:23 and was transferred to Mr. Shepard who introduced himself as an associate and explained that Mr. Randazza was unavailable, but that he had agreed to a 30 day extension. **Exhibit #12 Phone Record of calls to and from Mr. Randazza's firm** During the conversation, Mr. Shepard asked if Ms Merrell could give him the names of attorneys with whom the HONR Network had referred me. She said that there had been many referrals, but that she personally had discussed the case with Mr. Mark Bankston, an attorney in Texas and Mr. Stephen Lambert, an attorney out of Colorado. Both had previously worked with the HONR Network and both were interested in the case.

At that point, Mr. Shepard said that he thought Mr. Randazza should talk to me and would we mind holding. I reminded him that I had to call into the court in a few minutes. We sat on hold until 3:47 when Mr Randazza called me from a different line (we were still on hold). He reiterated that he would offering 30 days, which he felt was generous and then said, "Oh I have been waiting for this phone call, I'll call you right back" and hung up. At 3:50, Mr. Randazza called me from a different number, but directed his attention to Ms Merrell.

"*Who did you say you were?*" he said and before she even got her name out, he erupted yelling at her, "*I don't know who you are, you're a fucking cunt, you're a fucking liar, you fucking bitch, Bankston doesn't know who Mike Postle is.*" I think that

we were both just stunned. He just kept on at her, cursing and yelling and calling her names until he finally said *"now shut the fuck up and let the boys talk. I'll give you 60 days, no more."* We both just hung up the phone.

At 3:55, Mark Bankston called Ms Merrell, who failed to reach her and the call was returned at 3:56. He said that he had just got the weirdest call from Marc Randazza. Mr. Randazza had demanded to know if he was going to represent Mike Postle. Mr. Bankston responded that he didn't know anyone named Mike Postle and Mr. Randazza hung up. He said only after did he realize that Mike Postle was the name of the "poker guy," which is the way that they had always referred to the case. **Exhibit #13 Alexandrea Merrell's incoming and outgoing phone logs**

Of course, by that time, the court had closed. So even though Mr. Bensamochan had agreed to up to 90 days, and Mr. Randazza had agreed to 60 days, I had been unable to contact to court. Keeping me on hold for so long was a clear tactic. Attacking this lady who was their to help me and provide information, was a clear attempt to intimidate her and prevent the HONR Network from helping me. The next day on the zoom call, without a lawyer and without the HONR Network, Mr. Randazza's tactics were rewarded with a 33 day extension.

Ms. Merrell and I both filed complaints about Mr. Randazza on March 18, 2021. **Exhibit #14 Copy of my complaint and Ms Merrell's complaint** Despite no further contact, Mr. Randazza has continued to attack Ms Merrell and the HONR Network online **Exhibit #15 CardChat Article where Mr. Randazza calls people offering me assistance "idiots" and claims even in his filing for fees that Ms Merrell and the HONR Network "likely committed the unlicensed practice of law" and a billing statement where Randazza claims he is owed more because of HONR.** She made it very clear that she was not a lawyer and that the HONR

Network does not give legal advice, they do offer legal referral however and that is exactly what they did. Clearly his issue with the HONR Network is due to the Alex Jones case, but that has nothing to do with me and I shouldn't have to pay for his personal vendettas against the father of a murdered kindergartener.

### Doxxing

Mr. Randazza's unethical and threatening behavior towards me and those who might be able to provide assistance certainly didn't stop there. With a short extension granted, I began to prepare my response to the anti-SLAPP. But was delt two blows in a short span of time. Mr. Bankston's father died on March 24, and he wouldn't be available and Ms Merrell was hospitalized on Apirl 1st and she wouldn't be available. With no hope of handling this myself, I asked to withdraw the case, but be allowed to refile at a later date. Mr. Randazza, posted the withdraw form on twitter, including my address and phone number, despite being aware that myself and my minor daughter have been the subject of death threats. He mocked me, linked his tweet to a video where a man is beaten up, saying that that is what happens....and then when others pointed out that doxing someone by posting their personal address online is illegal, he refused to remove it. Instead of removing it, Ms Brill retweeted it and shared my address and phone number dozens of time. **Exhibit #16. Mr. Randazza's tweet and refusal to remove the doxing content, Ms Brill's reposting of my address and phone number and a small sampling of the attacks received due to Mr. Randazza and Ms Brill doxing me.**

### Misrepresentation

I would like to draw your attention to a situation that I do think has bearing on this case. Mr. Randazza has mentioned many times that I had no interest in actually pursuing this case and did so only for fame or attention. His support of this position is two-fold, first that a

documentarian contacted me (and others including Ms Brill) about making a documentary about the scandal and second that I have made no real attempt to find counsel.

I was contacted about participating in some sort of documentary project, but to date, no project has materialized. I was not the facilitator, I didn't contact anyone asking to make a film or tv show about me or about the scandal.

Additionally, I have not pursued any press at all. In fact, I have been completely off social media since September 30, 2019 and have spoken to the press only in response to Ms Brill's failed attempt to sue me. Even those rare interviews haven't occurred since Oct, 2020. I have not sought attention through the press or social media in any way. Mr. Randazza's continued attempts to paint me as a media seeker are easily verifiable as inaccurate and are a continued attempt to cast me in a false light. If his position were so strong, why the need to lie?

**Continued Dishonesty**

Mr. Randazza 's dishonesty continues in his letter to the court feigning a complete lack of understanding as to why Ms Brill was included in my suit and minimizing her role in what has happened to me. I have known Ms Brill for many years, while I was a professional poker player and she was a part-time poker commentator. Over the years, I have been aware of five other male poker players whom she has accused of sexual harassment or sexual assault. I had been warned to avoid her. I was in the middle of a painful divorce and custody battle, and tried to avoid more drama by insuring that we were never alone together. Eventually, I had to be very stern that I wasn't interested. Angry at being rejected, she turned very nasty. On the final day of her employment at Stones Gaming Hall, she used her show to attempt to get me banned from the casino by claiming "Mike must be cheating."

I don't think that she really expected her statement to blow up like it did. Previously when she went after someone, as she did with Roger Bailey and at least 4 others whom I am aware, her target was simply "canceled." But all of a sudden, this person who had failed to make a career for herself as a commentator and was minutes until the end of her last show, a person with hardly any social media followers, had the whole poker world hanging on her word. She went from a thousand followers on social media to more than 14k almost over-night. Poker celebrities wanted to talk about the scandal, poker shows and sports shows all wanted to talk to her, they called her a whistle-blower and a hero and wanted to know how she cracked the cheating scandal.

Quickly she went from "it's greater than zero percent chance that he is cheating" to "he's a cheat and I can prove it." Though of course she never did prove it. Within days, she launched a $30 million dollar law suit, not focused on me, but focused on the deep pockets of the casino with myself and a floor manager as casualties. 89 people jumped on the suit, expecting the casino to quickly and quietly pay out. **Exhibit #17 Brill etc. vs Postle, Stones casino, and Justin Kuraitis**

But that didn't happen. Stones Gaming Hall, the casino, did their own investigation, hired a 3rd party to do a second investigation and the DOJ did a third. The judge dropped me from the case, but Brill battled on hoping for a big win from the casino. Eventually, Ms Brill's attorney at the time, Mr. Verstandig had to issue a statement that no cheating was found **Exhibit #18 Statement from Maurice VerStanding**

Instead of apologizing or even just ignoring me and moving on, Ms Brill doubled down, calling me a cheater, a con man and a scum bag, she did countless videos and interviews even claiming that the DOJ was bought and paid for by the casinos. Even now, she still goes on

twitter to mock me and call me a cheater, even posting the video of the last court procedure, making fun of me because I was nervous and didn't speak as well as I would have liked. It is endless. She has made an entire career off of defaming me and Mr. Randazza pretends to the court to be baffled. **Exhibit #19 Twitter Posts including the court video, revealing that she is aware that she is not supposed to have it and that she doesn't care that she is violating the court's order.**

   I understand that I am without a lawyer and so at a significant disadvantage. I am so thankful that I have friends and supporters around the country who have spent evenings and weekends to try and help me compile this information and launch a defense. But no one can risk defending me, even on social media because Ms Brill and Mr. Randazza have proven themselves to be eager to attack and devour anyone who supports me or even questions their story line.

   My life has been completely destroyed by this baseless accusation. Yet thanks to Ms Brill, I continue to be attacked, my name is a punch line in jokes, and I am referred to as a cheater to a nationwide audience on gigs that she landed because of her attack on me. I get that life isn't fair, but I don't understand how someone can be allowed to use the internet to destroy a person's life without consequence.

   I understand that poker and gamblers in general have a reputation of being less than upstanding members of society. So, this may seem like an inconsequential issue.

   But I am a good person. I am a single farther, raising a young daughter by playing poker. I have been a professional poker player for over 17 years. This is a game that I love and a game that I am good at. But because of Ms Brill I can't even earn a living at my chosen profession.

I understand that the law requires that people who bring an anti-SLAPP have their fees covered in order to protect those who might not otherwise be able to afford to fight. But it isn't supposed to be a lottery win for the opposition.

I didn't complain about Todd Witteles' fees, despite Mr. Bensamochan's claim in court that his client made one post one time, he has spent hours and hours on his podcast calling me a cheater, a liar, and continues to do so, though certainly more carefully now. While I don't excuse what Mr. Witteles has done to me, the fact is he pursued me so vigorously in order to impress Ms Brill, repeating everything that she claimed about me and then reporting to her what he had done.

Ms Brill should be held accountable for the ongoing harassment and defamation that has had far reaching consequences for myself and my family. Withdrawing from a case that I feel certain could be easily proven, a case that winning might not regain all that I have lost, but would at least feel like a degree of justice was received, was devasating. But I didn't feel that I had a choice. I understand that we aren't trying her actions in this forum.

But paying Marc Randazza for his continued campaign of manipulation and intimidation on her behalf, especially after he has already been paid, that I simply don't understand.

## CONCLUSION

For the reasons set forth above, I respectfully request that the Court should construe the defendant's request for legal fees be denied on the basis that Mr. Randazza has already been compensated more than the amount set in the previous proceeding, that his claim for 142 hours of work is not only excessive, but fraudulently so, and that his unprofessional behavior has been an obstruction to this entre proceeding.

Date: June 8, 2021

Respectfully,

*Michael Postle*

Michael Postle, PRO PER

3724 Deer Walk Way

Antelope, CA 95843

# EXHIBIT 14

EXHIBIT #14

COMPLAINTS FILED AGAINST MR RANDAZZA BY MYSELF
AND MS MERRELL

## DECLARATION OF MIKE POSTLE

STATE OF CALIFORNIA              §
                                 §
SACRAMENTO COUNTY                §

I, Mike Postle, declare under penalty of perjury that the following declaration is true and

correct and based upon my personal knowledge:

1.  My name is Mike Postle. I am over the age of 18 and competent to make this
    declaration.

2.  I am a resident of Sacramento, California. I am a professional poker player. I am
    currently pursuing a defamation lawsuit based on false allegations that I cheated at a
    series of live-stream poker events.

3.  Attorney Marc Randazza represents one of the individuals who defamed me.

4.  On March 17ᵗʰ, 2021, I had a phone conversation with Alexandrea Merrell and Mr.
    Randazza in which Mr. Randazza acted in an outrageously unprofessional manner.

5.  During this phone call, Mr. Randazza made abusive statements, including calling Ms.
    Merrell "a fucking cunt."

6.  Mr. Randazza also said, "I don't know who the fuck you are" and "shut up and let the
    boys talk," he continued to berate her and call her a "fucking liar" and a "fucking
    bitch" so we hung up on the call.


_Mike Postle_ (signature)

Mike Postle

Dated: March 18ᵗʰ, 2021

## DECLARATION OF ALEXANDREA MERRELL

STATE OF NEW YORK     §
                      §
NEW YORK COUNTY     §

I, Alexandrea Merrell, declare under penalty of perjury that the following declaration is true and correct and based upon my personal knowledge:

1. My name is Alexandrea Merrell. I am over the age of 18 and competent to make this declaration.

2. I am the President of Orndee Public Relations based in New York. My firm specializes in crisis reputation response and communication strategy. I have also come to be heavily involved in the growing national struggle with online harassment and defamation.

3. Over the past several years, I have assisted numerous individuals who have been harassed online, both in my business and through *pro bono* endeavors.

4. On some occasions, I assist these individuals in trying to locate law enforcement who are willing to pursue their harassers, or in trying to locate and convince attorneys to pursue legal cases on their behalf.

5. One such individual I have been assisting is Mike Postle, a poker prodigy whose professional career was cut short by a false smear campaign that he was a cheater.

6. Marc Randazza represents one of the individuals who is alleged to have defamed Mr. Postle. At present, Mr. Postle remains unrepresented.

7. Over the past few weeks, I have been contacting attorneys to see if they are interested in bringing a defamation case based on that smear campaign.

8. In early March 2021, I called attorney Mark Bankston to discuss the case. Because of my work with some of the Sandy Hook families in fighting online abuse, I knew Mr. Bankston handled these kind of defamation cases.

9. I described to Mr. Bankston the basic facts of the case, but I did not disclose Mr. Postle's name. Mr. Bankston told me he was interested in the facts and that once he had researched some legal issues he would like to talk to the client.

10. On March 17, 2021, Mr. Postle and I had a phone conversation with Mr. Randazza. During that conversation, I told Mr. Randazza that we had approached Mr. Bankston

and that he would hopefully be appearing in the near future. Mr. Randazza then said that he had to take a call and hung up.

11.   A few minutes later, Mr. Randazza called us back. He told us that he had called Mr. Bankston and that Mr. Bankston denied any intention to make an appearance for Mr. Postle.

12.   Mr. Randazza was astonishingly abusive and profane during this call.

13.   During the call, Mr. Randazza called me "a fucking cunt," "a fucking liar," and "fucking bitch liar."

14.   He then told me to "shut the fuck up and let the big boys talk."

15.   My career has often brought me into contact with lawyers and law enforcement, and thus I am no stranger to colorful language, crude humor, and the occasional aggressive confrontation. But what Mr. Randazza did was truly upsetting

16.   I am also extremely disturbed that his abuse and his insult of "fucking cunt" was meant to demean and disgrace me as a woman.

_Alexandrea Merrell_

Dated: March 18th, 2021